**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

MEITAV DASH PROVIDENT FUNDS AND
PENSION LTD.,

              Lead Plaintiff

and

JACOB GOLDMAN, Individually and on
behalf of all others similarly situated,
GARY SMITH, Individually and on behalf
of all others similarly situated, and
EMPLOYEES' RETIREMENT SYSTEM
OF THE CITY OF PROVIDENCE, CITY
OF MIAMI FIRE FIGHTERS' AND
POLICE OFFICERS' RETIREMENT
TRUST,

              Consolidated Plaintiffs,

v.

SPIRIT AEROSYSTEMS HOLDINGS, INC.,
THOMAS C. GENTILE, III, JOSE GARCIA,
JOHN GILSON, and SHAWN CAMPBELL

              Defendants/Consolidated
              Defendants.

Case No. 20-CV-0054-CVE-JFJ
<u>BASE FILE</u>

Consolidated with:
Case No. 20-CV-0077-CVE-JFJ

and

Case No. 20-CV-0117-CVE-JFJ

<u>ORAL ARGUMENT REQUESTED</u>

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS… ........................................................................................................... 6

    A.    Background of Spirit and the Boeing 737 MAX .................................... 6

    B.    The Grounding of the 737 MAX Fleet and the Boeing-Spirit MOA..................... 7

    C.    Boeing Instructs Spirit to Cut 737 MAX Production............................. 9

    D.    Defendants Falsely Assure Investors that Spirit Would Continue 737 MAX Production at 52 APM ...................................................................... 12

    E.    Spirit's Internal Controls Contained a Material Weakness................... 13

    F.    Defendants Knew or Recklessly Disregarded the Material Weakness ................ 16

    G.    Defendants Misrepresented that Spirit's Internal Controls were Effective .......... 17

    H.    The Truth Emerges ............................................................................. 18

III.  LEGAL STANDARD........................................................................................ 19

IV.   ARGUMENT .................................................................................................... 21

    A.    Defendants' Statements About the 737 MAX Production Rates Were False and Misleading Because Boeing Had Instructed Spirit to Cut Production................. 22

        1.    Defendants' Misstatements Are Not Inactionable Opinions .................... 24

        2.    FE 7's and FE 8's Allegations Must Be Accepted As True Because They Are Sufficiently Reliable and Particular ...................................... 28

        3.    Defendants' Unpled "Facts" Do Not Refute FE 7 and FE 8.................... 33

        4.    Misstatements in Jefferies Report and The Wichita Eagle are Actionable ................................................................................. 37

            a)    The Statement in the Jefferies Report Was False and Misleading............................................................ 39

            b)    The Statements in The Wichita Eagle Article are Actionable ...... 40

    B.    Defendants Misled the Market About Spirit's Compliance with Established Accounting Procedures and Internal Controls Over Financial Reporting ........... 42

        1.    The Material Weakness in Spirit's Internal Controls ............................. 42

        2.    Defendants' Misstatements Regarding Internal Controls Were Material ................................................................................... 44

        3.    Defendants' Misrepresentations in SOX Certifications Are Actionable .. 45

        4.    Defendants Misrepresented that Spirit's Internal Controls Were Effective ................................................................................... 48

5. Defendants Misrepresented Spirit's Adherence to GAAP........................ 49

6. Defendants' Representations That Spirit's Internal Controls Had Not Materially Changed Were False and Misleading....................................... 50

C. The CC Pleads a Strong Inference of Scienter....................................... 51

1. Defendants' Misstatements Regarding Spirit's 737 MAX Production Rate ........................................................................................ 52

a) Defendants Knew of Boeing's Order to Cut 737 MAX Production.................................................................... 52

b) The Importance of the 737 MAX to Spirit's Operations Supports a Strong Inference of Scienter ..................................... 54

c) Gentile's Misstatements to Analysts Show His Scienter.............. 56

2. Defendants' Misstatements Regarding the Company's Internal Controls........................................................................................ 57

a) Defendants Knew or Recklessly Ignored the Material Weakness ........................................................................ 57

b) Defendants' Terminations Strongly Support a Scienter Inference ........................................................................ 60

c) False SOX Certifications Support a Strong Inference of Scienter ........................................................................ 61

d) The Importance of the EAC Process to Spirit's Operations Supports a Strong Inference of Scienter ....................................... 62

3. The CC Alleges Corporate Scienter.......................................... 63

4. Gentile's Substantial, Suspicious Insider Sales Support a Strong Inference of His Scienter........................................................................... 65

5. A Holistic View Supports a Strong Inference of Scienter ...................... 67

D. The CC Alleges Violations of Rules 10b-5(a) and (c).......................................... 68

E. The CC Adequately Alleges Section 20(a) Control Liability Claims.................... 70

F. Plaintiffs Respectfully Request the Opportunity to Amend ................................. 71

V. CONCLUSION.................................................................................... 72

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................24, 25, 26

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003).......... *passim*

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ........................................................................ *passim*

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007)..............................................................47, 48

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)................................................................24

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) .................................................................................48

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................19, 20

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)..................................................................................57

*Carmignac Gestion, S.A. v. Perrigo Co.*,
2019 WL 3451523 (D.N.J. July 31, 2019)............................................................56

*Cheng Jiangchen v. Rentech, Inc.*,
2017 WL 10363990 (C.D. Cal. Nov. 20, 2017).....................................................21

*Chipman v. Aspenbio Pharma, Inc.*,
2012 WL 4069353 (D. Colo. Sept. 17, 2012).......................................................35

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)....................................................................46

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)....................................................29, 30

*DiTucci v. Ashby*,
2020 WL 1249627 (D. Utah Mar. 16, 2020) .....................................................25, 26

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................57, 58

*Empls. Ret. Sys. of R.I. v. Williams Cos.*,
  889 F.3d 1153 (10th Cir. 2018) ...................................................................................34

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).........................................................................................31

*Erste-Sparinvest Kapitalanlagegesellschaft MBH v. SeresTherapeutics, Inc.*,
  2018 WL 1567614 (D. Mass. Mar. 30, 2018)..............................................................32

*FDIC v. RBS Acceptance, Inc.*,
  2020 WL 491202 (D. Colo. Jan. 30, 2020)..................................................................41

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ...................................................................................27

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015) ........................................................................................60

*Francisco v. Abengoa, S.A.*,
  2020 WL 4940752 (S.D.N.Y. Aug. 21, 2020)..............................................................60

*Freeland v. Iridium World Commc'ns, Ltd.*,
  545 F. Supp. 2d 59 (D.D.C. 2008)...............................................................................38

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...............................................................................53, 58

*Gillaspy v. Town of Silver City*,
  2008 WL 11451949 (D.N.M. Feb. 1, 2008) .................................................................21

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ...................................................................................40

*Hampton v. root9B Technologies, Inc.*,
  897 F.3d 1291 (10th Cir. 2018) ...................................................................................33

*Hampton v. root9b Techs, Inc.*,
  2016 WL 7971184 (Aug. 4, 2016),
  *objections to report and recommendation sustained on other grounds*,
  2016 WL 9735744 (D. Colo. Sept. 21, 2016)..............................................................54

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)..........................................................................61

*Hull v. Global Digital Solutions, Inc.*
   (D.N.J. Dec. 19, 2017) ...........................................................................27

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ........................................................48

*In re Apple Inc. Sec. Litig.*,
   2020 WL 2857397 (N.D. Cal. June 2, 2020) ...........................................37

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)......................................................25

*In re Banco Bradesco S.A. Securities Litigation*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017).....................................................47

*In re Bear Stearns Cos. Sec. Derivative, and ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011).....................................................44

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017)........................................................63

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017)...........................................43

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ......................................................................38

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ...................................................29

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ................................................47

*In Re CommVault Sys., Inc. Sec. Litig.*,
   2016 WL 5745100 (D.N.J. Sept. 30, 2016) .............................................31

*In re Dynex Capital, Inc. Sec. Litig.*,
   2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..........................................52

*In re: Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)..........................................45, 50

*In re Fisker Automotive Holdings, Inc. Shareholder Litigation*,
   2015 WL 6039690 (D. Del. Oct. 15, 2015) ..............................................39

*In re Gold Res. Corp. Sec. Litig.*,
   776 F.3d 1103 (10th Cir. 2015) ...............................................................62

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
   2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019) ......................................................61

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
   34 F. Supp. 3d 298 (S.D.N.Y. 2014)......................................................................54

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. Mar. 28, 2005)................................................54, 59

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .................................................................45

*In re Level 3 Communications*,
   667 F.3d at 1345 ................................................................................... *passim*

*In re Molycorp, Inc. Sec. Litig.*,
   157 F. Supp. 3d 987 (D. Colo. 2016)........................................................... *passim*

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007)....................................................................46

*In re Navarre Corp. Sec. Litig.*,
   299 F.3d 735 (8th Cir. 2002) ................................................................................37

*In re New Century*,
   588 F. Supp. 2d. 1206 (C.D. Cal. 2008) ................................................................67

*In re Oxford Health Plans, Inc. Sec. Litig*,
   187 F.R.D. 133 (S.D.N.Y 1999) ............................................................................65

*In re Pixar Securities Litigation*,
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) .................................................................35

*In re Proquest Sec. Litig.*,
   527 F. Supp. 2d 728 (E.D. Mich. 2007)..................................................................42

*In re PXRE Group, Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................56

*In re Qwest Commc'ns Int'l, Inc., Sec. Litig.*,
   396 F. Supp. 2d 1178 (D. Colo. 2004)....................................................................72

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................66

*In re Retek Inc. Sec. Litig.*,
   2007 WL 14352 (D. Minn. Jan. 3, 2007)................................................................31

*In re Rhythms Sec. Litig.*,
  300 F. Supp. 2d 1081 (D. Colo. 2004) ..................................................................29

*In re Ribozyme Pharm., Inc. Sec. Litig.*,
  119 F. Supp. 2d 1156 (D. Colo. 2000) .................................................................70

*In re S. Pac. Funding Corp. Sec. Litig.*,
  83 F. Supp. 2d 1172 (D. Or. 1999) ......................................................................44

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ...................................................................................60

*In re SemGroup Energy Partners, L.P.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010) ...............................................29, 41, 61

*In re Sprint Corp. Sec. Litig.*,
  232 F. Supp. 2d 1193 (D. Kan. 2002) ..................................................................41

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ......................................................27

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2020 WL 2786936 (D.N.J. May 29, 2020) .....................................................31, 40

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ......................................................48

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .........................................................46, 47, 48, 50

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003) ...............................................21, 29, 52

*In re Zagg, Inc. Sec. Litig.*,
  797 F.3d 1194 (10th Cir. 2015) ......................................................................61, 62

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ..................................................................................56

*JAC Holding Enters, Inc. v. Atrium Capital Partners, LLC*,
  997 F. Supp. 2d 710 (E.D. Mich. 2014) ...............................................................69

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ....................................................................................... *passim*

*Kapur v. USANA Health Sciences., Inc.*,
  2008 WL 2901705 (D. Utah Jul. 23, 2008) ..........................................................33

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................34

*Knurr v. Orbital ATK Inc.*,
    294 F. Supp. 3d 498 (E.D. Va. 2018) ................................................64

*Krstevski v. Welsh*,
    2016 WL 4532095 (D. Utah Aug. 29, 2016) ................................................39

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020) ................................................67

*Levy v. Gutierrez*,
    2017 WL 2191592 (D.N.H. May 4, 2017) ................................................30

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................29, 30

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ................................................63

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ................................................69

*Lorusso v. Boulder Brands, Inc.*,
    2017 WL 4365180 (D. Colo. Mar. 1, 2017) ................................................46

*Luna v. Marvell Tech. Grp.*,
    2017 WL 2171273 (N.D. Cal. May 17, 2017) ................................................60, 61

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) ................................................71

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................36

*Malouf v. Sec. & Exch. Comm'n*,
    933 F.3d 1248 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 1551 (2020) ................................................69

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................21

*Medina v. Clovis Oncology, Inc.*,
    215 F. Supp. 3d 1094 (D. Colo. 2017) ................................................36

*Mishkin v. Zynex Inc.*,
    2011 WL 1158715 (D. Colo. Mar. 30, 2011) ................................................57

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013) ................................................31

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ................................................20, 51

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................59

*Nibur v. SandRidge Mississippian Tr. I*,
    2017 WL 3996421 (W.D. Okla. Sept. 11, 2017) ................................................52

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................38, 48, 51

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ................................................38

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................ *passim*

*Pa. Ave. Funds v. Inyx Inc.*,
    2010 WL 743562 (S.D.N.Y. Mar. 1, 2010) ................................................49

*Peace Officers' Annuity & Ben. Fund of Georgia v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019) ................................................55, 62

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015) ................................................35

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ................................................31, 66

*Plumley v. Sempra Energy*,
    2017 WL 2712297 (S.D. Cal. June 20, 2017) ................................................66

*Raab v. General Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ................................................38

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................47

*Robbins v. Okla.*,
    519 F.3d 1242 (10th Cir. 2008) ................................................20

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) (Mot. ) ................................................41

*Schott v. Nobilis Health Corp.*,
   211 F. Supp. 3d 936 (S.D. Tex. 2016) ...................................................62

*Schwartz v. Celestial Seasonings, Inc.*,
   178 F.R.D. 545 (D. Colo. 1998) ...........................................................37

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
   2016 WL 466958 (M.D. Pa. Feb. 8, 2016) .......................................44, 48

*SEC v. Goldstone*,
   2015 WL 5138242 (D.N.M. Aug. 22, 2015) .....................................25, 44

*SEC v. Huff*,
   758 F. Supp. 2d 1288 (S.D. Fla. 2010),
   *aff'd,* 455 F. App'x 882 (11th Cir. 2012)...........................................50

*SEC v. Nacchio*,
   438 F. Supp. 2d 1266 (D. Colo. 2006)...................................................27

*SFF-TIR, LLC v. Stephenson*,
   250 F. Supp. 3d 856 (N.D. Okla. 2017).................................................21

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...........................................56, 61

*Shure Inc. v. Clearone, Inc.*,
   2020 WL 2839294 (D. Del. June 1, 2020)..............................................41

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010)...................................................................28

*Smallen v. W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ..................................................... *passim*

*Sorkin, LLC v. Fischer Imaging Corp.*,
   2005 WL 1459735 (D. Colo. June 21, 2005).....................................33, 61

*Steinbeck v. Sonic Innovations, Inc.*,
   2003 WL 26072957 (D. Utah Feb. 11, 2003) .........................................70

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)................................................................................70

*T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharm. Int'l, Inc.*,
   2018 WL 395730 (D.N.J. Jan. 12, 2018) ................................................64

*Tabak v. Canadian Solar Inc.*,
   549 F. App'x 24 (2d Cir. 2013) ..............................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................ *passim*

*TK-7 Corp. v. Estate of Barbouti*,
    966 F.2d 578 (10th Cir. 1992) ...............................................................21

*Tung v. Dycom Indus., Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ...................................................27

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009)......................................................42

*Video Gaming Techs., Inc. v. Castle Hill Studios LLC*,
    2018 WL 284991 (N.D. Okla. Jan. 3, 2018)........................................34, 35

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    2008 WL 879023 (D. Colo. Mar. 28, 2008) ...........................................30

*Wanca v. Super Micro Comput., Inc.*,
    2018 WL 3145649 (N.D. Cal. June 27, 2018),
    *appeal dismissed*, 2018 WL 7107616 (9th Cir. Oct. 30, 2018) ................47

*Wieland v. Stone Energy Corp.*,
    2007 WL 2903178 (W.D. La. Aug. 17, 2007) ....................................46, 58

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019) ................................................ *passim*

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ..................................................................35

**Statutes**

15 U.S.C. § 78j(b) ..........................................................................................21

Exchange Act Section 10(b) ...............................................................20, 21, 70

Exchange Act Section 20(a).................................................................................20

Private Securities Litigation Reform Act........................................................20, 27, 51

Sarbanes-Oxley Act of 2002 ..................................................................... *passim*

**Rules**

F.R.E. 801(d)(2) ...........................................................................................29

Fed R. Civ. P. 8 .............................................................................................20

Fed. R. Civ. P. 9(b) ..........................................................................................................20

Fed. R. Civ. P. 15(a) ........................................................................................................72

Rule 10b-5.........................................................................................................20, 21, 68, 69

Rule 16b-3...............................................................................................................................66

Court-appointed Lead Plaintiff Meitav Dash Provident Funds and Pension Ltd. and Consolidated Plaintiffs Gary Smith and City of Miami Fire Fighters' and Police Officers' Retirement Trust (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in opposition to the motions to dismiss[1] Plaintiffs' Consolidated Class Action Complaint (ECF No. 49 ("CC")) filed by (i) Defendants Spirit Aerosystems Holdings, Inc. ("Spirit" or the "Company"), Thomas C. Gentile ("Gentile"), and Shawn Campbell ("Campbell") (ECF No. 77); (ii) Defendant Jose Garcia ("Garcia") (ECF No. 78); and (iii) Defendant John Gilson ("Gilson").[2]

I. **INTRODUCTION**

Plaintiffs bring this securities fraud class action on behalf of all persons or entities who purchased or otherwise acquired Spirit securities from October 31, 2019 through February 27, 2020, inclusive (the "Class Period"), to recover losses incurred as a result two separate frauds by Defendants. *First*, Defendants misrepresented Spirit's ability to maintain its prior production rate of aerostructures, or "shipsets," for 737 MAX planes sold by The Boeing Company ("Boeing")—a product that accounted for over 50% of Spirit's revenues—after the 737 MAX fleet was grounded by U.S. and international authorities in the wake of two fatal crashes. *Second*, Defendants misrepresented Spirit's compliance with established accounting procedures and the effectiveness

---

[1] The Court so-ordered a stipulation allowing Plaintiffs to file a single omnibus opposition to Defendants' motions to dismiss of up to the total length of Defendants' supporting memoranda, which is 75 pages. *See* ECF No. 65 n.2 & 66. The "Motion" or "Mot." refers to the memorandum filed by Spirit, Gentile, and Campbell, which Garcia and Gilson joined in full. *See* ECF No. 77-1. "Garcia Motion" or "Garcia Mot." refers to the memorandum filed by Garcia. ECF No. 78. "Gilson Motion" or "Gilson Mot." refers to the memorandum filed by Gilson, ECF No. 79, and collectively with the other Defendants' briefs, the "Motions."

[2] "Defendants" refers to Spirit, Gentile, Campbell, Garcia, and Gilson. "Individual Defendants" refers to Gentile, Campbell, Garcia, and Gilson.

of its internal controls over financial reporting relating to production of Boeing planes, including the 737 MAX. When the truth emerged, Spirit's stock plummeted, harming investors.

Spirit, which was spun off from a division of Boeing in 2005, is one of the world's leading commercial aerostructure designers and manufacturers and is Boeing's primary supplier for the 737 MAX. The Company's revenues are overwhelmingly dependent on sales to Boeing, which account for **79%** of Spirit's net revenues, and the 737 MAX program in particular, which accounted for more than **50%** of Spirit's revenues during the Class Period. The 737 MAX fleet has been grounded by the U.S. Federal Aviation Administration ("FAA") and other international regulators since March 2019 after two crashes in the span of just a few months. Investors and analysts immediately recognized that a prolonged grounding of the fleet would dramatically reduce Boeing's need for new 737 MAX shipsets, which in turn would devastate Spirit's revenues.

To assuage these concerns, in April 2019 Spirit quickly announced a memorandum of understanding ("MOA") with Boeing. Under the MOA, among other things, Spirit would continue to produce 52 aircraft shipsets per month ("APM"), the rate the Company had produced pre-grounding, Boeing would take delivery of 42 APM, and Spirit would store the remaining undelivered shipsets at its Wichita, Kansas facility. In the wake of the MOA announcement, Defendants, Spirit's officers and executives, repeatedly assured investors that Spirit would continue producing at the 52 APM rate even as the FAA suggested that the 737 MAX would remain grounded indefinitely and the Company quickly accumulated close to **100** undelivered 737 MAX shipsets at its facility by July 2019, far more than the 10 per month disclosed in the MOA.

According to former Spirit employees ("FEs"),[3] but unbeknownst to investors, in late September or early October 2019, Boeing instructed Spirit to cut 737 MAX production *in half*. As a result, Defendants immediately began creating the plan to implement the cut, including running related layoff analyses. The initial results of these analyses were approved by Campbell, the head of Spirit's 737 MAX program, and then presented to Gentile, Spirit's CEO, just before the end of October 2019. Although Defendants previously had indicated to investors that Spirit would disclose any production cut ordered by Boeing, on October 31, 2019, Defendants made multiple public statements assuring investors that Spirit would maintain its 52 APM rate, thus deliberately concealing Boeing's directive to cut production. For example, on an October 31, 2019 earnings call, in response to direct questions from an analyst about 737 MAX production, Gentile insisted that "*we're going to be at 52 for an extended period of time*."[4]

As the prospect of the FAA lifting the grounding in the near term continued to dwindle, in mid-November Boeing privately instructed Spirit to cease 737 MAX production altogether. However, rather than disclose this development, Defendants continued to mislead investors and just days later told the market that "*the [737] MAX is set to stay at a rate of 52/[month] until May 2020*." On December 16, 2019, Boeing finally disclosed that it and, by extension, Spirit were halting production, and Spirit's stock price plummeted. The following day, however, Gentile continued to downplay the impact of this revelation, falsely reassuring investors that, among other things, he was "not expecting to have to do layoffs," even though Spirit had begun planning for layoffs in *October*. Just a few weeks later, on January 10, 2020, Spirit disclosed that, contrary to

---

[3] The FEs agreed to speak to Plaintiffs as part of Plaintiffs' investigation on a confidential basis, and thus they are all referred to in the feminine to protect their identities.

[4] Unless noted otherwise, all emphasis is added.

Gentile's claim, it was laying off 2,800 employees due to the 737 MAX production halt, and Spirit's stock price fell again. Spirit's stock price declined again upon additional disclosures, on January 30, 2020 and February 28, 2020, which revealed the full impact of the 737 MAX production halt on Spirit, including that the Company would not return to the prior 52 APM rate until *2022* at the earliest.

Other FEs' accounts also show that Defendants concealed a material weakness in Spirit's internal controls over financial reporting related to certain accounting processes—which Defendants subsequently *admitted*. This known, undisclosed material weakness rendered false and misleading Defendants' statements regarding the effectiveness of Spirit's internal controls and compliance with applicable accounting principles in Spirit's quarterly financial report filed with the SEC on October 31, 2019. Specifically, FEs described a significant failure to maintain adequate checks and balances over the Company's accounting processes related to the determination of what is known as the "estimate at completion" ("EAC") in connection with valuing and recording adverse monetary claims made by Spirit's customers, such as Boeing, particularly for the 737 MAX program. Notably, Defendants failed to implement adequate validation policies and practices, and permitted Campbell to repeatedly ignore information provided by finance and other relevant personnel about the true value of such claims and thus understate claims made by Boeing in the EAC process, making the 737 program appear more profitable than it really was.

According to one FE, Campbell knew that his estimates for Boeing claims were understated because this FE directly confronted him about these issues on several occasions to no avail, as she, and her colleagues who voiced similar concerns, were repeatedly "shut down" by Campbell. Further, this FE expressed her concerns about Campbell's understatement of Boeing claims in the EAC process and the related lack of adequate controls directly to Gilson at a meeting in his office

in early or mid-2019 convened to discuss the FE's concerns. But Gilson also did not take any remedial action as a result of the meeting, prompting the FE to leave Spirit soon thereafter.

The truth regarding Defendants' deficient internal controls over the EAC process emerged in two separate disclosures that contributed to the substantial drops in Spirit's stock price on those dates. First, on January 30, 2020, in addition to the 737 MAX production revelations, Spirit disclosed its failure to comply with accounting procedures over contingent liabilities (*i.e.*, customer claims) in the third quarter of 2019. As a direct result of this finding, the Company also announced the immediate "resignations" of Garcia and Gilson, who as the CFO and Controller, respectively, were primarily responsible for such accounting functions. According to FEs, Campbell was fired at the same time given his direct involvement in the accounting violations at issue. Finally, on February 28, 2020, in addition to the 737 MAX production disclosures, the Company admitted that these accounting violations occurred as a result of a "***material weakness*** in our internal controls related to our ***EAC process***" for "***customer claims*** and assertions," just as the FEs described. Although Defendants told investors that such accounting violations would not require the restatement of any of Spirit's previously filed financial reports, they also revealed that this material weakness affected the accounting processes for ***76%*** of the Company's business, and that, therefore, "the instance of [such] non-compliance is a ***critical*** item the Company must address." Indeed, Defendants further acknowledged extensive remedial measures to address these deficiencies, including "***management changes***" (*i.e.*, the termination of Garcia, Gilson, and Campbell) and an overhaul of Spirit's training on and documentation systems for the validation of customer claims in the EAC process, confirming the failures detailed by FEs.

Defendants' Motions seek to dismiss the CC primarily on the grounds that: (i) Defendants' assurances that Spirit would maintain 737 MAX production were inactionable opinions; (ii) FEs'

accounts of Boeing's order to cut production are not credible; (iii) the material weakness in internal controls was not material to investors; (iv) Defendants' assurances regarding Spirit's internal controls and adherence to Generally Accepted Accounting Principles ("GAAP") were literally true; and (v) the CC fails to allege scienter. Notably, Defendants do not contest loss causation.

Defendants' arguments should be rejected. *First*, Defendants' assurances that Spirit would maintain its rate of 52 APM are statements of fact directly contradicted by Boeing's undisclosed instruction to cut production, and thus actionable. *Second*, the CC's allegations regarding Boeing's instruction arise out of corroborated, detailed first-hand accounts from multiple FEs who were in a position to know the facts alleged and thus must be accepted as true. *Third*, the undisclosed weakness in Spirit's internal controls was plainly material because it affected *76%* of Spirit's long-term contracts and Defendants themselves admitted it was "material," characterizing it as "a critical item" upon which the "profitability of certain programs depends significantly." *Fourth*, Defendants misstatements about Spirit's internal controls and adherence to GAAP are actionable because they misled investors to believe that the controls were effective. *Fifth*, the CC pleads numerous facts, which, when viewed holistically, support a strong inference of scienter, including: specific FE accounts showing that Defendants knew or recklessly disregarded material, non-disclosed facts that directly contradicted Defendants' positive public statements; the core operations doctrine; Defendants' suspicious resignations; and Gentile's unusual insider trading. Accordingly, Defendants' Motions should be denied.

## II. <u>FACTS</u>

### A.  Background of Spirit and the Boeing 737 MAX

Spirit is one of the world's largest commercial aerostructure designers and manufacturers. ¶¶60–62. Gentile has been Spirit's President and CEO since August 2016. ¶37. Garcia was Spirit's

CFO from January 2019 to January 2020; Gilson was controller from January 2018–January 2020; and Campbell was Vice President for the 737 program from March 2016–January 2020. ¶¶38–40.

Spirit is the largest independent supplier of aerostructures for Boeing's 737 jetliners, including the 737 MAX, accounts for 70% of the 737's structure, and, therefore, is Boeing's critical supplier for the 737 MAX. ¶¶63–68. The relationship is symbiotic. In recent years, sales to Boeing accounted for **79%** of Spirit's net revenue, and, during the Class Period, the 737 MAX accounted for more than **50%** of the Company's annual revenue. ¶70. Indeed, Defendants repeatedly emphasized to investors that Boeing is Spirit's largest customer and the 737 MAX is the Company's most important program. *Id.* Analysts also advised investors that "[t]he 737 remains the **critical driver** of Spirit's market value." *Id.* Accordingly, investors understood the importance of Boeing, and the 737 MAX in particular, to Spirit's financial success.

Spirit's importance to Boeing created a close relationship between the two companies. ¶72. Multiple FEs (FE 2, FE 3, FE 4, and FE 12) stated that, during the Class Period, Spirit employees worked on-site at Boeing and, conversely, Boeing maintained a large personnel base at Spirit. *Id.* Gentile also repeatedly touted this tightly intertwined relationship to investors. *Id.* In 2018, for example, he boasted that Boeing and Spirit "**actually go[] out jointly** to several of [our] suppliers" because "[a] lot of our supplier issues are also supplier issues for Boeing." *Id.* He also described "the level of **cooperation** and **transparency** with Boeing" as "at an **all-time high**," such that Spirit has "**very good communications on a daily basis, many times during the day**." *Id.*

### B.  The Grounding of the 737 MAX Fleet and the Boeing-Spirit MOA

On October 29, 2018, a 737 MAX crashed after take-off in Indonesia, killing all passengers. ¶73. Four months later, on March 10, 2019, a second 737 MAX crashed after take-off in Ethiopia, with all passengers perishing as well. *Id.* The FAA promptly grounded the 737 MAX, and all 387 737 MAX planes worldwide were grounded by the following week. *Id.* The crashes

were later linked to the planes' Maneuvering Characteristics Augmentation System ("MCAS"), which is unrelated to the aerostructures manufactured by Spirit. *Id.*

Market observers and analysts immediately recognized that the grounding threatened Spirit's financial condition, particularly if Boeing cut production. ¶74. Spirit had been producing 52 737 MAX shipsets per month for Boeing since 2018, and the Company had touted its plans to increase production to 57 APM by the second quarter 2019. ¶71. After the crashes, however, an analyst predicted Spirit "definitely will feel financial disruption if [Boeing] alters its production schedule," and another observed that "Spirit [] is the most exposed [supplier] to the 737." *Id.*

The analysts' fears quickly were justified when Boeing announced on April 5, 2019 that it would cut its own 737 MAX production from 52 APM to 42 APM. ¶75. Later that day, however, Boeing and Spirit announced that they had entered into an MOA that allowed Spirit to continue to produce at the prior 52 APM rate—and thus minimize the negative impact of the grounding on its financial performance—"***unless [Boeing] advised otherwise***." *Id.* Under the MOA, Spirit would continue to produce 52 APM, but store the 10 extra shipsets at the Company's Wichita location rather than immediately deliver them to Boeing. ¶¶75–76.

During Spirit's first earnings call after announcing the MOA, on May 1, 2019, an analyst pointedly asked about the amount of notice Boeing had to provide in advance of a cut. ¶75. Gentile evasively replied that the advance notice was "***not really relevant***" because Spirit "work[s] ***very closely with Boeing every day***." *Id.* Gentile thus reassured investors that Spirit would know the moment Boeing issued a 737 MAX production cut, given the companies' close working relationship, and the Company would in turn promptly apprise investors of any cut.

In July 2019, Defendants continued to insist to investors that Spirit would maintain 52 APM despite the rapidly accumulating 737 MAX inventory that Spirit was storing for Boeing in

8

Wichita. *See* ¶¶86–87. For example, on the July 31, 2019 earnings call, Gentile boasted that Spirit expected to produce 52 APM for the remainder of 2019 and "all of 2020." ¶91. Defendants also reaffirmed to investors that Spirit was "working really closely with Boeing on production schedules" and thus solidified the expectation that Defendants would promptly disclose any changes in production rate. ¶¶92–93. Analysts, and thus investors, were encouraged by Spirit's reassurances about 737 MAX production, repeatedly highlighting how critical Spirit's continued ability to maintain the 52 APM rate was to the Company's financial well-being. ¶¶78–80, 82, 97.

### C. Boeing Instructs Spirit to Cut 737 MAX Production

Unbeknownst to investors, however, according to FE 7, by early October 2019 Boeing alerted Spirit that—at a minimum—the Company would have to cut production ***in half***. ¶¶83–84. FE 7 was a Spirit Business Operations Specialist throughout the Class Period who worked on, among other things, the 737 MAX program. ¶¶51–52. FE 7 was responsible for gathering and presenting data on Spirit's 737 MAX production performance to senior managers, including Campbell. *Id.* FE 7 also prepared materials summarizing the status of 737 MAX production performance for regular joint meetings between Spirit and Boeing executives to discuss the production of the 737 MAX. ¶100. These meetings, which were attended by Campbell, and generally Garcia and Gilson, occurred much more frequently after the second crash. ¶¶51–52, 100. FE 7 was debriefed on these meetings, including any changes to the 737 MAX production rate and Spirit's related production schedule, by Campbell himself and by her supervisor, Angel Little ("Little"), because her responsibilities included providing data about the performance of the 737 MAX program, and as these meetings occurred more frequently, she had to provide data more frequently. ¶100. FE 7 and another Spirit Business Operations Specialist used information from the meetings to update Spirit's business operations plans and related materials, including Spirit's "Master Schedule," which reflected Spirit's internal production schedule. ¶¶51–52, 100–01.

FE 7 said that in late September 2019 or early October 2019, Boeing told Spirit during one of the companies' regular status meetings to cut Spirit's 737 MAX production rate ***in half***. ¶¶98, 103. The status meeting was attended by Campbell, and likely also by Garcia and Gilson, whose sign-off would be needed on Spirit's new production schedule. ¶102. FE 7 learned of Boeing's directive to cut production when she was debriefed about the meeting by Campbell and Little during a weekly business operations specialists' meeting she attended in late September or early October 2019. ¶¶98, 103. At this meeting, Little and Campbell instructed FE 7 and other business operations specialists to revise Spirit's 737 MAX production plan in light of Boeing's order to cut production. *Id.* FE 7 said that as soon as Boeing communicated the cut in production, the Company had to "follow suit" and change its production plan. ¶103. FE 7 said only a "select few" Spirit employees were aware of the cut because that information was strictly confidential. ¶102.

Moreover, Little instructed FE 7 to provide certain data needed to implement Boeing's instruction to cut 737 MAX production and revise Spirit's production plan accordingly. ¶¶98, 104. Specifically, FE 7, and others on her team, among other things, ran "exercises" to help determine the number of workers needed to produce 737 MAX shipsets at the lower rate. *Id.* These exercises included reports examining staffing, costs and the financial impact of staffing reductions, *e.g.*, impact on earnings per share, to identify layoffs necessary to implement the cut. ¶¶104–05. FE 7's work was rolled up with exercises performed by her colleagues and provided to Little's boss, Bill Brown ("Brown"), the Senior Vice President of Spirit's Boeing Program, and Brown's direct reports, including Campbell, for review and approval, and Brown reported the results to Gentile for his approval. ¶104. Gentile received the results of the first round of these layoff exercises just before ***the end of October 2019***, and Spirit's plan implementing the cut in 737 MAX production was finalized in November 2019. ¶105. According to FE 7, Spirit could not just flip a switch and

implement the rate cut immediately because such a rate reduction involved a multi-step planning process that included working with unions, coordinating with production and supply chain personnel, and examining financial aspects of the cut. ¶104 & n.12.

FE 8 corroborated FE 7's account. FE 8 was a Supply Chain Procurement Agent at Spirit throughout the Class Period and managed the request for quote, contract negotiation, and award process with Spirit's suppliers. ¶53. FE 8 said that Spirit used SAP software to generate 12-month forecasts for demands for parts and materials needed in Spirit's manufacturing process. The production schedule was incorporated into the "Master Schedule." ¶107.

According to FE 8, suppliers could access Spirit's forecasts through the online Spirit Partners Network ("SPN") driven by SAP. ¶108. In September and October 2019, FE 8 received calls from Spirit suppliers who also interfaced with Boeing directly. ¶¶106, 108–09. These suppliers advised FE 8 that Boeing had said it planned to substantially reduce 737 MAX production, but the cuts were not reflected in Spirit's SPN. ¶¶106, 108–09. In particular, FE 8 recalled a specific conversation in fall 2019 where one of Spirit's suppliers called and informed her of a letter the supplier had received from Boeing with an updated lower forecast for 737 MAX production. ¶110. The supplier questioned FE 8 as to why it had not "heard anything" from Spirit about the reduction given Boeing's notice to the supplier. *Id.* The supplier said it was contacting Spirit because it did not want to be stuck making "all of these parts and then be caught holding the bag." *Id.*

Notably, Boeing told Spirit to cut 737 MAX production just before or as the public learned that a top Boeing pilot had previously expressed significant concerns about the 737 MAX's software. ¶111. According to public press reports in October 2019, the FAA excoriated Boeing for not disclosing the messages sooner and all but confirmed that the 737 MAX fleet would remain

11

grounded, stating that Boeing's actions "would effectively invite stricter regulation" and revealing

that an FAA administrator had told Boeing's CEO, "[y]ou're forcing my hand." ¶¶112–13.

### D. Defendants Falsely Assure Investors that Spirit Would Continue 737 MAX Production at 52 APM

Instead of promptly disclosing Boeing's instruction to cut production, as they had assured

investors they would, Defendants publicly insisted that Spirit would continue at 52 APM for the

foreseeable future. For example, on an October 31, 2019 earnings call for third quarter 2019 ("3Q

2019 earnings call"), Gentile assured investors that "*[w]e are continuing to produce at a rate of

52*," "*we're going to be at 52 for an extended period of time*," and "*[o]ur current expectations

are that we will continue to produce at rate 52*." ¶¶227–29. Spirit's related press release and Form

10-Q for the third quarter of 2019 ("3Q 2019 10-Q"), issued on the same day and signed by Garcia

and/or Gilson, repeated similar misrepresentations. ¶¶225–26. Defendants also misleadingly

cautioned investors that Boeing *could* order production cuts, when they knew that Boeing had in

fact *already* cut production. *See, e.g.*, ¶229 ("*[i]f* Boeing goes down more, we *would* . . . talk with

them about what's the appropriate production level"); *see also* ¶225 ("[f]or so long as the

grounding of the B737 MAX fleet continues, there *may* be further reductions in the production

rate"). Analysts were buoyed by these misrepresentations, writing, for example, that

"[m]anagement now believes *the 737 will likely stay at rate 52/month at least through 2021*, and

potentially into 2022." ¶¶233–34.

A couple weeks later—in mid-November 2019—Boeing privately notified Spirit that

Boeing would halt production of the 737 MAX *indefinitely*. ¶¶84, 121. Specifically, FE 2, a 737

MAX Assembly/Operations manager, stated that approximately two weeks before Thanksgiving

2019, Vic McMullen, Spirit's Senior Vice President, Global Manufacturing and Boeing

Operations, announced at a daily internal 737 MAX meeting attended by FE 2 that Boeing had

directed Spirit to temporarily "stop producing the 737 MAX" after completing the number of shipsets set for the fourth quarter of 2019, and thus Spirit then would not produce *any* 737 MAX shipsets for the time being. ¶¶121–22. FE 2 said McMullen likely learned of the shutdown in a meeting with the then-Boeing CEO of Commercial Airplanes, Kevin McCallister. ¶123.

Although Defendants knew Boeing had decided to stop *all* 737 MAX production, they continued to mislead investors. On November 24, 2019, securities analyst firm Jefferies published a report entitled "Management Meeting Takeaways: Getting Into the Spirit" ("Jefferies Report"), which stated that Jefferies had hosted Gentile and Garcia "on the West Coast" for a "[m]anagement [m]eeting" and discussed Spirit's operations, including the latest outlook regarding the 737 MAX production, and learned that "[t]he [737] MAX *is set to stay* at a rate of 52/mo. until May 2020 w[ith] a potential rate decision at that time." ¶¶124, 235–36.

### E.  Spirit's Internal Controls Contained a Material Weakness

As Defendants were misleading investors about 737 MAX production, they were also misrepresenting the effectiveness of Spirit's internal controls over financial reporting. As a public company, Spirit is subject to financial reporting and auditing obligations, including adherence to the Sarbanes-Oxley Act of 2002 ("SOX"), which requires, among other things, that Spirit maintain proper internal controls over financial reporting and Gentile and Garcia, as CEO and CFO, to certify that those controls were operating effectively. ¶132. Spirit is also subject to SEC regulations that require the Company's financial statements to be prepared in accordance with GAAP. ¶139.

Under GAAP, revenue and associated expenses from long-term contracts must be recorded "over time" as opposed to "at a point in time." *Id.* In its 2019 Form 10-K, Spirit reported that "approximately *[76%]* of the Company's contracts recognize revenue as 'over time.'" ¶140. Accordingly, the vast majority of Spirit's revenues during the Class Period were recognized "over time," as they were pursuant to long-term supply agreements (primarily with Boeing). ¶138.

To properly recognize revenue over time, Spirit had to determine the total costs it expected to incur to fully perform its long-term agreements with Boeing (¶143) and then record revenue (and associated income) periodically over time based on Spirit's progress towards completion. This method of revenue recognition is called "percentage of completion accounting" and is predicated on Spirit's proper determination of "estimate at completion" or "EAC." *Id.* Spirit's processes for determining these costs were based on data and management assumptions. ¶144. Therefore, to be effective, the Company's internal controls needed to ensure the proper evaluation of this information. *Id.* For example, Spirit's internal controls needed to include a process whereby the EAC was updated when Spirit learned of customer (*e.g.*, Boeing) claims likely to impact the Company's costs. *Id.* This would include proper consideration of any contingent liability related to a contractual obligation. ¶148. According to former Spirit employees, however, before and during the Class Period the Company's internal controls over financial reporting contained a material weakness and thus did not ensure that (i) all available information was considered and validated during the EAC process, and/or (ii) amounts of contingent liabilities relating to claims from Boeing were properly validated and accounted for in the EAC. ¶149.

The material weakness in the Company's internal controls arose directly from Campbell's manipulation of inputs into Spirit's EAC process. For example, FE 10, who worked at Spirit for years before the start of the Class Period until 3Q 2019 and held a finance role that included providing financial forecasts for the costs of Spirit's aircraft programs such as the 737 MAX to support its EAC process (¶¶55, 151), said that Spirit did not have adequate internal controls over that process. ¶151. FE 10 explained that Campbell would push back and make her revise estimates to incorporate additional opportunities or risks separate from those identified through the standard EAC process. ¶151. According to FE 10, the opportunities and risks dictated by Campbell and

14

other program managers were incorporated into EAC at *optimum* values, which had the effect of reducing the costs included in the EAC and skewing measurements of revenue and income on Spirit's projects. ¶153. In addition, by only using the most optimistic values for estimating costs in the EAC, the values lacked underlying support and were not in line with the best information available to Spirit, which was not consistent with GAAP requirements. *Id.*

To make matters worse, according to FE 10, Spirit's 737 program, which was run by Campbell, did not have a finance and/or accounting team dedicated to validating Campbell's estimates, unlike other programs at Spirit. ¶151. FE 10 said that Spirit's internal audit team was "toothless," meaning that there were thus no real checks and balances over Spirit's EAC process, because Garcia, upon joining Spirit in early 2019, had fired or forced out competent leaders. *See* ¶156. These deficiencies meant the Company's internal controls did not ensure that costs attributed to customer claims in the EAC process were properly assessed and validated, which was both a GAAP violation and a material weakness in the Company's internal controls. ¶154.

A second confidential witness, FE 9, who worked at Spirit for several years leading up to the Class Period, including 3Q 2019, corroborated FE 10's description of GAAP violations and a material weakness in Spirit's internal controls arising out of Campbell's involvement in the EAC process. FE 9 was a manager in Spirit's finance group who oversaw a team supporting the Company's Boeing programs. ¶54. FE 9 and her team provided input on costs consisting of monetary claims made by Boeing (*i.e.*, "Boeing Claims") against Spirit for issues with aircraft shipsets, including the 737 MAX, which needed to be incorporated into Spirit's EAC. *Id.* FE 9 stated that, instead of accounting for Boeing Claims in the EAC under a policy controlled by Spirit's Finance Department, entitled "Procedure 3033" or "PRO-3033" (¶161), Spirit's "process" for determining the amounts of Boeing Claims was "a one-way street" under the complete control

of Campbell and thus lacked *any* meaningful checks and balances (¶162). According to FE 9, Spirit also lacked appropriate in-person and mandated training for evaluating claims for the EAC (¶165) and did not have a centralized, integrated electronic system to track and document customer claims for validation and instead relied on "archaic" spreadsheets for each department (¶168). Moreover, Spirit's exception "process" for addressing and resolving any issues with an EAC consisted simply of one person—Campbell, for the 737 program—directing a final, underestimated value of costs to be put into the EAC without any meaningful checks and balances to validate those costs by finance or other personnel (¶167). These deficiencies precluded Spirit from maintaining effective internal controls and determining costs, revenue, and income on its long-term contracts with Boeing in accordance with GAAP.

FE 9 personally witnessed Campbell consistently and intentionally underestimating Boeing Claims for the EAC throughout Campbell's tenure as head of Spirit's 737 program, including 3Q 2019. ¶¶171, 174–75. FE 9 told Campbell on multiple occasions that it was impossible for Campbell's amounts for Boeing Claims to be even close to accurate, but Campbell "bullied" and "intimidated" her, insisted on using his amounts regardless of FE 9's concerns, would "go around [FE 9]," or ignored her. ¶176. FE 9 said she repeatedly "made a stand" to Campbell and other finance personnel about Campbell's conduct, but her concerns were "shut down." *Id.* FE 9 left Spirit shortly after the end of the third quarter of 2019 because of this inappropriate behavior. ¶171.

### F.  Defendants Knew or Recklessly Disregarded the Material Weakness

FE 9 also raised concerns about Campbell's misconduct in connection with Spirit's EAC process directly to Gilson in early or mid-2019. ¶178. FE 9 said that she was "called into [Defendant] Gilson's office" because she was so frequently raising concerns about Campbell's conduct, and then was accused of creating "conflict." *Id.* At that meeting, FE 9 detailed her

concerns to Gilson, but left "completely disappointed" when he took *no* action and instead accused her team of not supporting the 737 program. *Id.*

Gentile, Garcia, and Gilson also knew or recklessly disregarded the material weakness in Spirit's internal controls because they personally participated in discussions of Spirit's EAC process and outsized Boeing Claims. ¶180. FE 9 said that the size of Boeing Claims had been an important issue at Spirit since early 2018, and was often discussed by Spirit management, including at quarterly EAC review meetings. ¶¶180–82. These meetings were attended by program managers, vice presidents, senior managers, and Gentile, Garcia, and Gilson. ¶182. According to FE 9, issues with Boeing Claims were raised at *every* EAC review meeting, including in 2019, but discrepancies between the actual value of claims and the values that Campbell had insisted on were not adequately discussed during these meetings because Campbell presented, and thus controlled the messaging of, the EAC estimates for his program at the meetings (*id.*), nor were the internal controls surrounding the determination of those values modified or remediated to ensure proper inputs for the EAC. FE 9 also said Gentile, Garcia, and Gilson knew or recklessly disregarded the material weakness because, by early-to-mid-2018, Boeing was making more aggressive (*i.e.*, larger) claims, which were a "constant source of conversation" at Spirit as Boeing used the claims as leverage in other negotiations with Spirit. ¶180. FE 9 said Defendants also had notice of the material weakness on many other occasions where Boeing Claims were discussed, including monthly Executive Program Reviews for Spirit's 737 program and separate briefings that she attended with Campbell, Garcia, Gilson, and sometimes Gentile. ¶183.

### G.  Defendants Misrepresented that Spirit's Internal Controls were Effective

Despite Campbell's flagrant manipulation of the costs associated with Spirit's 737 program, on October 31, 2019, Defendants falsely represented in Spirit's 3Q 2019 10-Q that, for example, its financial statements were prepared in accordance with GAAP, that the Company had

effective internal controls over financial reporting, as required by SOX (¶¶244–46, 248) and that the 3Q 2019 10-Q "contained all adjustments" that were "necessary to fairly present the results of operations." ¶242. Garcia and Gilson signed Spirit's 3Q 2019 10-Q and falsely certified that the Company's financial statements had been prepared in accordance with established accounting principles (*i.e.*, GAAP) while Gentile and Garcia also certified, among other things, that they had evaluated the effectiveness Spirit's internal controls and disclosed any deficiencies or material weaknesses in them. ¶¶240–41; 244–248.

## H. The Truth Emerges

Investors began to learn the truth about Spirit's 737 MAX production rate on December 15, 2019, when The Wall Street Journal reported that Boeing's board met to discuss the 737 MAX and that Boeing likely would either substantially reduce or halt 737 MAX production entirely. ¶187. The following day, after the close of trading, Boeing confirmed that it would suspend all 737 MAX production beginning in January 2020. ¶189. Investors understood this meant that Spirit would have to suspend, or dramatically reduce, its own 737 MAX production and thus would not continue to produce 52 APM, as Defendants had insisted throughout the Class Period that it would. As a result, Spirit's stock fell 5.4% over the next three trading days. ¶193. Nevertheless, Defendants continued to downplay the impact of Boeing's announcement when Gentile falsely assured investors on December 17, 2019 in The Wichita Eagle that, among other things, he was "not expecting to have to do layoffs." ¶196. Three days later, on December 20, 2019, Spirit confirmed that it was halting 737 MAX production at Boeing's direction. ¶194. Then, on January 10, 2020, Spirit announced that it would lay off 2,800 employees and further disclosed that when 737 MAX production eventually resumed, levels would be far lower than 52 APM. ¶197. Spirit's stock price plummeted 5% over two trading days. ¶199.

On January 30, 2020, the Company announced a new agreement with Boeing and revealed that Spirit would only produce 216 shipsets in 2020, or approximately 18 APM—*over 66% lower than the 52 APM rate in 2019*—and would not produce at the prior 52 APM rate *until 2022*. ¶¶203–04. Spirit also disclosed that it had not complied with accounting procedures for contingent liabilities (*i.e.*, customer claims) in 3Q 2019 and that Garcia and Gilson had resigned as a result. ¶206. Spirit's stock price fell another 4%. ¶209.

The full impact of the 737 MAX production halt on Spirit's business was revealed on February 28, 2020, when the Company disclosed, among other things, that the continued grounding of the 737 MAX was a "significant issue" for the Company such that Spirit had been forced to take substantial measures, including terminating over 3,000 employees and securing a $375 million loan to "preserve liquidity." ¶¶210–13. As to the prior accounting violations, Spirit revealed that it had identified a *material weakness* in its internal controls over financial reporting related to its EAC process. ¶¶214–15. Although the weakness purportedly did not require restating Spirit's financials, Defendants admitted that the "*non-compliance is a critical item the Company must address*" because it related to the accounting employed for "*[76%]* of the Company's contracts." ¶215. Spirit also disclosed extensive remediation measures that confirmed the FEs' accounts of Spirit's deficient internal controls, including "management changes"; enhanced training and reassessment of its controls related to "customer claims and assertions" in the "EAC process"; and revamping of Spirit's customer claims documentation system, including the "retention of this data in a centralized claims repository." ¶216. On this news, Spirit's stock declined an additional 10.4% over three trading days. ¶217.

### III. LEGAL STANDARD

To defeat the Motions, the CC must allege "enough facts to state a claim" that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Tenth Circuit construes

*Twombly* to require "enough factual matter (taken as true) to suggest that . . . [Plaintiffs are] entitled to relief." *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008).[5] The Court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "resolve all reasonable inferences in a plaintiff's favor," *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1001 (D. Colo. 2016), as amended (Jan. 28, 2016).

Because the CC asserts securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, it must allege the fraud with particularity, per Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). It must do so by "specify[ing] each fraudulent statement, explain[ing] why the statement was misleading, and alleg[ing] with particularity [the] basis" for the statements' falsity. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015).

While this is a higher standard than notice pleading under Fed R. Civ. P. 8, the Tenth Circuit applies a "common sense" test assessing multiple factors to determine whether facts alleged in a securities fraud complaint, "taken as a whole," support "a reasonable belief that the defendant's statements" were false or misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099, 1102–03 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003). This is because the PSLRA was ***not*** "designed . . . to make meritorious claims impossible to bring." *Id.* at 1099–1100. Accordingly, plaintiffs do ***not*** need to "plead with particularity 'every single fact upon which their beliefs concerning false or misleading statements are based,'" but rather only "sufficient facts to support those beliefs." *Id.* at 1098–99. Nor are Plaintiffs required to "plead their ***evidence*** in their complaint" because the PSLRA did not "move up the trial to the pleadings stage." *Id.* at 1101.

---

[5] All citations and internal quotations have been omitted unless otherwise indicated.

The elements of a securities fraud claim are: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with a purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Defendants move to dismiss the CC's claims for failure to allege elements (1) and (2) only.[6] As set forth below, the CC plausibly alleges with particularity that Defendants made material misrepresentations and omissions and pleads with particularity facts supporting a strong inference of Defendants' scienter. Accordingly, the Motions must be denied.

## IV. ARGUMENT

A misrepresentation is actionable under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder if that misrepresentation includes any untrue statement of a material fact or omits "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 984–85 (N.D. Okla. 2017) (citing 15 U.S.C. § 78j(b)). The test for whether a statement is materially misleading "is not whether isolated statements are true but whether the defendant's representations and omissions, considered together and in context, would affect the total mix of information and mislead a reasonable investor." *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1219 (N.D. Okla. 2003). Moreover, "whether the statements were false or misleading remains a question for the trier

---

[6] Defendants' main brief, joined by Garcia and Gilson (*see* ECF Nos. 78 & 79), improperly uses excessive, overlong footnotes and an "Appendix" to evade the already-extended page limits that **Defendants themselves requested**. *See, e.g.*, Mot. at 5 n.2, 30 n.21, 35 n.26. In particular, the Motion's six-page, single-spaced "Appendix A" collects the alleged misstatements and adds unpled language from the earnings call transcripts or SEC filings in which the misstatements were made, ostensibly for "context," *i.e.*, grounds to grant the Motions. *See* ECF No. 77-1 at 1 n.2, 2 & 4. As the footnotes and appendix violate the Court's page limit order, they should be disregarded or struck. *See, e.g.*, *TK-7 Corp. v. Estate of Barbouti*, 966 F.2d 578, 579 (10th Cir. 1992) (striking brief for excessive footnotes); *Cheng Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *4 (C.D. Cal. Nov. 20, 2017) (striking appendix); *Gillaspy v. Town of Silver City*, 2008 WL 11451949, at *1 (D.N.M. Feb. 1, 2008) (disregarding excessive footnotes).

of fact." *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 873 (D. Kan. 2019).

> **A.      Defendants' Statements About the 737 MAX Production Rates Were False and Misleading Because Boeing Had Instructed Spirit to Cut Production**

The alleged misrepresentations concerning the 737 MAX production rate readily satisfy the standard for falsity because it is well-established that statements about a company's business that are directly contradicted by internal "specific facts" known to and omitted by the defendants are actionable. *See, e.g., Yellowdog*, 426 F. Supp. 3d at 868 (assurances of gradual business transition actionable where defendants knew but "failed to disclose specific facts" that they had already accelerated transition); *Molycorp*, 157 F. Supp. 3d at 1005 (misrepresentation that mine contained "principal products" actionable where defendants knew mine did not contain products).

Here, the CC alleges in great detail Boeing's directive to Spirit to cut 737 MAX production *in half* at a late September or early October 2019 meeting attended by Campbell, and likely Garcia and Gilson. ¶102. FE 7 had direct knowledge of the meeting because her responsibilities included providing data for such meetings and she was, therefore, briefed on such meetings after they occurred. ¶¶100–01. In one such briefing, Campbell and FE 7's supervisor, Little, told FE 7 that Boeing had ordered Spirit to cut production *in half*. ¶102. FE 7's supervisor then instructed her and her colleagues to work on analyses, including for layoffs, to implement the cut. ¶¶104–05. FE 7's work was incorporated into reports approved by Campbell and presented to Gentile before the end of October 2019. *Id.* The revised production plan was finalized in November 2019. ¶105.

FE 7's description of Boeing's order is corroborated by FE 8. ¶53. FE 8 received calls in September and October 2019 from suppliers who said that Boeing indicated to them that it would cut 737 MAX production. ¶¶106, 108–09. The suppliers were concerned that Boeing's forecast reflected the cut, but Spirit's forecasts and production demands did not. *See* ¶¶106–07. FE 7 and

FE 8 thus offer mutually corroborative descriptions of Boeing's order in late September or early October 2019.

FE 7 and FE 8's statements are also corroborated by Gentile's public descriptions of Spirit and Boeing's working relationship. *See Molycorp*, 157 F. Supp. 3d at 1007 (complaint adequately pleads falsity where alleging sufficient "details provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, and other similar indicia"). For example, on the May 2019 earnings call, Gentile boasted that Spirit "work[s] very closely with Boeing every day" on 737 MAX production rates, which is consistent with FE 7's description of frequent Boeing-Spirit production meetings. *Compare* ¶75 *with* ¶¶101. Gentile also described how Spirit and Boeing communicated with suppliers in lockstep. *See* ¶72. It naturally follows that, as described by FE 8, suppliers were accustomed to hearing consistent messages from Boeing and Spirit, and thus would be alarmed when Boeing communicated a production cut, but Spirit did not. ¶¶106–110.

Concurrent public events also amplify the plausibility of FE 7 and FE 8's accounts. By July 2019 Spirit was storing approximately 100 undelivered 737 MAX shipsets for Boeing, and Boeing knew it would have an inventory of over 400 737 MAX by the end of the year. ¶87. In addition, in October 2019 the FAA all but told Boeing that the 737 MAX would remain grounded. *See* ¶¶111–13. It thus makes perfect sense that, as described by FE 7 and FE 8, Boeing ordered suppliers, including its primary supplier, Spirit, to cut production at this time given the FAA's statements and the mounting shipset backlog. *See id.*

Indeed, courts routinely find similar allegations sufficient to plead falsity. For example, in *Yellowdog*, the court denied dismissal of allegations that the defendants misrepresented that a transition away from the company's most profitable business "would not be immediate" and "the

negative impact would be minimal" because the defendants had *__already decided__* to accelerate that transition. Similarly, here, the CC alleges that Defendants misrepresented that Spirit would maintain the prior production rate of its most important product even though Boeing had *__already ordered__* Spirit to cut production. *Compare* ¶¶98–103 *with Yellowdog*, 426 F. Supp. 3d at 868. Likewise, in *Backe v. Novatel Wireless, Inc.*, dismissal was denied where, as here, defendants did not disclose that a company's biggest customer had given notice that it would no longer buy the company's chief product. 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009).

Despite this overwhelming legal and factual support for denying the Motions, Defendants nevertheless argue that the CC should be dismissed because (i) Defendants' misstatements are inactionable opinions; (ii) FE 7 and FE 8 are not credible; (iii) when the CC's allegations are considered with unpled and non-noticeable facts, the CC's claims are not plausible; and (iv) certain misstatements were published by third parties. Defendants' arguments are all meritless.

### 1. Defendants' Misstatements Are Not Inactionable Opinions

Defendants argue that their misstatements regarding the 737 MAX production rate in Spirit's October 31, 2019 SEC filings and earnings call and in The Wichita Eagle article are inactionable statements of opinion. Mot. at 9.[7] Not so. They are virtually all flat assertions of fact that falsely assured investors that Spirit was maintaining its current production rate and would continue to do so for the foreseeable future. *See* ¶¶226–29, 237. To be considered as an opinion, a statement generally is "couch[ed] . . . with prefatory language like 'I believe' or 'In my estimation.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020); *see also Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)

---

[7] Defendants do not argue that alleged misstatements in the Jefferies Report (Mot. at 15–16) and another alleged misstatement in The Wichita Eagle article (Mot. at 17–18) are inactionable opinions.

("a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not"). None of Defendants' misstatements concerning Spirit's 737 MAX production rate include this language; rather, they are unqualified statements of present fact, *i.e.*, what Defendants "current[] expect[]" or are "continuing" to do. *See* ¶¶226–29; *Abramson*, 965 F.3d at 176. In addition, Gentile's statement that "***[n]ow we're going to be at 52 for an extended period of time***" (¶229) responded to an analyst and thus "because of its posture as a response to a specific question and its categorical nature" it is a statement of fact. *Id.*

Similarly, Spirit's 3Q 2019 10-Q stated that Spirit would produce 52 APM "subject to any reductions that Boeing ***may*** decide to implement," and "***[t]o the extent*** that . . . Spirit is required to further reduce its production rate" Spirit's business "***could***" falter. ¶225. These misstatements not only falsely assured investors Spirit would continue at 52 APM, but they also are actionable because they convey the embedded fact that Boeing had ***not already*** instructed Spirit to cut production, and thus are actionable. *See SEC v. Goldstone*, 2015 WL 5138242, at *227 (D.N.M. Aug. 22, 2015) (embedded statements of fact are actionable).

Defendants nevertheless argue that these misstatements are opinions because they concern "expectations about the future." Mot. at 9 (quoting *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018)). But in the Tenth Circuit (and elsewhere), statements of "present expectations" ***can*** "constitute [actionable] misrepresentations of fact." *DiTucci v. Ashby*, 2020 WL 1249627, at *4 (D. Utah Mar. 16, 2020). In fact, Defendants' citation of *Aratana* does not aid the Court's analysis. *Aratana* ***affirmed*** that opinions are "often marked by phrases such as 'I believe,'" and conducted a combined analysis of opinions and forward-looking statements that appeared to construe the statements including "believe" as opinions. *See* 315 F. Supp. 3d at 758.

Even if the Court does construe any of Defendants' misstatements as opinions—which, as noted above, they are **not**—the statements are nevertheless actionable. As the Supreme Court held in *Omnicare*, a "pure statement[] of opinion" is misleading and actionable if it "omits material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *See* 575 U.S. at 186, 189; *see also Yellowdog*, 426 F. Supp. 3d at 871 ("an omission of a material fact may make a statement of opinion misleading and thus actionable" (citing *Omnicare*)). Here, Defendants omitted that Boeing had already instructed Spirit to cut production in half—a material fact that directly conflicted with Defendants' positive assurances that the Company would maintain its prior 52 APM production rate for the foreseeable future. Indeed, a reasonable investor would take assurances that, for example, "[o]ur current expectations are that we will continue to produce at rate 52" (¶228), to mean, at a **minimum**, that Boeing had not **already** instructed Spirit to cut 737 MAX production significantly because there would be no reasonable basis for Spirit to expect to remain at the prior rate given such a cut. *See Yellowdog*, 426 F. Supp. 3d at 871 (opinions actionable if not supported by a reasonable basis); *see also Abramson*, 965 F.3d at 177.

With respect to such alleged omissions, Defendants respond that they had no duty to disclose Boeing's order to cut production because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." Mot. at 14 (quoting *Omnicare*, 575 U.S. at 189–90). This argument defies common sense. The CC's allegations that Boeing instructed Spirit to cut 737 MAX production goes to the basis for and squarely contradicts Defendants' assurances that Spirit would continue to produce 52 APM. *See Omnicare*, 575 U.S. at 194. At best, Defendants' argument only suggests a dispute over whether their misstatements were factual or opinion, an issue not appropriate to resolve at this stage. *DiTucci*, 2020 WL 1249627, at *4 n.6

26

(whether statement is opinion "as opposed to a knowing misstatement of fact, depends largely on the speaker's intent, which cannot be determined at the motion to dismiss stage"); *see also Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1256–57 (S.D. Fla. 2020) (unless a "statement at issue is objectively one of opinion . . . characterization of such a statement as opinion is not for the Court to make at this stage").

Finally, Gilson separately argues that the misleading statements alleged in Paragraph 225 of the CC, which Defendants collectively argue are inactionable opinions, are also not actionable because they could be literally true and/or are forward-looking and protected by the PSLRA safe harbor. *See* Gilson Mot. at 4–5 (citing ¶225).[8] But Gilson ignores that the CC alleges that the statements are misleading because they "cautioned" investors about a potential cut that had already occurred, *see FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"), and omit Boeing's instruction to cut production, *see, e.g.*, *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *5 (C.D. Cal. June 17, 2011) ("[s]tatements literally true on their face may nonetheless be misleading in context") (citing *SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1279 (D. Colo. 2006)). For the same reason, the statement is actionable even if considered to be forward-looking, because Defendants knew of the production cut when the statement was made, *see Hull v. Global Digital Solutions, Inc.*, at *14 (D.N.J. Dec. 19, 2017) (statements regarding potential acquisition actionable when defendants "knew the purchase would not ever be consummated"), and thus any cautionary language "***cannot be meaningful***" because it did not

---

[8] Notably, Gilson selectively quotes only the statement in paragraph 225 that "[w]e expect that the annualized average monthly shipsets deliveries over the court of the year to be at rate 52 subject to any reductions that Defendants may implement," thereby ignoring the other alleged misstatements in that paragraph. Gilson Mot. at 4–5; *see* ¶225.

disclose the cut. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010). Gilson's cases are irrelevant because they do not involve warnings of events that had already occurred. *See* Gilson Mot. at 5–7.

### 2. FE 7's and FE 8's Allegations Must Be Accepted as True Because They Are Sufficiently Reliable and Particular

Recognizing that, when accepted as true, FE 7 and FE 8's accounts regarding Boeing's instruction to cut production establish that Defendants knowingly misrepresented Spirit's 737 MAX production rate, Defendants resort to arguing that the Court can disregard these FEs because they are not credible. *See* Mot. at 10–12. Defendants are wrong. FE 7 and FE 8's allegations must be ***accepted as true*** at this stage because the CC adequately pleads the FEs' basis of knowledge and the accounts are sufficiently detailed, supported by particularized facts, and corroborated. At bottom, Defendants' arguments are thinly-veiled attacks on FE 7 and FE 8's ***credibility*** which are improper at this stage. *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016) (courts must "accept the truth of the witnesses' accounts as pleaded in the complaint and . . . ***not assess the witnesses' credibility***") (citing *Tellabs*, 551 U.S. at 322).

In the Tenth Circuit, a court must credit confidential witnesses' allegations if the complaint alleges facts "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information" alleged. *Adams*, 340 F.3d at 1100. The CC alleges not only FE 7's job title, time spent in that position, supervisor and responsibilities, which all show that she was in a position to know the information alleged, but also specifically how she learned of the production cut—directly from Campbell (and her supervisor) who personally told her and several colleagues about Boeing's instruction at one of their weekly 737 production performance meetings because she needed that information to perform her work. ¶¶51–52, 98–103. Further, the CC alleges that, in response to the cut, FE 7

assisted with analyses of layoffs needed to implement the production cut, creating data for reports that were ultimately approved by Campbell and presented to Gentile. ¶104–05. The CC also alleges the same level of detail in support of FE 8's basis of knowledge, including her job title, time in her position, supervisor and responsibilities (¶53), as well as that FE 8 learned through her work that Boeing had instructed other suppliers to cut production based on her personal phone conversations with such suppliers (¶¶106–10). These particularized allegations far exceed the standard for confidential witness testimony and thus must be accepted as true. *See, e.g., In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276 (N.D. Okla. 2010) (confidential witnesses identified by title obtained knowledge through position at company); *Williams*, 339 F. Supp. 2d at 1218 (same); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081 (D. Colo. 2004) (same).

Defendants nevertheless argue that FE 7 and FE 8's allegations are insufficient because they are hearsay, conclusory, do not identify the individual at ***Boeing*** who ordered the cut, allege only a possible cut, and are uncorroborated. *See* Mot. at 11–13. Again, Defendants are wrong.

*First*, FE 7's testimony is not hearsay. FE 7 said Campbell told her about the production cut. Because Campbell is a ***party*** to this case, his statement, made as a Spirit employee, is "[a]n Opposing Party's Statement" and ***not*** hearsay. F.R.E. 801(d)(2). Even if the statement were hearsay, which it is ***not***, hearsay allegations are sufficient to defeat a motion to dismiss. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (hearsay accepted as true if "sufficiently reliable, plausible, or coherent"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 2020 WL 4547217, at *5 (S.D.N.Y. Aug. 6, 2020) (court "may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge"); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) ("likely hearsay" accepted where complaint alleged basis for witness's knowledge).

*Second,* FE 7's description of Boeing's instruction is not conclusory. FE 7 stated that Campbell (and her supervisor) had expressly told her that Boeing had instructed Spirit to cut production in half. ¶¶103–04. FE 7 supported her account with particularized facts, including a description of the weekly 737 MAX production performance wherein she and her colleagues were debriefed by Campbell and Little about Boeing's production cut, the regular Boeing-Spirit meeting where Campbell received the instruction to cut production, and the specific tasks FE 7 subsequently carried out in light of those instructions, which were then presented to Campbell and Gentile. ¶¶104–05. Because the allegations are "specific in time, context, and details," they must be accepted as true even though FE 7 did not attend the Boeing-Spirit meeting. *See Lloyd*, 811 F.3d at 1208 (confidential witness testimony based on another individual's account of a board meeting was sufficiently reliable for pleading purposes because it was "specific in time, context, and details"); *see also World Wrestling Entm't.*, 2020 WL 4547217, at *5 (crediting statements made by confidential witness even though they were based on "indirect knowledge, that is, information and belief that is hearsay but plausible" where his basis of knowledge adequately pled); *Levy v. Gutierrez*, 2017 WL 2191592, at *8 n.7 (D.N.H. May 4, 2017) ("specific descriptions of the precise means through which [the fraud] occurred, provided by persons said to have personal knowledge of them" defeat dismissal). Defendants are essentially arguing that Plaintiffs must plead *evidence* to defeat the Motions, but that is not required at this stage. *See Adams*, 340 F.3d at 1100.

*Third*, the identity of the specific Boeing employee who instructed Spirit to cut production is not relevant because the CC alleges how a person in FE 7's position "would possess the information" alleged, which is the relevant test that is readily satisfied here as discussed above. *See id.* Such granularity is simply not required at this stage. *See W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *16 (D. Colo. Mar. 28, 2008) (crediting

allegations where confidential witnesses did not disclose ultimate sources); *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740 (M.D. Tenn. 2013) (same). Similarly, the Court may not discredit FE 7 and FE 8's allegations on the ground that they are multiple reporting levels from the Individual Defendants because that is not the test for reliability of confidential witness testimony. *See, e.g.*, *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 301 (2d Cir. 2015) (reversing dismissal by crediting witnesses multiple levels from defendants); *In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 2786936, at *9 (D.N.J. May 29, 2020) (crediting witnesses multiple levels from defendants); *In Re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (rejecting "argument that the CW[s], as low level employees, would not have first-hand knowledge" of relevant facts).

*Fourth*, Defendants twist FE 7's allegations to speculate that she may have been only told about a hypothetical future cut. *See* Mot. at 12. But FE 7 clearly stated that Boeing had **instructed** Spirit to cut production **in half**, and that as soon as Boeing communicated the cut, the Company had to "follow suit." ¶¶102–03. FE 7 also said she was ordered to give other members of her team the data to **implement** the cut, not prepare for a **possible** cut. ¶¶98, 104. At best, Defendants posit a hypothetical **disputed fact** that precludes dismissal. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193–94 (10th Cir. 2003) ("it is not [a court's] role to evaluate the accuracy of plaintiffs' well-pleaded facts; the only questions are whether plaintiffs satisfy the [PSLRA's] pleading requirements."); *In re Retek Inc. Sec. Litig.*, 2007 WL 14352, at *5 (D. Minn. Jan. 3, 2007) (rejecting argument that a confidential witness was unreliable "because the Court cannot make credibility determinations or resolve disputed facts in a motion to dismiss"). Separately, Gilson twists FE 7's statements to argue that the CC does not allege when the cut was to take place. Gilson

Mot. at 5 n.5. Gilson is wrong. FE 7 said Spirit had to "follow suit"—*i.e.*, implement the ***already ordered*** cut—but that implementation would take time. ¶¶103–05 & n.12.

     *Fifth*, FE 8 corroborates FE 7 through her account that Boeing communicated a production cut to its suppliers. ¶110. Given that Spirit was Boeing's primary supplier with whom it had a particularly close working relationship, as Defendants repeatedly highlighted (¶¶72, 75), it strains credulity that Boeing told other less important suppliers of the production cut but kept Spirit in the dark. FE 8 also corroborates FE 7's statement that only a "select few" Spirit employees knew about the cut, which was kept "strictly confidential." *Compare* ¶102 *with* ¶110.

     Defendants nevertheless claim that FE 8 contradicts FE 7, because "Spirit had not changed its purchase orders" and "[i]f Spirit had been told by Boeing to cut its production schedule, the first thing it would likely do is to update its purchase orders from suppliers in order to avoid obtaining unnecessary materials." *See* Mot. at 12. Not only do Defendants again improperly ask the Court to make a factual inference in their favor, *see Molycorp*, 157 F. Supp. 3d at 1001, but Defendants' speculation also should be rejected because it is inconsistent with the CC's allegations, which must be accepted as ***true***, *Anderson*, 827 F.3d at 1239; *see also Erste-Sparinvest Kapitalanlagegesellschaft MBH v. SeresTherapeutics, Inc.*, 2018 WL 1567614, at *3 n.1 (D. Mass. Mar. 30, 2018) (defendants' attempts to "dispute the reliability of [the] CW[]'s allegations" at most raise factual disputes improper at the "motion to dismiss [when] the Court may assume the factual allegations in the amended complaint to be true, including CW[] statements"). For example, the CC alleges Spirit kept Boeing's instruction strictly confidential (¶102) and needed lead time to plan for such major production changes (¶104 & n. 12). Spirit thus plausibly would ***not*** change orders immediately because that would instantly disclose the cut and interfere with planning. In

32

addition, as *suppliers* were panicked that *they* would be left "holding the bag," the CC alleges that Spirit was not at risk of "obtain[ing] unnecessary materials." *See* ¶110.

*Sixth*, Defendants' case law does not support disregarding FE 7 or FE 8. For example, the court in *Kapur v. USANA Health Sciences., Inc.*, found two single-sentence allegations too conclusory. *See* 2008 WL 2901705, at *16 (D. Utah Jul. 23, 2008). The CC, however, contains *seven pages* of particularized allegations from FE 7 and FE 8. *See* ¶¶98–110. Moreover, *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *10 (D. Colo. June 21, 2005), held that the confidential witnesses were not in position to know the information alleged, while the CC alleges FE 7 and FE 8 learned information *because* of their roles at Spirit. *Compare id.* at *9 *with* ¶¶98– 110. Further, *Zucco* dismissed claims for lack of other "details describing which projects or what employees were affected," which rendered the confidential witness accounts insufficiently particular. *See* 552 F.3d at 997–98. Finally, *Hampton v. root9B Technologies, Inc.*, did not involve confidential witnesses and is irrelevant. *See* 897 F.3d 1291, 1298–99 (10th Cir. 2018).

### 3.  Defendants' Unpled "Facts" Do Not Refute FE 7 and FE 8

Finally, Defendants try to undermine FE 7 and FE 8's particularized allegations by arguing that FE 7's statements are inconsistent with Boeing's statements to its investors, which are not pled in the CC. *See* Mot. at 5, 14–15, 29 n.20, 36. This argument fails because Boeing's extrinsic statements, which inject disputed facts to contradict the CC's well-pled allegations, are not judicially noticeable. In any event, FE 7 and FE 8's allegations about Boeing's *private* statements to its suppliers are plausible and not refuted by Boeing's *public* statements to its investors.

Defendants appear to informally ask this Court to take judicial notice of Boeing's public statements in transcripts of an October 23, 2019 Boeing earnings call (*see* Ritchie Decl. Ex. 1, ECF No. 77-3 ("October Transcript")) and a November 6, 2019 investor conference (*see id.* Ex. 2, ECF No. 77-4 ("November Transcript")) for their truth, *i.e.*, that Boeing had not in fact decided to cut

737 MAX production before Defendants' misstatements on October 31, 2019 and November 24, 2019. *See* Mot. at 5 n.2. For example, Defendants assert that "it is an indisputable fact" that Boeing publicly confirmed that it had "no such plans [to cut production]." Mot. at 4, 5, 29 n.20, 36 (citing October Transcript); *see also id.* at 14–15 (arguing that Boeing could not have instructed Spirit to cut 737 MAX production in half because Boeing's public statements were "the ***most authoritative*** . . . statements [Spirit] had received from Boeing").

On a motion to dismiss, however, a court may consider documents outside the pleadings only if they are "incorporated by reference into the complaint" or otherwise "relied upon" by plaintiffs in the complaint (*i.e.*, the incorporation-by-reference doctrine), or are "matters of which a court may take judicial notice," *e.g.*, "public documents filed with the SEC"—but, in either case, it may do so "***only*** for what they contain, ***not to prove the[ir] truth***." *Empls. Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1158 (10th Cir. 2018). Accordingly, a court may only "judicially notice a fact that is ***not subject to reasonable dispute***" and "must consider the purpose for which judicial notice is sought" because "judicial notice of the ***substantive validity*** of [] public documents is improper." *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, 2018 WL 284991, at \*4 (N.D. Okla. Jan. 3, 2018). Indeed, courts have noted "a concerning pattern in securities cases like this one: exploiting these procedures [judicial notice and incorporation doctrines] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018).[9]

Accordingly, here, it is improper for the Court to judicially notice the Boeing public statements for their truth as Defendants seek—*i.e.*, that Boeing had no plans to cut production

---

[9] Here, Defendants do not argue that Boeing statements in these transcripts are referenced or relied upon in the CC. Thus, they rely solely on the judicial notice doctrine.

before Defendants' misstatements. This is a central fact "subject to reasonable dispute" given the FEs' contrary allegations and cannot be decided at this early stage before discovery. *Video Gaming Techs.*, 2018 WL 284991, at *3 (declining to judicially notice documents because "in essence, [defendant] is seeking an evidentiary ruling on the substantive merits of the claims" and "the effect of the information contained in the [documents] on [plaintiff's] claims in this litigation is subject to 'reasonable dispute' and therefore is not the proper subject of judicial notice"); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (on a motion to dismiss, courts may not "consider[] contents of a public record as an established fact and as evidence contradicting the complaint"). The transcripts thus are not noticeable and should be disregarded.[10]

Even if the Court does notice the October and November Transcripts, however, Boeing's statements do not render implausible, nor even necessarily contradict, FE 7 and FE 8's accounts of Boeing's order ***for Spirit and other suppliers*** to cut 737 MAX production. Defendants excerpt statements in the transcripts that ***Boeing*** did not intend to cut ***Boeing's*** production below ***42*** 737 MAX planes per month. *See* Mot. at 14. The CC alleges, however, that Boeing instructed ***Spirit*** and other suppliers to cut ***their*** production of ***52*** 737 MAX shipsets per month. ¶¶98–110. Boeing's private instruction to its suppliers is thus not necessarily inconsistent with Boeing's public claim that it would continue to produce 42 APM because, as alleged in the CC, Spirit was storing

---

[10] Notably, ***none*** of the cases Defendants cite support judicially noticing the transcripts here. *See* Mot. at 5 n.2. For example, in *Chipman v. Aspenbio Pharma, Inc.*, the plaintiffs did not oppose defendants' motion for judicial notice and argued only that they were unaware of "analysts' reports" on obscure websites. *See* 2012 WL 4069353, at *2, *6 (D. Colo. Sept. 17, 2012); Pl.'s Opp. to Mot. to Dismiss First Am. Individual Compl. at 10, *Chipman*, No. 11-CV-00163-REB-KMT (D. Colo. Nov. 21, 2011), ECF No. 30. Nor did the plaintiffs contest judicial notice in *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd. See* 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015). Finally, in *In re Pixar Securities Litigation*, transcripts were ***block quoted in the complaint*** and thus plainly noticeable. *See* 450 F. Supp. 2d 1096, 1100 (N.D. Cal. 2006); Am. Compl. ¶¶ 34, 51, 57, *Pixar*, No. 05-cv-4290-JSW (N.D. Cal. May 26, 2006), ECF No. 59.

*hundreds* of undelivered 737 MAX shipsets for Boeing. ¶¶85–87. In other words, it makes sense that Boeing would order its suppliers to cut production so that Boeing could take delivery of and complete the backlog of shipsets in storage at Spirit's facilities while still maintaining Boeing's own 42 APM rate.

Defendants' argument discounting FE 7 and FE 8's allegations based on Boeing's statements also relies on the faulty premise that it is implausible that Boeing would commit securities fraud. Mot. at 14 n.9. But this inference is belied by countless securities fraud decisions finding that public companies did just that.[11] Moreover, this argument is meritless here because, as described in Section IV.A.2, FE 7 and FE 8's detailed descriptions of Boeing's instruction must be accepted as ***true*** at this stage, and Defendants improperly ask the Courts to make inferences in Defendants' favor. *See Molycorp*, 157 F. Supp. 3d at 1001.

Finally, arguing that a court must assume that a company would never commit securities fraud is one ***every*** securities fraud defendant could make in ***every*** case, which is likely why Defendants cite ***no*** supporting authority. Indeed, the stronger inference is that Spirit was concealing the production cut in the hopes that the FAA would soon lift the 737 MAX grounding. *See Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1130 (D. Colo. 2017) ("it is more than logical for plaintiffs to assert that the Clovis Defendants acted in the hope that positive results would overtake negative ones"); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (inferring that defendants hoped to "conceal[] bad news in the hope that it will be

---

[11] The inference that Boeing would not lie to its investors is especially inappropriate here as Boeing is both currently litigating allegations of misrepresentations in connection with its 737 MAX program, *see* Consol. Class Action Compl., *In re Boeing Co. Aircraft Securities Litigation*, No. 1:19-CV-2394 (N.D. Ill. Feb 14, 2020), ECF No. 144, and has previously settled securities fraud claims alleging that the company "conceal[ed] important information about the status of Boeing's ***commercial airplane production health***." Stipulation of Settlement at 4, *In re Boeing Sec. Litig.*, No. 97-cv-1715 (W.D. Wash. Nov. 16, 2001), ECF No. 642.

overtaken by good news . . . like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered").

4.   Misstatements in Jefferies Report and The Wichita Eagle are Actionable

Defendants argue that the misstatements in the Jefferies Report and The Wichita Eagle are inactionable because they are not particularized and were published by third parties. Mot. at 15, 17–18. Not so. *First*, contrary to Defendants' assertions, the CC particularizes its allegations by attributing them to specific Defendants and identifying the meetings where the statements were made and the dates that the reports were published. ¶¶235–38. For example, the CC alleges that Jefferies, based on a recent "[m]anagement [m]eeting" on "the West Coast" with Gentile and Garcia to discuss Spirit's operations, reported that "[t]he [737] MAX is set to stay at a rate of 52/mo." ¶236. Likewise, on December 17, 2019 The Wichita Eagle reported that Gentile met with Kansas governor Laura Kelly after Boeing announced that it was halting 737 MAX production and told her that "he's optimistic that production of the troubled aircraft will resume soon," and that "he's not expecting to have to do layoffs." ¶¶238–39. These specifics are more than sufficient. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020) (statement in analyst report that "'Apple says the battery replacement program is having little impact on shipments'" actionable as "it is a reprinting of Apple's statement").

*Second*, these misstatements are actionable because Gentile and Garcia intended to distribute false information to the market through these third parties. *See, e.g.*, *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 562 n.12 (D. Colo. 1998) (rejecting argument that defendants "cannot be held liable for statements purportedly made by third-party analysts"); *see also In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) (third-party statements attributable to defendants where "the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those

37

statements to the market"); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("plaintiffs may state a claim against corporate officials for false and misleading information ***disseminated through analysts' reports*** by alleging that the officials [among other things] . . . intentionally fostered a mistaken belief concerning a material fact that was incorporated into reports").

Defendants' policy argument (Mot. at 16–17) fails because "[a] test that require[s] 'control,'" as Defendants advocate here, "would give company officials too much leeway to commit fraud on the market by using analysts as their mouthpieces." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 37–38 (1st Cir. 2002). Instead, the appropriate test is whether "defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree." *Id.* That test is easily satisfied here, as Plaintiffs allege that Gentile and Garcia made these discrete and identifiable statements "with the intention of distributing false information to the market." ¶124. In addition, Defendants' reliance on *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993), is misplaced. *Raab* did not allege any source for a paraphrased statement, while the CC alleges a specific meeting and its attendees. *Raab* also may no longer be consistent with the "current state of the law." *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 75 (D.D.C. 2008).

Further, Defendants are incorrect that these misstatements are inactionable because they were the third parties' "paraphrases" rather than direct "quotations." Mot. 15–16. "[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held actionable even if they are not exact quotations." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) (upholding "paraphrased" statements in analyst report); *see also Cabletron*,

311 F.3d at 38. The statements in the Jefferies Report and The Wichita Eagle clearly originated from the Defendants and are thus actionable.[12]

a)   *The Statement in the Jefferies Report Was False and Misleading*

The CC alleges that, according to FE 7 and as corroborated by FE 8, by no later than late September 2019 or early October 2019, well before the November 24, 2019 Jefferies Report was published, Boeing had *already* told Spirit to cut production of the 737 MAX *in half*, and that soon after receiving that instruction Spirit began planning the steps to reduce its production. ¶98. Defendants simply ignore these allegations, which alone establish falsity. *See* Mot. at 17 (challenging only FE 2's account for this statement).

In addition, FE 2's account adds further reasons for this statement's falsity. Per FE 2, in mid-November, approximately on November 14—*more than a week before the Jefferies report*— a senior Spirit executive, Vic McMullen, Senior Vice President, Global Manufacturing and Boeing Operations, announced at an internal meeting that FE 2 attended that Boeing had told Spirit to stop producing the 737 MAX after it completed the "line number" for fourth quarter 2019.[13] ¶¶121–22. These allegations show that by the time Gentile and Garcia met with Jefferies near the end of November, assuring them that the 52 APM would stay at 52 APM, they knew that was false given Boeing's contrary directive. ¶124. *See In re Level 3 Comm'ns, Inc. Sec. Litig.*, 667 F.3d 1331,

---

[12] Defendants' other cases are not to the contrary. The *Krstevski v. Welsh* plaintiffs did not identify "which defendant made each statement or to whom," 2016 WL 4532095, at *5 (D. Utah Aug. 29, 2016), and the statement in *In re Fisker Automotive Holdings, Inc. Shareholder Litigation* was not "wholly attributable" to the defendant, *see* 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015). Defendants' reliance on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-143 (2011) fails because that case did not involve such third-party publications of statements that clearly originated from Defendants.

[13] FE 2 stated that the meeting with McMullen was approximately two weeks before Thanksgiving, which was on November 28, 2019. ¶122. Thus, this meeting likely occurred on or around November 14, 2019—well before the November 24 Jefferies Report.

1342 & n.9 (10th Cir. 2012) (allegations of a "mid-December 2006 report" that was "inconsistent" with defendants' public statements sufficient to defeat dismissal).

Further, the CC makes clear that FEs 7 and 2 had a sufficient basis of knowledge to support the falsity of the statement in the Jefferies Report. *See supra* Section IV.A.2 (FE 7). The CC alleges FE 2's title, position, responsibilities, and that she attended daily meetings for program managers that were led by a Director or Senior Manager, and sometimes Senior Director Jim Hans, to discuss 737 MAX production and progress toward meeting the line number. ¶¶46, 121.[14] She also described a specific meeting where she was directly told by SVP McMullen that Spirit was suspending production of the 737 MAX. ¶122. While Defendants twist FE 2's account to suggest that Boeing directed Spirit to "temporarily" stop production (Mot. at 17), FE 2 made clear that Spirit was to ***stop*** production when the fourth quarter 2019 line number was completed and gave no indication when production would resume. ¶122. These allegations are sufficiently particular to support a reasonable belief that Gentile's and Garcia's statement to Jefferies was false. *Adams*, 340 F.3d at 1098.

b)      *The Statements in* The Wichita Eagle *Article Are Actionable*

Gentile's statements in The Wichita Eagle are similarly actionable. For example, Gentile's statement that he was "optimistic that production of the troubled aircraft will resume soon" is actionable because it is a statement of corporate optimism that has a "basis in objective and verifiable fact." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997). In *Grossman*, the Tenth Circuit held that defendant's statement that he was "pleased with the accelerating pace of product development since the acquisition was announced in March[]" was actionable. *Id.*

---

[14] That FE 2 was "five reporting levels below the Individual Defendants," Mot. at 17, is irrelevant to her direct knowledge of the 737 MAX production suspension based on this meeting. *See Synchronoss*, 2020 WL 2786936, at *9.

Similarly here, Gentile's statement that he was "optimistic that production would resume soon[]" was objectively verifiable, had some basis in fact, and is not puffery. *See Shure Inc. v. Clearone, Inc.*, 2020 WL 2839294, *7 (D. Del. June 1, 2020) (statement that product would be unavailable *soon* was "verifiably false statement[] of fact" and thus actionable).[15]

Moreover, "an optimistic statement's materiality must be evaluated in light of the 'total mix' of information available to the market, and optimistic statements may be actionable where material, nondisclosed information undermines the truth of those statements." *SemGroup,* 729 F. Supp. 2d at 1294. Here, Gentile failed to disclose material facts that directly contravened his optimistic assertion that production of the 737 MAX would resume "soon," namely that Spirit was planning extensive layoffs and had been implementing Boeing's order to cut production since October. ¶¶237–38; *In re Sprint Corp. Sec. Litig*., 232 F. Supp. 2d 1193, 1219 (D. Kan. 2002) (statements expressing "confidence" and "expectation[s]" regarding regulatory approval actionable where defendants omitted adverse information).

Similarly, Defendants are wrong that Gentile's insistence that Spirit "was not expecting to have to do layoffs" is an inactionable opinion that was "entirely consistent" with the internal reality described by the FEs. *See* Mot. at 19. As an initial matter, Gentile's statement is not opinion for the reasons set forth in Section IV.A.1 *supra*. In addition, even if considered an opinion, the statement is actionable because it misleadingly suggests that layoffs are unlikely while omitting the contrary facts that Spirit had been planning for such layoffs since October. *See Omnicare*, 575 U.S. at 189; *FDIC v. RBS Acceptance, Inc.*, --- F. Supp. 3d ----, 2020 WL 491202 (D. Colo. Jan. 30, 2020) (opinion actionable because defendants failed to disclose conflicting facts).

---

[15] In contrast, Defendants' case, *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996) (Mot. at 18), involved a vague statement that defendants were "optimistic *about 1993*," which was not capable of such verification. *Id.* at 811.

**B. Defendants Misled the Market About Spirit's Compliance with Established Accounting Procedures and Internal Controls Over Financial Reporting**

Separately from misrepresenting Spirit's 737 MAX production rate, Defendants falsely represented that, during the Class Period, the Company maintained effective internal controls over financial reporting. Defendants argue that these misstatements are not actionable because the weakness in internal controls was not "material," misstatements in SOX certifications are inactionable, and their statements were literally true. Mot. at 19–26. None of these contentions has merit. Because the CC alleges with particularity the material weakness in Spirit's internal controls and the basis for Defendants' knowledge or reckless disregard of that material weakness, Defendants' misstatements are actionable. *See*, *e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606–07 (S.D.N.Y. 2009) (averments concerning internal controls statements actionable where the complaint specified misstatements and explained why statements were fraudulent); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 742–743, 745–746 (E.D. Mich. 2007) (certification as to adequacy of internal controls actionable).

1. The Material Weakness in Spirit's Internal Controls

During the Class Period, *76%* of Spirit's contracts, including its contracts with Boeing, were long-term contracts for which the Company recognized expenses, revenue, and related income "over time." ¶¶138–40. To properly recognize this revenue in accordance with GAAP, Spirit had to determine the total costs it expected to incur in performing the underlying contracts, and then recognize revenue and income accordingly based on progress towards the end of the projects. ¶143. Spirit made these calculations using an "estimate at completion" process, or "EAC." ¶¶143–44. Securities laws require Spirit to maintain an effective system of internal controls over financial reporting, including with respect to its EAC process given the magnitude of its "over time" contracts to its results of operations.

42

As described in Sections II.E–F above, and according to FE 9 and FE 10, however, there was a material weakness in these controls stemming from Campbell's abuse of the EAC process. ¶¶151–56. FE 10, who provided financial forecasts for the costs of Spirit's aircraft programs (¶55), described how Campbell would make her group to revise cost estimates using figures that lacked underlying support, were not in line with the best information available to the Company and were not consistent with GAAP (¶153). Similarly, FE 9, a manager in Spirit's finance group who oversaw a team supporting the Company's Boeing programs (¶54), personally witnessed Campbell consistently and intentionally underestimating Boeing Claims for purposes of determining the EAC. ¶¶171, 174–75. FE 9 confronted Campbell about his conduct, but he either bullied or ignored her. ¶176. FE 9 also raised her concerns directly to Gilson when she "was called into" Gilson's office for a meeting in early 2019, but he ignored her as well. ¶178. Per FE 9, Campbell also regularly discussed the 737 EAC estimates with Gentile, Garcia, and Gilson at quarterly EAC reviews, but they knowingly or recklessly disregarded Campbell's misconduct. ¶¶180–83.

Despite Campbell's manipulation of the EAC process, on October 31, 2019, Defendants represented to investors that Spirit complied with GAAP and had effective internal controls over financial reporting, as required by SOX (¶¶244–46, 248) and that the 3Q 2019 10-Q "contained all adjustments . . . necessary to fairly present the results of operations." ¶¶242, 249. In addition, Garcia and Gilson certified that Spirit's financial statements had been prepared in accordance with established accounting principles. ¶¶240–41. These statements were false and misleading, however, because, as described above, Defendants knew, or recklessly disregarded that Spirit's internal controls over financial reporting were not effective during the Class Period as a result of the material weakness emanating from Campbell's EAC process manipulation. *See, e.g., In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *10 (S.D. Cal. May 23, 2017) (denying dismissal

where confidential witnesses described inadequate internal controls); *In re S. Pac. Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1179 (D. Or. 1999) (denying motion to dismiss claims concerning inadequate internal controls).

### 2. Defendants' Misstatements Regarding Internal Controls Were Material

Defendants' primary challenge to their alleged misstatements regarding Spirit's internal controls is that these misrepresentations and omissions are inactionable because the material weakness in Spirit's internal controls was "undisputedly immaterial" in light of Defendants' statements that it amounted to only an $8 million accounting violation, which did not require a restatement of Spirit's financials. Mot. at 19. Materiality, however, is a "mixed question of law and fact and ordinarily should be reserved for the trier of fact," *Yellowdog*, 426 F. Supp. 3d at 870, and thus the CC's claims may only be dismissed on this ground if the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldstone*, 952 F. Supp. 2d at 1120. Under this standard, the CC plainly alleges that the undisclosed the weakness in Spirit's internal controls was material.

*First*, Defendants themselves admitted the materiality of this weakness. Defendants told investors that Spirit had a "***material weakness*** in our internal control related to our EAC process," which was central to the accounting practices that governed ***76%*** of the Company's contracts, and that, therefore, was a "***critical item the Company must address***." ¶129. Indeed, "[t]he profitability of certain programs depend[ed] significantly" on these controls. *Id.*

*Second*, Spirit's assessment of its internal controls over financial reporting is a critical metric for investors because it assures investors that the Company's financial statements are reliable. *See, e.g.*, *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *3 (M.D. Pa. Feb. 8, 2016) (effectiveness of internal controls is "information that a reasonable investor would consider significant in making an investment"); *In re Bear Stearns Cos. Sec.*

44

*Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 471 (S.D.N.Y. 2011) ("assessment of internal control over financial reporting was a critical metric for investors").

*Third*, Defendants' argument that the weakness in Spirit's accounting controls was immaterial because Spirit did not restate any financial reports (*see* Mot. at 19) fails because the CC alleges that Defendants' ***assurances*** of effective internal controls, not the ***size*** of errors in financial results, were materially misleading. *See* ¶¶239–50. Thus, the lack of a financial restatement is irrelevant. Indeed, Courts have repeatedly found similar misstatements concealing material weaknesses actionable where there was no financial restatement. *See In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (misstatements concerning internal controls actionable even though "Enzymotec has not restated any of its financial results and Enzymotec's independent auditors have never questioned Enzymotec's internal controls"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("the lack of a restatement did not mean that LDK only engaged in legitimate conduct").

Defendants' cases do not hold otherwise. For example, *Tabak v. Canadian Solar Inc.* focused on the size of a misreported transaction that represented only a "small fraction" of a company's business. *See* 549 F. App'x 24, 27 n.2 (2d Cir. 2013). Here, unlike *Tabak*, the weakness affected processes associated with ***76%*** of Spirit's contracts, was "a critical item the Company must address" on which "profitability of certain programs depend[ed] significantly," and concerned, among other things, the 737 MAX, which alone accounted for over ***50%*** of Spirit's revenues. *See* ¶¶70, 127–29. Accordingly, Defendants' misrepresentations were material.

### 3. Defendants' Misrepresentations in SOX Certifications Are Actionable

Defendants also argue that the misstatements contained in the SOX certifications attached to the 3Q 2019 10-Q are not actionable as a matter of law because such certifications "are not independently actionable." Mot. at 21–22. Defendants are incorrect. SOX certifications are

actionable where, as here, the complaint asserts facts "indicating that, at the time of the certification, that defendants knew or consciously avoided any meaningful exposure to the information that was rendering their certification erroneous." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417–18 (D. Del. 2009); *see also, e.g.*, *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007); *Wieland v. Stone Energy Corp.*, 2007 WL 2903178 (W.D. La. Aug. 17, 2007). Indeed, none of the cases cited by Defendants is apposite. For example, in *Lorusso v. Boulder Brands, Inc.*, 2017 WL 4365180, at *14 (D. Colo. Mar. 1, 2017), the court held that SOX certifications were not actionable for failure to plead "particularized facts demonstrating the[ir] falsity." Here, however, FE 9 and FE 10 detail how Spirit's internal controls were ineffective and Defendants knew or willfully ignored this. ¶¶172–80. None of Defendants' other cases holds otherwise. *See* Mot. at 22 n.13 (citing cases).

Defendants also argue conclusorily that the CC does not allege that they knew or recklessly disregarded that their SOX certifications were misleading. *See* Mot. at 22. As set forth in Section IV.B, *supra*, however, the CC alleges Defendants' knowledge or recklessness because, among other things, FE 9 personally warned Gilson about Campbell's misconduct (¶178), and Defendants discussed the EAC with Campbell at EAC reviews and other meetings, but willfully ignored whether Campbell's EAC calculations were supported, reliable, or accurate (¶¶172–80).

Defendants also argue that their representation that they had "design[ed]" internal controls was literally true. *See* Mot. at 23. But misleading "half-truths" that omit key facts are actionable. *See Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("The law is well settled . . . that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities

fraud"). Thus, Defendants' statements about designing internal controls are actionable because they created the misimpression that Spirit's controls were effective, when they were not.[16] *See Richman v. Goldman Sachs Grp.*, *Inc.*, 868 F. Supp. 2d 261, 277 (S.D.N.Y. 2012) ("[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest" was actionable for creating misimpression that controls effectively addressed conflicts).

Finally, Defendants argue that their certifications merely stated that they had disclosed all material weaknesses "based on [their] ***most recent*** evaluation" of Spirit's internal control. Mot. at 23. In other words, Defendants again argue that this misstatement is inactionable because it was "literally true," *i.e.*, Gentile and Garcia were only certifying as to what they had discovered and reported in the specific evaluation of Spirit's internal controls that they conducted in 3Q 2019. But this argument fails because, as noted above, such misleading "half-truths" that omit key facts are actionable. *See Omnicare*, 575 U.S. at 192; *Vivendi,* 838 F.3d 223 at 240. The CC alleges that this statement was misleading because Defendants knew or recklessly disregarded the existence of a material weakness when they made the statement. *See* ¶¶172–80.[17] In other words, the CC alleges that a reasonable investor would understand that Defendants' reference to their "most recent"

---

[16] For this reason, Defendants' cases, which did not allege that the alleged misstatements created the misimpression that a company had effective controls, are inapposite. *See* Mot. at 23, citing *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007). *In re Banco Bradesco S.A. Securities Litigation* is also inapposite because that court dismissed plaintiffs' controls claims for failing to allege "the design or structure of Bradesco's internal controls." 277 F. Supp. 3d 600, 654 (S.D.N.Y. 2017). Here, the CC describes the deficient internal controls with particularity. ¶¶158–68.

[17] Defendants' cases are inapposite (Mot. at 23–24 & n.16–17) as they did not concern allegations, like the CC's, of knowledge or reckless disregard of a material weakness. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *25 (D.N.J. Aug. 8, 2018); *Wanca v. Super Micro Comput., Inc.*, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018), *appeal dismissed*, 2018 WL 7107616 (9th Cir. Oct. 30, 2018).

evaluation was an assurance that Spirit's internal controls were effective, not that Defendants' certification did not cover previously discovered, undisclosed, and unremediated weaknesses.

4.   Defendants Misrepresented that Spirit's Internal Controls Were Effective

Defendants next argue that their statements that Spirit's "disclosure controls . . . are effective" (¶244) and "internal control over financial reporting was effective" (¶246) are not misleading as those statements only represent that Defendants *evaluated* those controls.[18]

Defendants again misread the CC, which alleges that Defendants *misrepresented the strength and quality* of existing controls and concealed the *existence* of "conduct actionable under the securities laws," rather than simply "matters of business judgment" or mismanagement.[19] *Novak*, 216 F.3d at 311–12; *see also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 950 (E.D. Pa. 1999) (plaintiffs pled securities fraud where defendants were "aware that mismanagement had occurred and made a material public statement of corporate affairs inconsistent with the *existence* of the mismanagement"). Indeed, courts have upheld similar misrepresentations. *See*, *e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 258 (5th Cir. 2005) (reversing dismissal where "plaintiffs

---

[18] Defendants also argue that these statements are not misleading because they are literally true. *See* Mot. at 21 n.12. The CC alleges, however, Defendants' statements were half-truths creating a misimpression that Spirit's internal controls, including those over financial reporting and disclosures, were effective, when they were not. Thus, Defendants' misstatements are actionable. *See Omnicare*, 575 U.S. at 192; *Vivendi,* 838 F.3d 223 at 240.

[19] Defendants rely almost entirely on *Red Robin* to argue that the statements in paragraphs 244 and 246 are inactionable, but that case is distinguishable. Mot. at 21. *Red Robin* held that plaintiffs' claims failed because they only alleged that "had management evaluated the Company's disclosure and financial reporting controls correctly, it would have or should have found them to be deficient." 505 F. Supp. 2d 662, 683 (D. Colo. 2007). This is not what the CC alleges. Rather, the CC alleges Defendants falsely assured investors that Spirit's internal controls were effective when Defendants knew they were not, allegations courts use to distinguish *Red Robin* and sustain claims for internal control misrepresentations. *See*, *e.g.*, *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *8 (S.D.N.Y. Sept. 19, 2017); *Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *3 (M.D. Pa. Feb. 8, 2016).

identified witnesses who claim[ed] that" defendants "actually knew about" control weaknesses); *Pa. Ave. Funds v. Inyx Inc.*, 2010 WL 743562, at *8 (S.D.N.Y. Mar. 1, 2010) (misstatements actionable where defendants knew of weaknesses).

### 5.   Defendants Misrepresented Spirit's Adherence to GAAP.

Defendants next argue that their assurances that Spirit's financial statements were "prepared in accordance with GAAP" are not misleading because those statements were literally true and did not expressly assure investors that Spirit's financial statements did not have an "accounting error." *See* Mot. at 24. Not so. The CC alleges that, when seeing Defendants' representation that Spirit's financial reports were prepared "in accordance with GAAP," a reasonable investor, who knew from Spirit's other disclosures that the Company recognized certain revenue over time (¶141), would understand that Spirit was recognizing certain long-term contract revenue "on the basis of [Spirit's] efforts or inputs to the satisfaction of a performance obligation (for example, resources consumed, labor hours expended, costs incurred, time elapsed, or machine hours used) relative to the total expected inputs to the satisfaction of that performance obligation" (¶142), *i.e.*, *in accordance with GAAP*. As described by FE 9 and FE 10, however, Spirit was recognizing revenue and income associated with *76%* of its contracts using unsupportable numbers devised by Campbell to benefit Spirit, which is *a GAAP violation*. *See* ¶¶151–85.[20] What a reasonable investor would take from the assurances of "accordance with GAAP" differs from "the facts on the ground," and thus Defendants' statements are false and actionable. *See Level 3*, 667 F.3d at 1343.

---

[20] Defendants also argue that "companies routinely disclose that their financial statements were prepared in accordance with GAAP even where they have identified an existing material weakness in internal controls." *See* Mot. at 24–25. This is Plaintiffs' point. Spirit's later 2019 10-K was not false and misleading *because it disclosed the material weakness*. The 3Q 2019 10-Q, in contrast, concealed the material weakness and thus *was* false and misleading.

Defendants suggest that they were entitled to rely on their accountants' audit opinion that Spirit's financial statements conformed with GAAP. *See* Mot. at 25. However, the fact that Defendants may have been successful in hiding these material weaknesses and any related impacts on their financial statements from the auditors, at least for a time, is irrelevant as to whether Defendants are liable for failing to disclose that weakness and the deviations from GAAP. *See*, *e.g.*, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *52–53 (similar misstatements actionable even though "independent auditors have never questioned [company's] internal controls"). In addition, reliance on an auditor's opinion is only appropriate "[w]here a company provides its auditors with all of the information necessary for the auditors." *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1351 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012). Here, however, Defendants did not disclose the material weakness and thus did not provide "all of the information necessary" that would allow them to rely on their auditors' opinions.

### 6. Defendants' Representations That Spirit's Internal Controls Had Not Materially Changed Were False and Misleading

Finally, Defendants argue that their assurance in the 3Q 2019 10-Q that "[t]here were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" could not be misleading because that statement was literally true. *See* Mot. at 26 (citing ¶248). Defendants again ignore that this statement was made with other statements in the 3Q 2019 10-Q, the SOX certifications attached to that 10-Q, or other statements incorporated by reference into that 10-Q (*see* ¶246–47) that collectively created the misimpression that Defendants' internal controls had been, and still were, effective, when Defendants knew that the opposite was true. *See, e.g.*, *Omnicare*, 575 U.S. at 192; *Vivendi*, 838 F.3d 223 at 240.

50

### C.  The CC Pleads a Strong Inference of Scienter

In determining whether a complaint states with particularity facts giving rise to a strong inference of scienter under the PSLRA, the Tenth Circuit examines the "plaintiff's allegations *in their entirety* . . . and determine[s] whether the plaintiff's allegations, taken as a whole, give rise to a strong inference of scienter." *Adams*, 340 F.3d at 1105. A "strong inference" of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.* This inference need only be as compelling as any opposing inference, and "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 314, 324. In other words, a tie in the weighing of inferences goes to Plaintiffs. *See id.* at 324, 328.

In the Tenth Circuit, "[s]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun*, 782 F.3d at 1150. Recklessness is "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Level 3*, 667 F.3d at 1343. A strong inference of scienter is thus pled if the CC "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

As set forth below, the CC pleads scienter because its allegations, taken holistically, show Defendants knew or recklessly disregarded facts contradicting their statements concerning Spirit's 737 MAX production and internal controls. Accordingly, Defendants' arguments fail.

1. <u>Defendants' Misstatements Regarding Spirit's 737 MAX Production Rate</u>

    a) *Defendants Knew of Boeing's Order to Cut 737 MAX Production*

FE 7's account of Boeing's instruction to Spirit to cut production shows that Defendants had actual knowledge of this fact. FE 7 stated that Campbell, and most likely Garcia and Gilson, attended the late-September or early-October 2019 production meeting where Boeing instructed Spirit to cut 737 MAX production in half. ¶¶102–03. These allegations alone are sufficient to plead these Defendants' scienter. *See, e.g., Nibur v. SandRidge Mississippian Tr. I*, 2017 WL 3996421, at *4 (W.D. Okla. Sept. 11, 2017) (allegations that defendants learned information contrary to public statements in meetings sufficient to allege scienter); *Williams*, 339 F. Supp. 2d at 1235 (scienter adequately pled because the defendant attended weekly and monthly meetings where relevant financial information was discussed). Moreover, as discussed in Section IV.C.1.(b) *infra*, it strains credulity that these Defendants then did not inform Gentile of this drastic production cut in Spirit's most important product given his admitted close personal involvement in monitoring 737 MAX production.

Further, the CC includes additional allegations confirming that Gentile was in fact informed of Boeing's directive to cut production by the time of his misstatements on October 31, 2019. Specifically, FE 7 details how, in light of Boeing's instruction, she was tasked with contributing to reports to determine the number of layoffs necessary to implement the cuts, which were approved by Campbell and presented to Gentile by late October 2019. ¶¶104–05. These allegations thus support a strong inference of Gentile's scienter because they show that Gentile knew of Boeing's production cut at least through those subsequent layoff analyses, which directly contradicted his October 31 misstatements assuring of no changes in the 52 APM rate. *See Williams*, 339 F. Supp. 2d at 1235 (allegations of defendants' use of "divisional reports prepared on a monthly basis" pled scienter); *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *4

(S.D.N.Y. Oct. 19, 2009) (plaintiffs "identif[y] and describe[]" reports that "put the Defendants on notice that their public statements were materially misleading").[21]

Defendants argue that the CC does not allege a strong inference of scienter based on cases finding *generalized* descriptions of meetings and reports insufficient, but that is not what is alleged here. *See* Mot. at 29–30; Garcia Mot. at 10; Gilson Mot. at 8–9. For example, in *Anderson*, unlike here, the plaintiffs failed to specify a meeting where the defendants learned of cost overruns for each of the three allegedly misrepresented projects, nor did the plaintiffs allege that the defendants received reports disclosing the overruns. *See*, 827 F.3d at 1239–40. Similarly, in *Smallen* the court held that allegations of meetings were not sufficient to plead scienter because the plaintiffs only alleged discussions of the "need for improving" a company's compliance controls was not sufficient to allege that the attendees had discussed "ongoing, unaddressed compliance violations," while in this case, the CC alleges that Boeing specifically instructed Spirit to cut 737 MAX production. *See Smallen v. W. Union Co.*, 950 F.3d 1297, 1307 (10th Cir. 2020) ("[w]e fail to see how . . . discussions about the need for improving Western Union's compliance controls equates to knowledge of ongoing, unaddressed compliance violations."). Finally, in *Garfield v. NDC Health Corp.*, the Court held that plaintiffs failed to plead scienter based on defendants' attendance at meetings because the plaintiffs "failed to allege what was said at the meeting, to whom it was said, or in what context." *See* 466 F.3d 1255, 1265 (11th Cir. 2006). Here, by contrast, the CC alleges these details with particularity, including that Boeing instructed Spirit to cut production of

---

[21] Garcia claims *In re Level 3 Communications* held that such reports are "insufficient to draw a strong inference of scienter." Garcia Mot. at 10. But *Level 3* held exactly the opposite—that "*the conflict between internal reports and public statements would be evidence of scienter*." *See Level 3*, 667 F.3d at 1345. *Level 3* dismissed claims for failure to allege that reports *contradicted* misrepresentations. *See id.* Here, in contrast, the CC alleges the reports regarding layoff analyses and related planning to implement the production cut directly contradict Defendants' public statements assuring that Spirit's production rate remained intact.

737 MAX shipsets *in half* (¶98) (*i.e.*, what was said) and that the instruction was given to Campbell, and likely Gilson and Garcia (¶100) (*i.e.*, to whom) during a Boeing-Spirit meeting to discuss the status of 737 MAX production (¶98) (*i.e.*, the context).

The CC's allegations of Boeing's instruction and the layoff analyses described by FE 7 are sufficient because "[p]laintiffs need not allege 'the exact date and time' when defendants became aware of [contrary] information" to plead a strong inference of scienter, as long as it "suppl[ies] some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. Mar. 28, 2005) (quotations and citation omitted); *see also In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014).[22]

> b)      *The Importance of the 737 MAX to Spirit's Operations Supports a Strong Inference of Scienter*

The CC's core operations allegations further support a strong inference of scienter here. Under this doctrine, the CC's allegations support a strong inference of scienter because "the nature of the relevant facts allegedly known and not disclosed by defendants was of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Hampton v. root9b Techs, Inc.*, 2016 WL 7971184, at *28 (Aug. 4, 2016), *objections to report and recommendation sustained on other grounds*, 2016 WL 9735744 (D. Colo. Sept. 21, 2016). The CC details Boeing's close working relationship with Spirit and the importance of the 737 MAX program as the Company's largest program that accounted for over 50% of annual revenue. ¶¶306–

---

[22] Defendants also repeat their argument that it is implausible that Defendants had actual knowledge that Boeing was going to cut 737 MAX production because Boeing was telling its own investors something different. Mot. at 29 n.20. As set forth in Section IV.A.3 *supra*, this argument fails because it asks this Court to make impermissible factual inferences in Defendants' favor based on their improper request for judicial notice, and because Boeing's public statements are not inconsistent with the CC's well-pled allegations.

11. Defendants, however, argue that these "core operations" allegations are insufficient standing alone and merely amount to allegations that "'must have known' of fraud because of their position in the company." *See* Mot. at 29, 35 (citing *Anderson*, 827 F.3d at 1245). Defendants are wrong.

First, contrary to Defendants' unsupported claim, Plaintiffs are not relying on core operations allegations alone to plead scienter. Rather, under *Tellabs*, these allegations must be viewed holistically with the CC's numerous other allegations of scienter, including notably the FE accounts. Courts in this Circuit, and elsewhere, have repeatedly held that such "core operations" allegations concerning the importance of a business can support an inference of scienter, particularly when viewed holistically with other scienter allegations, as here. *Yellowdog*, 426 F.Supp.3d at 875 ("the importance of this business is relevant and may be considered for purposes of this scienter inquiry"). In addition, Defendants citation to *Anderson* is inapposite because the projects in that case were only 20% of revenue, while the 737 MAX constitutes 50% of Spirit's revenue. ¶70. In addition, the CC, unlike *Anderson*, alleges that Defendants worked closely with Boeing on production and reviewed reports contradicting their representations. ¶¶80–81, 104–05.

Indeed, the CC's allegations track those in *Peace Officers' Annuity & Ben. Fund of Georgia v. DaVita Inc.*, which distinguished *Anderson*. *See* 372 F. Supp. 3d 1139, 1154–55 (D. Colo. 2019) ("unlike in *Anderson*, [d]efendants' statements cannot be characterized as 'overly optimistic' projections about [company's] abilities" because "[d]efendants' statements flatly denied the existence of the program that [p]laintiffs have plausibly alleged existed"). Like *Davita*, the CC alleges that Garcia, Gilson, and Campbell were personally involved in the 737 MAX production meeting where Boeing ordered a cut. Further, Defendants flatly denied any 737 MAX production cut, falsely assuring investors "we're going to be at 52 for an extended period of time" (¶117), which supports a strong inference of scienter. *See DaVita*, 372 F. Supp. 3d at 1154–55.

Defendants also mischaracterize the CC in arguing that it merely alleges that alleges Defendants "must have known" of fraud because of their respective positions. *See* Mot. at 29. To the contrary, the CC alleges that Defendants knew that Boeing had ordered a production cut because Campbell (and likely Garcia and Gilson) attended the meeting where Boeing issued the cut, and Campbell and Gentile reviewed and approved reports concerning layoffs necessary to implement the cut. ¶¶98–105. Defendants' cases do not consider such particularized allegations and, therefore, are irrelevant. *See, e.g.*, *Anderson*, 827 F.3d at 1245; *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 538 (S.D.N.Y. 2009).

### c)    *Gentile's Misstatements to Analysts Show His Scienter*

Gentile's misleading statements to analysts also support a strong inference of his scienter. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("The most powerful evidence of scienter" includes misleading "response[s] to repeated questions" by analysts). For example, in response to analysts' direct questions about future production cuts, Gentile said, "If Boeing goes down more, ***we would sit down and talk with them about what's the appropriate production level*** for us" and "***we're going to be at 52 for an extended period of time***." ¶¶116–17. These statements were false because Gentile knew that Boeing had ***already*** "sat down and talk[ed]" with Spirit and instructed the Company to cut production. *See, e.g.*, *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) ("detailed factual statement[s], contradicting important data to which [Defendants] had access, [create] a strong inference . . . that [they] knowingly misled the public"); *see also Carmignac Gestion, S.A. v. Perrigo Co.*, 2019 WL 3451523, at *15 (D.N.J. July 31, 2019) ("repeatedly respond[ing] to pointed analyst questions" and "answers indicat[ing] personal knowledge of the subject" support scienter inference).

2.   Defendants' Misstatements Regarding the Company's Internal Controls

a)       *Defendants Knew or Recklessly Ignored the Material Weakness*

The CC also alleges that Defendants knowingly or recklessly misrepresented the effectiveness of Spirit's internal controls over financial reporting because Defendants knew or recklessly disregarded the material weakness in those controls. For example, FE 9[23] stated that she repeatedly confronted Campbell about his improper insistence on using unvalidated, unsupported and unreasonably low[24] estimates of costs the Company expected to incur in performing long-term contracts, including costs associated with claims submitted by Boeing in connection with the 737 MAX program, but he either bullied or ignored her. ¶176. FE 9 also said that she raised her concerns about Campbell directly to Gilson in early 2019 during a meeting called ***because of her objections to the weaknesses in Spirit's EAC process***, but that Gilson ignored her as well. ¶178. Such particularized allegations of Defendants' insistence on engaging in misconduct over repeated protests by a confidential witness allege a strong inference of scienter. *See, e.g.*, *Mishkin v. Zynex Inc.*, 2011 WL 1158715, at *6 (D. Colo. Mar. 30, 2011) ("[the defendants] insisted that this practice continue, the CWs represent, even when [they] were confronted repeatedly with facts showing that collection of the billed amounts was essentially impossible"); *Dobina v. Weatherford Int'l Ltd.*,

---

[23] Defendants argue that FE 9's position is not alleged with particularity. Mot. at 34. This is incorrect. *See supra* Sections II.E–F & IV.B.1. If necessary, Plaintiffs can provide additional identifying information for FE 9 to the Court for *in camera* review. ¶54 n.6. Plaintiffs withheld this information at FE 9's request because of her fear of retaliation. *Id.* Defendants should not be permitted to use FE 9's fear to avoid liability, and none of their cases hold otherwise. *See, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004).

[24] Defendants assert that the CC only alleges Campbell was optimistic. Mot. at 35 n.26. Not so. The CC alleges Campbell ***knew*** his EAC submissions were unvalidated and unsupported because he bullied, intimidated, and ignored FE 9. *See* ¶¶180–82. The CC also alleges Campbell manipulated the EAC because Gentile, Gilson, and Garcia knew of or recklessly ignored his misconduct, not because he was young and knew no better. ¶¶164–65; 180–82, 305.

909 F. Supp. 2d 228, 246–47 (S.D.N.Y. 2012) (statement that confidential witness raised "genuine[] concern[s]" to defendants supported scienter inference).

FE 9 also described how Gentile, Garcia, and Gilson knew of or recklessly ignored Campbell's conduct through regular meetings such as the EAC Reviews. For example, FE 9 stated that the Boeing Claims had ballooned and were affecting Spirit's financial reporting and being used by Boeing in negotiations over other issues. ¶180. The ever-increasing claims were thus a serious concern and discussed at quarterly EAC review meetings (¶¶180–82), monthly Executive Program Reviews for Spirit's 737 program (¶183) and separate briefings, all of which FE 9 attended, along with Campbell, and Gentile, Gilson or Garcia. FE 9's account also indicates that Defendants essentially ignored apparent discrepancies between Boeing Claims and Campbell's amounts. *See* ¶182. Courts routinely hold that such allegations are sufficient to support a strong inference of scienter. *See Sandridge*, 2017 WL 3317862, at *10 ("weekly management meetings," "weekly team meetings," and "weekly [e]xploration [m]eetings"); *Wieland*, 2007 WL 2903178, at *7 ("numerous meetings" discussing inaccurate financials); *see also Dobina*, 909 F. Supp. 2d at 246–47 ("taxes 'were always an area of concern' and a 'constant' issue").

Defendants respond by mischaracterizing these allegations as generalized references to meetings that are insufficient to allege scienter. *See* Mot. at 29–30; Garcia Mot. at 10; Gilson Mot. at 8–9. But, as set forth in Section IV.C.1.(a), *supra*, Defendants are wrong. In addition, Defendants' claim that the CC's allegations of meetings are not particularized does not withstand scrutiny. The CC alleges how often the meetings occurred, that they were attended by all Individual Defendants, and that the quarterly reviews references by FEs were ***specifically*** for the EAC. *See* ¶¶180–83. The CC's allegations are thus materially different from the allegations in Defendants' cases. *See Anderson*, 827 F.3d at 1239–40; *Smallen*, 950 F.3d at 1307; *Garfield,* 466 F.3d at 1265.

Defendants also argue that the CC's allegations **negate** an inference of Defendants' scienter by alleging that the material weakness was "'not adequately discussed' at the meetings Gentile, Garcia, and Gilson purportedly attended." Mot. at 30. Contrary to Defendants' position, FE 9's allegation is a first-hand account of Defendants intentionally or recklessly **ignoring** the material weakness that **supports** a strong inference of scienter. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979 (N.D. Cal. 2015) ("[w]hen the defendant is aware of the facts that made the statement misleading, he cannot ignore the facts and plead ignorance of the risk"); *Roseville*, 686 F. Supp. 2d at 417–18 (scienter alleged where complaint asserts facts "indicating that, at the time of the certification, that defendants knew or consciously avoided any meaningful exposure to the information that was rendering their certification erroneous").

Further, Defendants conclusorily aver that the CC does not allege that Defendants were presented with information "at odds with their public statements," and that the CC merely alleges that Defendants "were negligent in failing to put together the pieces." *See* Mot. at 30 n.21. This understates the CC's particularized allegations of FE 9's effort to raise specific concerns about the material weakness in the Company's internal controls, including discussing them personally with Gilson, and Defendants' knowledge or willful disregard of Campbell's misconduct. *See* ¶¶180–82. At best, Defendants improperly demand that the CC "plead with particularity 'every single fact upon which their beliefs concerning false or misleading statements are based,'" which is not the standard for dismissal. *See Adams*, 340 F.3d at 1098–99; *JPMorgan*, 363 F. Supp. 2d at 624.

Defendants also contend that FE 9's failure to stop Gilson's intentional and reckless misconduct by ultimately "sign[ing] off" on Spirit's manipulated EAC shows that Gilson did not act with scienter but offer **no** authority to support it. *See* Mot. at 30 n.21 & 34; Gilson Mot. at 17.

This is because FE 9's confrontation with Gilson and her later resignation *support* a strong inference of his scienter.

Finally, Defendants argue that FE 9's allegations of her confrontation with him should be disregarded because the confrontation occurred prior to the Class Period. Mot. at 34. But FE 9's pre-Class Period allegations show Gilson's knowledge of the material weakness at the start of the Class Period on October 31, 2019 when his and the other Defendants' were made, and should thus be credited. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data is relevant" to establish falsity and scienter "at the start of the class period"); *REMEC*, 702 F. Supp. 2d at 1222 ("statements made before the class period can be relevant evidence on this issue of scienter because they may provide insight into what the defendant knew during the class period"). Defendants' cases are readily distinguishable because they do not involve a confidential witness's statements prior to the class period warning of the very misconduct that was later revealed. *See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.,* 778 F.3d 228, 245 (1st Cir. 2015); *Francisco v. Abengoa, S.A.*, 2020 WL 4940752, at *18 (S.D.N.Y. Aug. 21, 2020).

> **b)**      *Defendants' Terminations Strongly Support a Scienter Inference*

The CC's allegations that Garcia and Gilson resigned (*i.e.*, were fired) on January 30, 2020 as a direct result of the accounting violations that Spirit first disclosed on that date, and that Campbell was fired at the same time, in connection with the material weakness in Spirit's internal controls is strong evidence of their scienter. *See Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) ("***house-cleaning and reforms like terminating certain employees***, restructuring, and instituting training programs 'do not follow innocent mistakes. Rather, they customarily, even if not invariably, ***follow systemic and fraudulent abuse of internal financial controls***"). Indeed, Courts routinely infer scienter where, as here, a complaint alleges a defendant was terminated because of misconduct related to misrepresentations to investors. *See,*

*e.g.*, *SemGroup*, 729 F. Supp. 2d at 1299 ("[d]efendants' resignations support a strong inference of scienter"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (same); *see also Shenwick*, 282 F. Supp. 3d at 1148 (same). Like these cases, the CC alleges Gilson, Garcia, and Campbell were forced to resign (and Campbell was physically escorted from Spirit's facilities) because of the material weakness in Spirit's internal controls, based on the timing of their departures, Spirit's public disclosures, and FEs' statements. ¶¶206–07.

Defendants ignore these particularized allegations showing that these resignations were suspicious in timing and circumstances, and conclusorily claim that the terminations were benign. *See* Mot. at 32; Garcia Mot. at 15; Gilson Mot. at 16. But the cases Defendants cite all involve complaints, unlike the CC, that did not adequately link the terminated defendants to the alleged misconduct.[25] In contrast, here Defendants specifically admitted that Garcia's and Gilson's "resignations" were a direct result of the accounting internal controls failures. ¶128. Indeed, Spirit expressly acknowledged that its subsequent extensive remedial measures to address the EAC process deficiencies include these "management changes." ¶130. Further, while Garcia separately appears to argue that the CC fails to allege his scienter because Campbell was a rogue lower-level employee, his argument fails because the CC alleges Garcia was ***forced to resign***, which is powerful evidence of scienter. *Luna*, 2017 WL 2171273, at *5 (rejecting argument that material weakness was the result of a "rogue . . . employee").

       c)    *False SOX Certifications Support a Strong Inference of Scienter*

The SOX certifications signed by Gentile and Garcia in connection with Spirit's 3Q 2019 10-Q also contribute to a strong inference of scienter. *See, e.g.*, *SemGroup*, 729 F. Supp. 2d at

---

[25] *See, e.g.*, *Zagg*, 797 F.3d at 1205; *In re The Hain Celestial Grp. Inc. Sec. Litig.*, 2019 WL 1429560, at *18 (E.D.N.Y. Mar. 29, 2019); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005).

1298 (SOX certifications support a strong inference of scienter against the individuals who "personally signed [them] and caused [a company] to file" them with the SEC); *see also Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 950 (S.D. Tex. 2016). Defendants claim that SOX certifications "add nothing substantial to the scienter calculus" as a matter of law, but their ***own cases*** hold that certifications ***do*** support a strong inference of scienter where, as here, a complaint's allegations support an inference that defendants knew their certifications were false. *See*, *e.g.*, *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015) ("'***bare allegation***' that defendants lied when they certified . . . pursuant to SOX adds 'nothing substantial to the scienter calculus.'"); *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) (same).

> d)   *The Importance of the EAC Process to Spirit's Operations Supports a Strong Inference of Scienter*

The importance of the Boeing Claims and the EAC process to Spirit's bottom line also make it absurd to suggest that Defendants did not know about the material weakness in the Company's internal controls over financial reporting. *See DaVita*, 372 F. Supp. 3d at 1154–55 (scienter adequately alleged based on defendants' close involvement in financial reporting). As alleged in the CC, the EAC process affected ***76%*** of Spirit's contracts, and thus the majority of Spirit's revenue. ¶¶140, 215, 285. In addition, EAC calculations were discussed at specific meetings devoted to those calculations that were attended by the Individual Defendants, and Campbell himself was responsible for estimating the costs associated with the "Boeing Claims." ¶¶180–84. Further, the Boeing Claims were especially important to Defendants because of their ever-increasing size and Boeing's use of the claims as leverage in negotiations with Spirit, *id.*, and because Boeing accounted for ***79%*** of Spirit's net revenues. ¶70.

3.   The CC Alleges Corporate Scienter

In the Tenth Circuit, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability . . . when those senior officials were acting within the scope of their apparent authority." *Adams*, 340 F.3d at 1106. As described in Sections IV.C.1–2, *supra*, the CC alleges each Individual Defendant's scienter for misstatements concerning the 737 MAX production rate and the material weakness in Spirit's internal controls; thus, their scienter is imputable to Spirit. *See id.*; *Molycorp*, 157 F. Supp. 3d at 1011.

Corporate scienter may also be pled by alleging "either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)). Notably, the scienter of an employee who did not make any of the alleged misstatements can be imputed to the corporation because "***the individual making an alleged misstatement and the one with scienter do not have to be one and the same***." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017). Specifically, "[t]here is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Id.* Defendants, however, claim that the Court must ***ignore*** the CC's particularized allegations of Campbell's actual knowledge of Defendants' misstatements concerning the 737 MAX production cuts and the material weakness in the Spirit's internal controls because Campbell did not "make or issue" any of Defendants' misleading statements. *See* Mot. at 35 (citing *Smallen*, 950 F.3d at 1313). In *Smallen*, however, the Tenth Circuit directed courts to determine corporate scienter by evaluating "the state of mind of 'the individual corporate

official or officials who make or issue the statement (or order or approve it or its making or issuance, *or who furnish information or language for inclusion therein, or the like*)."' *Id.*

Given Campbell's critical role for both 737 MAX production and the 737 program's EAC process, the CC's allegations easily meet the standard for Campbell's scienter to be imputed to Spirit. Specifically, the CC alleges that, with respect to the 737 MAX production statements, Campbell, who was the head of the 737 MAX program, furnished information to Defendants for Spirit's financial reports because he instructed the Business Operations Team (including FE 7) to create layoff analyses and similar planning reports implementing Boeing's production cut. *See* ¶¶98–103. Likewise, given Campbell's ownership over the EAC process for Spirit's 737 program, he furnished false information for inclusion in Defendants' misstatements regarding the effectiveness of internal controls over the EAC process, including through the quarterly EAC reviews. *See, e.g., Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 516 (E.D. Va. 2018) (corporate scienter pled based on the scienter of non-speaking employees who knowingly "furnished false information on [the relevant] cost overruns and profit rates to corporate officers for inclusion in SEC filings and other public reports").

Campbell's scienter thus can be imputed to Spirit, even though Campbell did not make any of the alleged misstatements, because he was sufficiently senior, he was in charge of Spirit's 737 program, which accounted for over *50%* of the Company's revenues and controlled the process for valuing and reporting Boeing Claims in Spirit's EAC process. *See T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharm. Int'l, Inc.*, 2018 WL 395730, at *7 (D.N.J. Jan. 12, 2018) (employee who led department "responsible for a substantial portion of [the Company's] sales" sufficiently senior to impute scienter to corporation).

4.   Gentile's Substantial, Suspicious Insider Sales Support a Strong Inference of His Scienter

Gentile's suspicious stock sales during the Class Period sufficiently allege his motive to commit fraud and further support a strong inference of his scienter. In the Tenth Circuit, it is well-established that, although not required, "[m]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Smallen*, 950 F.3d at 1310. In particular, scienter can be supported by allegations of suspicious insider sales, which are suggested by "the amount of profit from the sales, the portion of stockholdings sold, [and] the change in volume of insider sales." *Id.*

Here, the CC alleges that on February 6, 2020, just weeks before the final disclosure revealing the full fraud to the public—e.g., the Company's admission that it had a material weakness in internal controls over the EAC process and the full, devastating impact of the 737 MAX production halt on Spirit's financial prospects—and thereby cause a steep decline in Spirit's share price, Gentile sold of 6,881 shares (3.15%) of his Spirit common stock for proceeds of $471,962.55. *Id.* The next day, February 7, 2020, Gentile disposed of an additional 41,017 shares (19.36%) of his holdings, for proceeds of $2,855,193.37. *Id.* Collectively, over the course of the two days Gentile sold 22.5% of his Spirit stock for proceeds of $3.3 million. *Id.*; *see In re Oxford Health Plans, Inc. Sec. Litig*, 187 F.R.D. 133, 139–40 n.1 (S.D.N.Y 1999) (sales of 17% and 11% of insiders' stock two months prior to a negative disclosure supported scienter). Further, these sales were suspiciously larger that his sales from 2016 to 2018, when he sold only 12.57%, 5.49%,

65

7.49%, respectively, of his Spirit stock. *Id.* ¶320. Gentile's suspiciously timed and outsized sales thus support a strong inference of his scienter.[26]

Defendants argue that Gentile's sales do not support an inference of his scienter because his: (1) holdings increased during the Class Period; (2) SEC filings indicate the sales were for tax reasons; and (3) sales were not "unusual" in size. *See* Mot. at 31–32. These arguments fail.

*First*, while Defendants cite *Smallen* to argue Gentile's sales are not indicative of scienter because he increased his holdings, that case is distinguishable. In *Smallen*, the sales occurred over a three-year period, not, as here, over two days just weeks prior to a major negative disclosure.

*Second*, while Defendants claim that Gentile's sales were for "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3" (Mot. at 31), they do not explain whether in fact Gentile had a "tax liability" (he had no exercise price for the shares since he acquired shares at a $0 cost basis, ¶318). Instead, Defendants baldly assert that "[f]ederal courts have found such sales—*i.e.*, sales to cover tax liabilities—as weighing against an inference of scienter." Mot. at 31 (quoting *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009)). But in *Radian*, the Court held that the defendant specifically noted the sale was "to cover taxes on a traunch of restricted stock that vested." 612 F. Supp. 2d at 611. Similarly, Defendants cite *Plumley v. Sempra Energy*, 2017 WL 2712297, at *12 (S.D. Cal. June 20, 2017), but ignore that, in *Plumley*, the Defendants provided *four years of SEC Form 4 filings* showing each year the Defendants used a portion of stock to "immediate[ly] sell[] to pay for their respective federal income tax withholding liability." *Id.* Regardless, the suspicious timing of substantial stock sales still supports a strong

---

[26] Even though the CC does not allege suspicious sales by other Individual Defendants, the court should not "infer from the fact that they did not sell their . . . stock that they lacked motive to defraud investors." *Pirraglia*, 339 F.3d at 1191 n.12.

inference of scienter even if the sales are processed through SEC programs. *Cf. In re New Century*, 588 F. Supp. 2d. 1206, 1232 (C.D. Cal. 2008) ("the timing of the 10b-5 plans, several years after they became available, at least raises the question precisely why there was a delay in creating those plans, and why they were formed during the Class Period"). At most, Defendants raise a fact issue that does not negate the suspiciousness of Gentile's sales.

*Third*, Defendants justify Gentile's quadrupling of his sales from the prior three years by citing *Leavitt v. Alnylam Pharmaceuticals, Inc.*, 451 F. Supp. 3d 176, 187–88 (D. Mass. 2020). In that case, unlike here, there was no other evidence of scienter and the Court found that stock sales *alone* were insufficient. *Id.* at 188. Here, the CC alleges that the trades were greater than in each of the ***three*** prior years (not just a single year), were made immediately prior to a negative disclosure and that Gentile knew about Boeing's order to cut 737 MAX production and the material weakness in Spirit's accounting controls, which support a strong inference of scienter.

## 5. A Holistic View Supports a Strong Inference of Scienter

Scienter allegations must be considered holistically, not individually. *See Tellabs*, 551 U.S. at 326. This is especially true at the pleading stage, where no "smoking gun" is required to allege scienter. *Id.* at 324. The CC's allegations, considered holistically, support a strong inference of scienter by alleging that (a) Boeing directed Spirit to cut production in half in late-September or early-October 2019; (b) Defendants instructed Spirit's Business Operations Team to create reports to determine the amount of layoffs necessary to implement the cut, which were approved by Campbell and presented to Gentile; (c) Defendants knew or recklessly disregarded Campbell's manipulation of the EAC process based on discussions of figures at EAC review meetings; (d) Gilson and Campbell were confronted by FE 9 about Spirit's use of unvalidated, unsupported and unreasonably low estimates of Boeing Claims; (e) Gentile traded in advance of negative announcements and reaped windfall profits at the expense of investors; (f) Gentile gave misleading

67

answers to direct questions from analysts; and (g) Boeing and the 737 MAX program were so important to Spirit, with Gentile repeatedly touting the Company's close relationship with Boeing and the 737 MAX comprising over *50%* of the Company's revenue, that it would be absurd to suggest Defendants did not know of the order to cut production or material weakness in internal controls concerning revenue on long-term contracts with Boeing.

Defendants claim that the inference that they "were forthcoming with investors and updated them with adverse facts when they became aware of them," Mot. at 36, is more compelling given Boeing's statements to its investors and Defendants' self-serving protestations of ignorance of the material weakness. Mot. at 36–38. Defendants' reliance on Boeing's statements fails for the reasons discussed above in Section IV.A.3. Moreover, Defendants were hardly "forthcoming with investors" given they knew of but deliberately concealed Boeing's production cut. Similarly, Defendants, particularly Gilson, who was confronted by FE 9 about Campbell's misconduct, knew or recklessly disregarded that Campbell's manipulation of the EAC process. *See* Section IV.B *supra*. The CC's allegations of Defendants' scienter thus outweigh any non-fraudulent inference.

### D.  The CC Alleges Violations of Rules 10b-5(a) and (c)

In addition to Defendants' liability for material misstatements under Rule 10b-5(b), the CC also alleges that Defendants engaged in an unlawful scheme under Rules 10b-5(a) & (c). Defendants argue that claims under Rules 10b-5(a) & (c) should be dismissed because the CC's allegations are duplicative of Plaintiffs' Rule 10b-5(b) claims, not fully explained, and do not allege that Plaintiffs relied on Defendants' scheme. *See* Mot. at 39–40. These arguments fail.

The CC separately and particularly plead sufficient facts supporting a scheme liability claim under Rules 10b-5(a) & (c). While Defendants argue that the scheme liability claim alleged in the CC is duplicative of the material misstatement claim under Rule 10b-5(b) and thus is not actionable (Mot. at 39), the Tenth Circuit has recognized that the Supreme Court has held that the

mere fact that certain elements of a scheme liability claim also support a misrepresentation claim is not grounds for dismissing Rule 10b-5(a) & (c) claims. *Malouf v. Sec. & Exch. Comm'n*, 933 F.3d 1248, 1260 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 1551 (2020) (recognizing that a defendant "can nevertheless be found to have violated [Rule 10b-5(a) and (c)] and related provisions of the securities laws, when the only conduct involved concerns a misstatement" (quoting *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100–01 (2019)). Thus, that the CC's scheme liability claims under Rules 10b-5(a) & (c) involve conduct similar to that underlying the Rule 10b-5(b) claims does not require dismissing the CC's scheme liability claims.

Regardless, the CC alleges that Defendants engaged in a scheme to assure the market that Spirit could provide timely information to investors regarding any changes in production levels for 737 MAX shipsets, and the revenue it could obtain from those sales, so as to minimize investor concerns relating to the uncertainties in Spirit's revenue stream created by the 737 MAX grounding. *See* ¶¶183–209. Defendants' scheme included multiple acts distinct from the misstatements alleged in the CC, including (i) touting its close relationship with Boeing in response to specific questions from analysts to set the expectation in investors that Spirit would immediately be aware of, respond to, and inform investors of any requests for changes (¶¶72–75); (ii) deflecting concerns about the number of 737 MAX shipsets Spirit was storing for Boeing (¶¶85–87); and (iii) making no effort to inform investors when Boeing ordered Spirit to cut production in late September or early October 2019 (¶¶97, 104, 110). These actions in furtherance of Defendants' scheme are actionable under Rules 10b5-1(a) and (c). *See JAC Holding Enters, Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014) (denying dismissal of scheme liability claims where defendants conspired to withhold material information in response to

specific requests from buyers); *see also Steinbeck v. Sonic Innovations, Inc.*, 2003 WL 26072957, at *6 (D. Utah Feb. 11, 2003) (denying dismissal of scheme liability).

In addition, while Defendants argue that the CC fails to allege that Plaintiffs relied on Defendants' scheme under the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 160 (2008), the CC's allegations are materially different than those in *Stoneridge*. Critically, unlike in *Stoneridge*, here it was deceptive acts by Defendants (not a third party) that were intended to boost the price of Spirit's securities by, among other things, deceiving the investing public into believing that they would be fully and timely informed of any changes in Spirit's 737 MAX shipset production. This conduct mitigated uncertainty in the minds of investors as to Spirit's shipset production and inflated the price for Spirit shares. That inflation was eliminated when Defendants belatedly announced that Spirit would stop production of 737 MAX shipsets. Accordingly, the CC alleges reliance.

### E.  The CC Adequately Alleges Section 20(a) Control Liability Claims

Because the CC sufficiently alleges a Section 10(b) violation, Plaintiffs' Section 20(a) claims should be sustained. *See In re Ribozyme Pharm., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000). Defendants concede that if the CC states a Section 10(b) claim, it also states Section 20(a) claims against Gentile and Garcia. *See* Mot. at 40. Defendants argue, however, that the CC fails to state Section 20(a) claims against Campbell and Gilson because neither is a "control person." Mot. at 40; Gilson Mot. at 14–15. These arguments fail.

To plead control under Section 20(a), the Tenth Circuit only "requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control persons." *Adams*, 340 F.3d at 1108. Because "[t]he statute is remedial and [thus] construed liberally," the Tenth Circuit only requires "some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Ribozyme*, 119 F. Supp. 2d at 1167 (quoting

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)). Accordingly, Plaintiffs need only "point to facts which indicate that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." *Adams*, 340 F.3d at 1108. Further, "[t]he control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss." *Yellowdog*, 426 F. Supp. 3d at 877.

The CC's allegations against Campbell and Gilson exceed this standard. The CC alleges that Campbell headed Spirit's 737 MAX program, which represented half the Company's revenue (¶40), had the power to influence and control the content and dissemination of information about that program (*id.*), attended regular 737 MAX production meetings between Spirit and Boeing (*id.*), approved reports concerning layoffs and related plans for Gentile (¶8), had complete control over the "treatment of claims and assertions and other subjective elements and key judgments of [Spirit's] EAC process" without any adequate checks and balances (¶131), and used his authority to repeatedly manipulate the value of Boeing accounts (¶17).

Similarly, the CC alleges that Gilson was Spirit's former Vice President and Corporate Controller (¶39), signed Spirit's 3Q19 10-Q that falsely reported a continued 52 APM production rate (*id.*), was required to sign off on changes to Spirit's 737 MAX production schedule (¶100), regularly attended production meetings with Boeing, likely including the meeting where Boeing communicated its rate cut to Spirit (*id.*), reviewed and approved Spirit's false EAC accounting figures (¶152), and failed to take any remedial actions after being directly informed of the material weakness in the EAC process (¶17). The CC thus alleges Campbell and Gilson are "control persons." *See Yellowdog*, 426 F. Supp. 3d at 877.

### F.  Plaintiffs Respectfully Request the Opportunity to Amend

Because this is the Court's first opportunity to assess any complaint in this action, if the Court grants any part of the Motions, Plaintiffs respectfully request the opportunity to amend. *See*

*In re Qwest Commc'ns Int'l, Inc., Sec. Litig.*, 396 F. Supp. 2d 1178, 1206 (D. Colo. 2004) (allowing plaintiffs leave for a fifth amended complaint as "leave to amend should be 'freely given when justice so requires'" and "it does not clearly appear that an attempt to amend necessarily would be futile") (quoting Fed. R. Civ. P. 15(a)).

## V.   CONCLUSION

For the reasons stated above, the Motions should be denied in their entirety.

Dated: November 17, 2020

Respectfully submitted,

/s/ *James W. Johnson*
**LABATON SUCHAROW LLP**
James W. Johnson (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
ivasilchenko@labaton.com

*Counsel for Lead Plaintiff Meitav Dash
Provident Funds and Pension Ltd. and Lead
Counsel for the Class*

**POMERANTZ LLP**

/s/ *Brian Calandra*
Jeremy A. Lieberman
Brian Calandra (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
bcalandra@pomlaw.com

*Additional Counsel for the Class*

**HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.**
James M. Reed, OBA No. 7566

72

John W. Dowdell, OBA No. 33162
320 South Boston Avenue, Suite 200
Tulsa, Oklahoma 74103
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
jreed@hallestill.com
jdowdell@hallestill.com

*Liaison Counsel for the Class*

**KESSLER TOPAZ MELTZER &
CHECK, LLP**
Geoffrey C. Jarvis (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gjarvis@ktmc.com
ehoey@ktmc.com

*Additional Counsel for the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 17, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by email to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Brian Calandra*
Brian Calandra