# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

MEITAV DASH PROVIDENT FUNDS
AND PENSION LTD.,

      Lead Plaintiff,

and

JACOB GOLDMAN, Individually and
on behalf of all other similarly situated,
GARY SMITH, Individually and on
behalf of all others similarly situated,
and EMPLOYEES' RETIREMENT
SYSTEM OF THE CITY OF
PROVIDENCE, CITY OF MIAMI
FIRE FIGHTERS' AND POLICE
OFFICERS' RETIREMENT TRUST,

      Consolidated Plaintiffs,

v.

SPIRIT AEROSYSTEMS HOLDINGS,
INC., THOMAS G. GENTILE, III,
JOSE GARCIA, JOHN GILSON,
and SHAWN CAMPBELL,

      Defendants/Consolidated
      Defendants.

Case No. 20-cv-00054-SPF-JFJ
**BASE** **FILE**

**Consolidated with:**
Case No. 20-cv-00077-SPF-JFJ
and
Case No. 20-cv-00117-SPF-JFJ

## ORDER

    Three investors[1] filed putative class actions against Spirit AeroSystems

Holdings, Inc. (Spirit), a publicly traded company, and certain of its senior

executives asserting claims under Section 10(b) and Section 20(a) of the Securities

---

[1] Jacob Goldman, Gary Smith, and Employees' Retirement System of the City of Providence.

Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The court entered an order (1) consolidating the actions, designating Case No. 20-CV-0054 as the base file; (2) appointing Meitav Dash Provident Funds and Pension Ltd. (Meitav) to serve as lead plaintiff; and (3) approving the selection of lead counsel, additional counsel, and liaison counsel. Thereafter, as ordered by the court, Meitav and consolidated plaintiffs, Gary Smith (Smith) and City of Miami Fire Fighters' and Police Officers' Retirement Trust (Retirement Trust) filed a Consolidated Class Action Complaint (consolidated complaint), superseding all filed complaints.  Defendants have moved to dismiss the consolidated complaint.  Doc. nos. 77, 78 and 79.  Lead plaintiff and consolidated plaintiffs have responded, opposing dismissal.[2]  Doc. no. 90.  Defendants have replied.  Doc. nos. 91, 92 and 93.  Subsequently, the case was transferred to the undersigned.  Upon due consideration of the parties' submissions and relevant law, the court makes its determination.[3]

I.

*Parties*

Lead plaintiff Meitav is one of the leading investment houses in Israel. Consolidated plaintiff Retirement Trust provides retirement and disability benefits

---

[2] In their response, plaintiffs request that the court disregard or strike the "excessive, overlong footnotes," in doc. no. 77, specifically, n. 2, n. 21, and n. 26 and "six-page, single-spaced 'Appendix A'" attached to doc. no. 77 on the ground they violate the court's page limit order. Doc. no. 90, n. 6.  Upon review and in its discretion, the court declines plaintiffs' request.  The court is not convinced the footnotes and Appendix A are improper.

[3] Although plaintiffs have requested oral argument, the court concludes that oral argument is not necessary.  The present motions, focusing, as they must, on what is (and is not) down in black and white in the papers before the court, do not, by their nature, call for oral argument.   That said, if the court had concluded that oral argument would aid its consideration of these motions, it would have set them for argument.

2

to participating firefighters and police officers of the City of Miami, Florida. Consolidated plaintiff Smith is a securities investor.  Plaintiffs bring this securities fraud action, individually and on behalf of all persons and entities who or which, during the period from October 31, 2019, through February 27, 2020, inclusive (the Class Period), purchased Spirit's publicly traded common stock and suffered damages.  Plaintiffs claim they purchased Spirit's stock at artificially inflated prices during the Class Period and were damaged upon revelation of alleged corrective disclosures or materializations of the risks.

Defendant Spirit is a Delaware corporation with its headquarters in Wichita, Kansas.  It is one of the largest independent non-OEM (original equipment manufacturer) commercial aerostructure designers and manufacturers in the world. Spun off in 2005 from a division of The Boeing Company ("Boeing"), Spirit is the largest independent supplier of aerostructures (primarily fuselages) for Boeing's commercial aircraft.  Sales to Boeing accounted for roughly 79 percent of Spirit's net revenues in fiscal years 2018 and 2019.  During the Class Period, more than 50 percent of Spirit's revenues were dependent on Boeing's 737 MAX jetliners. Spirit's securities trade on the New York Stock Exchange under the ticker symbol "SPR."  As of April 29, 2020, Spirit had over 105 million shares of common stock outstanding, "owned by hundreds or thousands of investors."  Doc. no. 49, ¶ 36.

Defendant Thomas C. Gentile, III (Gentile) serves as Spirit's President and Chief Executive Officer and has occupied those positions since August 1, 2016. Defendant Jose Garcia (Garcia) is Spirit's former Senior Vice President and Chief Financial Officer, having served the company in that capacity from January 9, 2019, until January 29, 2020.  Defendant John Gilson (Gilson) served as Spirit's Vice President and Corporate Controller from January 8, 2018, until January 29, 2020. Defendant Shawn Campbell (Campbell) was Spirit's Vice President for the 737 NG

and 737 MAX programs,[4] serving the company from March 2016 until January of 2020.

## II.

### *Background*

In October of 2018 and March of 2019, two 737 MAX jetliners crashed after take-off, killing all passengers on board.  All 737 MAX jetliners were grounded on March 13, 2019, pending recertification by aviation authorities.[5]  Securities analysts following Spirit recognized that the 737 MAX jetliners' grounding would negatively impact Spirit's financial condition, particularly if Boeing altered its production schedule.

On April 5, 2019, Boeing announced that it would reduce its production rate of the 737 MAX jetliners from 52 to 42 aircraft per month.  Later that day, Spirit announced that it and Boeing had entered into a Memorandum of Agreement, wherein the companies agreed that, despite Boeing's reduction of its production rate to 42 aircraft per month, Spirit would maintain its prior production rate of 52 aircraft shipsets (fuselage and other components) per month to minimize supply chain disruptions.  Spirit was to maintain its production rate of 52 aircraft shipsets per month until May 1, 2020, unless advised otherwise.  Boeing would pay for all 52 aircraft shipsets each month and have Spirit store the 10 excess aircraft shipsets at its Wichita facility or at McConnell Air Force Base, adjacent to the Wichita facility. When Boeing increased its production rate per month to 57 aircraft per month as

---

[4] The 737 NG is the third generation of the Boeing 737 airplane, and the 737 MAX is the fourth generation.  The 737 MAX was announced in 2011 and began commercial flights in 2017.

[5] It was later revealed that the crashes were caused by a problem with certain software in the 737 MAX flight control computer–specifically, an automated system called the Maneuvering Characteristics Augmentation System, which was designed to automatically take over the plane and point the nose downward if a sensor detected a "pitch-up" in flight that had not been commanded.

originally planned prior to the crashes, Spirit would maintain its 52 aircraft shipsets per month production rate and satisfy Boeing's increased demand by slowly "burn[ing] off" its accumulated inventory of 737 MAX shipsets.  Doc. no. 49, ¶ 76.

Over the next few months, defendants publicly reiterated that Spirit intended to maintain its 52 aircraft shipsets per month production rate and minimized the likelihood of any cuts in the rate of production despite the continued grounding of the 737 MAX jetliners.  Analysts believed defendants' assurances that Spirit had successfully navigated the issues surrounding the 737 MAX program–critical to Spirit's financial success–and would continue to do so.

According to a former Spirit employee,[6] designated in the consolidated complaint as FE 7, in either late September or early October of 2019 at one of the frequent meetings between Boeing and Spirit to discuss the production of the 737 MAX, Boeing told Spirit to cut the production rate of 737 MAX shipsets in half. Campbell attended that meeting.  The confidential witness believed Garcia and Gilson also attended the meeting because they generally attended such meetings, and the production rate schedule required their sign-off.  The confidential witness learned about the production rate cut from her direct supervisor, Angel Little, and Campbell.  According to the witness, Campbell disclosed the production rate cut in a regular meeting of the business operations team relating to production.  The confidential witness claims defendants began creating a plan to implement the cut, including running related layoff analyses, and the results of the analyses were approved by executives, including Campbell, and presented to Gentile just before the end of October 2019.

---

[6] Plaintiffs refer to several former Spirit employees as "Confidential Former Employees."  *E.g.*, Doc. no. 49, ¶ 45.  For brevity, the court will refer to them simply as former employees.

Another former Spirit employee, designated in the consolidated complaint as FE 8, claimed that in September or October of 2019, other suppliers that interfaced directly with Boeing were apparently notified by Boeing that it planned to substantially reduce its 737 MAX production rate, and they called FE 8, as a supply chain procurement agent, to ask for Spirit's updated forecasts for parts and materials based upon Boeing's lower production rate.  FE 8 advised that she had not received an internal update from Spirit at that point.

Plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made public statements that Spirit would maintain the 52 aircraft shipsets per month production rate, concealing Boeing's directive to cut the production rate in half.

According to another former Spirit employee, designated in the consolidated complaint as FE 2, a senior Spirit executive announced at a daily internal meeting in mid-November of 2019 that Boeing had decided that Spirit should temporarily halt 737 MAX production after the fourth quarter of 2019.  Plaintiffs claim Gentile and Garcia concealed this damaging development by stating several days later at an analyst meeting hosted by Jefferies LLC that Spirit's 737 MAX production was to stay at the rate of 52 aircraft shipsets per month until May 2020.

After the close of trading on December 16, 2019, Boeing publicly disclosed that it was halting production of the 737 MAX beginning in January 2020.  Spirit's stock price declined following Boeing's announcement.  Plaintiffs claim Gentile downplayed the impact of the revelation by falsely reassuring Spirit's investors, among other things, that he was not expecting to have to implement layoffs, even though Spirit had begun planning for layoffs in October.  However, a few weeks later, on January 10, 2020, Spirit publicly disclosed that it was laying off 2,800 employees at its Wichita facility due to the 737 MAX production halt.  Spirit's stock price fell again.  According to plaintiffs, Spirit's stock price declined again upon additional disclosures on January 30, 2020, and February 28, 2020, that the 737

MAX production rate in 2020 would amount to a total of 216 aircraft shipsets—over 66 percent lower than in 2019—and the company would not return to the prior 52 aircraft shipsets per month production rate until 2022.

In addition to misleading investors about the 737 MAX production rate, plaintiffs claim that during the Class Period, defendants publicly misrepresented Spirit's compliance with established accounting procedures and the effectiveness of its internal controls over its financial reporting.  According to the former Spirit employees designated in the consolidated complaint as FE 9 and FE 10, there was a failure to place sufficient safeguards on the company's accounting processes related to the determination of what is known as the "estimate at completion" (EAC), in connection with valuing and recording adverse claims for compensation made by Spirit's customers, such as Boeing, with respect to the 737 MAX program.  The employees claim Gentile, Garcia, and Gilson, who were involved in overseeing the EAC process, failed to implement effective internal controls, and permitted Campbell to manipulate and understate Boeing Claims[7] to make the 737 MAX program appear more profitable than it really was.

Plaintiffs claim the truth regarding the deficient internal controls over the EAC process emerged on January 30, 2020.  On that date, Spirit disclosed it had not complied with its established accounting procedures relating to certain contingent liabilities (customer claims) that were received by the company after the end of the third quarter of 2019.  The company announced that Garcia and Gilson had tendered their resignations "[i]n light of these findings."  Doc. no. 49, ¶ 206 (emphasis omitted).  According to a former Spirit employee, designated as FE 11, Campbell was fired a week before Garcia and Gilson resigned.  Subsequently, on February 28,

---

[7] FE 9 stated that the Boeing Claims were claims "Boeing made against Spirit for, *inter alia*, the time and expense Boeing had to expend for disruptions due to delays and certain quality issues with delivered shipsets."  Doc. no. 49, ¶ 159.

2020, the company stated the accounting violations occurred due to a "material weakness" in the internal controls related to the EAC process for customer claims and assertions.  *Id.*, ¶ 215 (emphasis omitted).  The company further noted that the material weakness related to 76 percent of the company's contracts, that "noncompliance" with its established accounting procedures "is a critical item the [c]ompany must address" and that it resulted in deficient "internal controls over financial reporting."  *Id.*, ¶¶ 28, 215.  Spirit's stock price dropped after both the January and February disclosures.

Plaintiffs allege defendants violated Section 10(b) of the Securities Exchange Act and Subsection (b) of Rule 10b-5 by making false and materially misleading statements concerning the 52 aircraft shipset production rate and by making false and materially misleading statements concerning the compliance with established accounting procedures and the effectiveness of Spirit's internal controls.

In addition, plaintiffs allege defendants violated Section 10(b) and Subsection (a) and Subsection (c) of Rule 10(b)(5) by carrying out a common plan, scheme, and unlawful course of conduct which was intended to and did deceive the investing public, artificially inflate the price of Spirit's common stock and cause plaintiffs to purchase the stock at artificially inflated prices.

Plaintiffs further assert claims against the individual defendants under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which creates joint and several liability for a "control person" of a party found liable for violations of securities laws.  Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998).

### III.

### *Elements of Plaintiffs' Claims*

Section 10(b) of the Securities Exchange Act and its implementing regulation, Rule 10b-5, Subsection (b), "prohibit making any material misstatement or omission

in connection with the purchase or sale of any security." <u>Halliburton Co. v. Erica P.</u>
<u>John Fund, Inc.</u>, 573 U.S. 258, 267 (2014).  The Supreme Court has "inferred from
these provisions an implied private cause of action permitting the recovery of
damages for securities fraud."  <u>Goldman Sachs Group, Inc. v. Arkansas Teacher</u>
<u>Retirement System</u>, 141 S.Ct. 1951, 1958 (2021) (citing <u>Halliburton Co.</u>, 573 U.S.
at 267).

Count I of the consolidated complaint alleges violations of Section 10(b) and
Rule 10b-5, subsection (b), against Spirit, Gentile, Garcia, and Gilson.  To state a
claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege:

> (1) the defendant made an untrue or misleading statement
> of material fact, or failed to state a material fact necessary
> to make statements not misleading; (2) the statement
> complained of was made in connection with the purchase
> or sale of securities; (3) the defendant acted with scienter,
> that is, with intent to defraud or recklessness; (4) the
> plaintiff relied on the misleading statements; and (5) the
> plaintiff suffered damages as a result of his reliance.

<u>Smallen v. The Western Union Company</u>, 950 F.3d 1297, 1304 (10th Cir. 2020)
(emphasis omitted).

Defendants argue that plaintiffs have failed to sufficiently plead the first and
third elements.

Count III of the consolidated complaint alleges violations of Section 10(b)
and Rule 10b-5, subsections (a) and (c), against all defendants.  "Unlike  a  claim
under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections
(a) and (c) does not require an allegation that the defendant made a false or
misleading statement; rather, liability is premised on a course of deceptive or
manipulative conduct."  <u>Takata v. Riot Blockchain, Inc.</u>, Civ. Action No. 18-02293
(FLW), 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020).  To state a claim under
subsections (a) and (c) of Rule 10b-5, plaintiffs must allege that defendants

committed a deceptive or manipulative act in addition to the other standard elements of a Section 10(b) violation.  *Id.*

In their motions, defendants posit that plaintiffs have failed to sufficiently plead deceptive or manipulative conduct.  Defendants also argue that plaintiffs have failed to plead the requisite reliance element.

Count II of the consolidated complaint asserts liability under Section 20(a) of the Securities Exchange Act against the individual defendants, Gentile, Garcia, Gilson, and Campbell.  To state a claim under Section 20(a), plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person.   <u>City of Philadelphia v. Fleming Companies, Inc.</u>, 264 F.3d 1245, 1270 (10th Cir. 2001).   If a plaintiff has not adequately alleged a primary violation of the securities law, then the Section 20(a) claim is properly dismissed.  *Id*.

Defendants argue that plaintiffs' Section 20(a) claims fail because they have not adequately alleged a primary violation of the securities laws.

IV.

*Legal Standards*

Generally, "[t]o survive a motion to dismiss [under Rule 12(b)(6), Fed. R. Civ. P.], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing <u>Twombly</u>, 550 U.S. at 556).

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  <u>Tellabs, Inc. v.</u>

10

Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In addition, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including "documents incorporated into the complaint by reference, [ ] matters of which a court may take judicial notice," and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  Id.; Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002) (citation omitted).

Any complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., and the PSLRA.  Tellabs, 551 U.S. at 319-321.  Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting the fraud."  Rule 9(b), Fed. R. Civ. P.  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud[] and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  United States ex. rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726-27 (10th Cir. 2006), abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S.Ct. 791 (2019) (quotations and citations omitted).

Under the PSLRA, plaintiffs are required to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter."  Tellabs, 551 U.S. at 313.  The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  As to the scienter element, the PSLRA requires a plaintiff to, "with respect to each act or omission alleged. . ., state with particularity facts

giving rise to a strong inference that the defendant[s] acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A).   "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   Tellabs, 551 U.S. at 322-23 (emphasis in original).   A complaint survives dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."   *Id*. at 324.

## V.

### *Consideration of Defendants' Exhibits*

Defendants Spirit, Gentile and Campbell attach various documents to their motion and request the court to consider them without converting the motion into one for summary judgment.[8]   The documents consist of (1) transcripts of the third quarter 2019 earnings conference call with analysts and reporters held on October 23, 2019, and the Baird Global Industrial Conference held on November 6, 2019, both involving Boeing (doc. nos. 77-3, 77-4); (2) Spirit's Form 10-K for the fiscal year ending December 31, 2019 and Spirit's Form 10-Q for the quarterly period ending September 26, 2019, both filed with the Securities and Exchange Commission (SEC) (doc. nos. 77-5, 77-7); (3) the Jefferies' analyst report dated November 24, 2019 (doc. no. 77-6); and (4) two Form 4, Statement of Changes in Beneficial Ownership of Securities, filed with the SEC with respect to Gentile (doc. no. 77-8).

---

[8] Although Garcia and Gilson have filed separate dismissal motions (doc. nos. 78 and 79), they join and incorporate by reference the motion to dismiss of defendants Spirit, Gentile and Campbell (doc. no. 77).   Garcia also joins and incorporates by reference Gilson's motion to dismiss.

Plaintiffs only object to the court's consideration of the transcripts of the earnings call and conference involving Boeing.  Specifically, they assert that defendants seek judicial notice of those transcripts for the purpose of establishing the truth of the matters asserted in them, which is not permissible under Tenth Circuit authority.  In response, defendants counter that the court may properly consider the publicly available investor call transcripts because they are being used for the "purpose of showing that various disclosures were made and available to investors." Doc. no. 91, ECF p. 9 (quoting Chipman v. Aspenbio Pharma, Inc., Civil No. 11-cv-00163-REB-KMT, 2012 WL 4069353, at *2 (D. Colo. Sept. 17, 2012)).

The court agrees with plaintiffs that it should not take judicial notice of the transcripts.  In the October 23, 2019 earnings call, Boeing's Chief Executive Officer stated that Boeing's "best current estimate" was for "a return of service of the MAX that begins this quarter," and that it expected the company to "maintain [its] current production rate of 42 [737 MAX] deliveries per month . . . followed by incremental rate increases that would bring [Boeing's] production rate to 57 by late 2020." Doc. no. 77-3, ECF p. 7.  At the November 6, 2019 investor conference, Boeing's Chief Financial Officer stated that it was "still the plan" for Boeing "to move up from 42" 737 MAX deliveries and "try to achieve [] 57" deliveries a month "exiting 2020." Doc. no. 77-2, ECF pp. 10-11.  Despite their response, defendants do not ask the court to consider the transcripts to establish what was publicly available to investors at the time of the alleged fraud.  Rather, they seek the court's consideration of the transcripts to establish that defendants' public statements on October 31, 2019 were not actionably misleading.  According to defendants, at the time Gentile, Garcia and Gilson made their October 31, 2019 statements, "the ***most authoritative*** and ***most recent*** statements they had received from Boeing indicated that Boeing was ***_not_*** planning any reduction in 737 MAX production." Doc. no. 77, ECF p. 22 (emphasis in original).  Defendants assert that this is what they told the market in their October

31 statements, and therefore "Plaintiffs have fallen far short of alleging that [the] October 31 Statements were misleading under the stringent *Omnicare*[9] standard." *Id*. at ECF pp. 22-23. They also note that the statements render implausible the former Spirit employee's account that Boeing instructed Spirit to cut the 52 shipsets production rate in half. *Id*. at ECF p. 22, n. 9. The court concludes that defendants' submission of the transcripts is for the purpose of establishing the truth of the matters asserted in them, rather than showing what information was available to investors at the time, and therefore declines to consider the transcripts in adjudicating defendants' dismissal motions. *See*, Tal v. Hogan, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006) (documents may only be considered to show their contents, not to prove the truth of the matter asserted in them).

As to the other documents (the SEC filings and analyst's report), whose consideration is unopposed, the court concludes that they may properly be considered in adjudicating defendants' motions.

VI.

*Count I – Claims Under Section 10(b) and Rule 10b-5, Subsection (b)*

A. Alleged False and Misleading Statements

   (i). *Aircraft Shipset Production Rate*

      a. October 31, 2019

Plaintiffs allege that Garcia, Gilson and Gentile publicly made false and misleading statements on October 31, 2019, reaffirming that Spirit would continue the 52 aircraft shipsets per month production rate. Plaintiffs allege that defendants' statements were false and misleading because Boeing had already told Spirit in late September or early October 2019 to cut its 737 MAX production rate in half, and soon after receiving that notification Spirit had begun planning to take the steps

---

[9] Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175 (2015).

14

needed to reduce its production accordingly.   The specific alleged false and misleading statements are as follows.

Form 10-Q (for the quarter ending September 26, 2019), signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> We expect that the annualized average monthly shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement.
>
> * * * *
>
> For so long as the grounding of the B737 MAX fleet continues, there may be further reductions in the production rate, including a temporary shutdown in production.  To the extent that the grounding of the B737 MAX fleet continues for an extended period of time and Spirit is required to further reduce its production rate on the B737 MAX aircraft, Spirit's business, financial condition, results of operations and cash flows could be materially adversely impacted.

Doc. no. 49, ¶ 225 (emphasis omitted); doc. no. 77-1, statements #1 and #2.

The press release filed with the SEC on Form 8-K signed by Garcia stated in relevant part:

> Spirit continues to produce at a rate of 52 aircraft per month in accordance with its agreement with Boeing.

Doc. no. 49, ¶ 226 (emphasis omitted); doc. no. 77-1, statement #3.

During the earnings call relating to the quarter ending September 26, 2019, Gentile stated:

> [W]e are continuing to produce at a rate of 52 aircraft per month as we agreed with Boeing[.]"
>
> * * * *
>
> Our current expectations are that we will continue to produce at rate 52 . . . Given current production and

storage levels, our expectation is that we will not produce at a rate higher than 52 through 2020, [20]21 and possibly into 2022.

* * * *

If Boeing goes down more, we would sit down and talk with them about what's the appropriate production level for us . . . Now what I would say though is that this period of time where we're at 52, gives us a chance to achieve some stability . . . Now we're going to be at 52 for an extended period of time."

Doc. no. 49, ¶¶ 227, 228 and 229 (emphasis omitted); doc. no. 77-1, statements #4, #5, and #6.

Defendants contend plaintiffs have not sufficiently alleged that any of these statements were actionably misleading.  According to defendants, the alleged statements express expectations about the future rather than presently existing facts, and, therefore, constitute statements of opinion.  To render opinion statements actionable, defendants assert that plaintiffs must identify "'particular (and material) facts' that were not disclosed and 'that cannot be squared' with the statement of opinion."  Doc. no. 77, ECF p. 18 (citing Omnicare Inc. v. Laborers Dist. Council Const. Industry Pension Fund, 575 U.S. 175, 191, 194 (2015)).  Defendants maintain that plaintiffs cannot rely upon the account of confidential witness FE 7, a Business Operations Specialist, to establish particular and material facts not disclosed by defendants.  Defendants contend that FE 7's account of Boeing directing Spirit in late September or early October 2019 to cut its production rate of 737 MAX shipsets in half does not meet the PSLRA's stringent particularity requirement.  Defendants assert that FE 7's account is vague, conclusory and based upon multiple hearsay.  They maintain that FE 7's account is particularly deficient in that FE 7 does not claim to know the ultimate source of her hearsay information.  Defendants assert that the consolidated complaint provides no information indicating who from Boeing

16

gave the directive to Spirit to cut 737 MAX production in half or whether that individual had authority to issue the directive to Spirit.  Without knowing who from Boeing made the statement and exactly what was said, defendants posit that it is impossible to discern whether the statement was a definitive directive or a mere discussion of possibilities.  Defendants contend that FE 7's account suggests that the notification, if it occurred, was merely a discussion of possibilities because the allegations show Spirit did not make any immediate changes to its production, only a few of Spirit's employees were purportedly told about the directive, and FE 7 was tasked with running "exercises" about the number of resulting layoffs that would be required.  Further, defendants argue that while plaintiffs attempt to corroborate FE 7's account with FE 8's account, FE 8's account of Spirit not changing its purchase orders suggests that Boeing did not issue any draconian directive of a production rate cut in late September or early October 2019.  Defendants contend that if Spirit had been told to cut its production schedule, it would likely have updated its purchase orders to avoid obtaining unnecessary materials from suppliers.

Where allegations regarding a statement or omission are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs are required "to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements.  Generalized or conclusory allegations of fraud will not be sufficient."  Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1098 (10th Cir. 2003).  However, plaintiffs are not required to "plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based."  Id. at 1098-99 (quotation marks omitted).  Plaintiffs "need only plead with particularity *sufficient* facts to support those beliefs."  Id. (quotation omitted, emphasis in original).

The court must evaluate "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false and misleading." Adams, 340 F.3d at 1099. That evaluation will involve "(1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading." *Id*. "If, measuring the nature of the facts alleged against these indicia, a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id*.

Plaintiffs are not required to disclose the documentary or personal sources from which they learned facts alleged in an information and belief complaint. Adams, 340 F.3d at 1103. "[W]here a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading." *Id*.

In their consolidated complaint, plaintiffs do not identify the source of their allegation that Boeing told Spirit in late September or early October of 2019 to cut its 737 MAX production in half. However, they describe the job title, time spent in that position, the supervisors, and the specific duties of the confidential witness FE 7. The level of facts provided demonstrate that FE 7 was positioned to have known the information alleged about the production rate cut. Plaintiffs set forth facts to

show that Campbell, who was in charge of the 737 MAX program and had been present at the meeting between Boeing and Spirit, informed FE 7 of Boeing's notification at a weekly meeting related to the 737 MAX production, and because of that notification, FE 7 was tasked by her direct supervisor, Angel Little, with providing data to assist others in analyzing "the appropriate level of workers needed to continue production at the new lower rate."  Doc. no. 49, ¶ 104.  The facts surrounding how FE 7 came to know the facts alleged with respect to the production rate cut are particularly detailed, numerous, plausible, and objectively verifiable by defendants.

Although the information provided by FE 7 that "at one of the frequent meetings between Spirit and Boeing . . . Boeing told Spirit to cut production of the 737 MAX in half," doc. no. 49, ¶ 102, is hearsay,[10] "the fact that a confidential witness reports hearsay does not automatically disqualify [her] statement from consideration in the [falsity or misleading] calculus."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 998 n. 4 (9th Cir. 2009).  Instead, the court must examine the witness's hearsay report to determine if it is "sufficiently reliable, plausible, or coherent[.]" Id.  The court concludes that despite not specifically identifying which manager at Boeing told Spirit to cut the production rate in half, plaintiffs have provided supporting context and details enabling the court to determine that the information is sufficiently reliable.  The court is not convinced that FE 7's description of Boeing's notification is conclusory or vague as argued by defendants.  In the court's view, the facts alleged will support a reasonable belief that the defendants' statements were false or misleading.

---

[10] The court agrees with defendants that a statement by Campbell revealing what Boeing told Spirit in the meeting constitutes hearsay.

The court additionally concludes that FE 8's account, viewed in plaintiffs' favor, corroborates FE 7's account.  And the court credits the allegations attributed to both FE 7 and FE 8 because the factual allegations demonstrate they were positioned to know the information provided, and despite defendants' arguments, they form a plausible and coherent narrative.  The court concludes that plaintiffs' allegations are sufficient to satisfy the particularity requirements of the PSLRA (as well as Rule 9(b)).

Next, defendants argue that even if the court were to credit FE 7's account, that account is not sufficient to render the October 31, 2019 statements actionably misleading.  Defendants specifically rely upon the statements of Boeing's CEO and CFO on October 23, 2019, that the company was expecting to maintain its 42 aircraft per month production rate, with an incremental or gradual increase to 57 aircraft per month by late 2020.  However, as discussed, the court has declined to take judicial notice of those statements.  Consequently, the court rejects defendants' arguments that October 31, 2019 statements with respect to Spirit's 737 MAX shipsets production rate are not actionably misleading given the statements of Boeing's CEO and CFO on October 23, 2019.

In his motion, Gilson asserts that the only statement attributable to him regarding the 52 aircraft shipset production rate (expecting the shipset deliveries over the course of the year to be at rate 52 subject to any reductions that Boeing may decide to implement) was demonstrably true.  Gilson points out that plaintiffs do not allege in their consolidated complaint that the shipset production rate for the remainder of 2019 was less than 52 shipsets.  Also, he points out that when the "so-called 'truth'" was revealed, doc. no. 79, ECF p. 8, plaintiffs allege that Boeing announced it was suspending all production of the 737 MAX aircraft "beginning in January 2020."  *Id*. at ECF p. 9 (citing doc. no. 49, ¶ 189) (emphasis omitted).  Gilson asserts that there are no well-pled factual allegations suggesting the shipset

production rate for 2019 was below 52 or that as of October 31, 2019, he did not expect the production rate for 2019 to be 52.  Further, Gilson notes that FE 7's account, even if adequately pled, does not provide factual details suggesting that the cut would take place in 2019.  However, viewing plaintiffs' factual allegations and all reasonable inferences therefrom in their favor, the court concludes that plaintiffs have sufficiently pled that Gilson's statement was in fact misleading.

Gilson also argues that his expectation statement is protected under the PSLRA's safe-harbor provision for forward-looking statements.  The court disagrees.  The court concludes that Gilson cannot claim protection under the PSLRA's safe-harbor provision for forward looking statements because, contrary to his arguments and as pointed out by plaintiffs, the subject statement was not cured by "meaningful" cautionary language since he cautioned about a potential cut that allegedly had already been directed by Boeing to occur.  *See*, FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1299 (11th Cir. 2011) (stating "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").  Further, the court concludes that the alleged facts and reasonable inferences therefrom, viewed in plaintiffs' favor, indicate that the production cut had already been ordered when the information was disseminated to FE 7.  The court therefore concludes that Gilson is not entitled to dismissal of plaintiffs' claims with respect to his October 31, 2019 statement.

In sum, the court concludes plaintiffs have sufficiently pled that defendants' public statements on October 31, 2021 were false or misleading.

      (b). November 24, 2019

In the consolidated complaint, plaintiffs allege that on November 24, 2019, Jefferies LLC published a report titled "Management Meeting Takeaways: Getting into the Spirit," which reported on the analyst's "takeaways" from a meeting with Spirit management, including Gentile and Garcia.  Plaintiffs allege that based upon

statements made by Gentile and Garcia, the analyst reported "[Spirit] targets 16.5% segment margins, despite stable 737 MAX rates" and "[t]he MAX is set to stay at a rate of 52/mo. until May 2020 w/a potential rate decision at that time." Doc. no. 49, ¶ 235 (emphasis omitted); doc. no. 77-1, statement #7.

Plaintiffs claim that the statements made by Gentile and Garcia, as reported by Jefferies LLC, were materially false and misleading or omitted material facts when made because of Boeing's instruction to cut the shipset production rate in half, as described by FE 7 and FE 8, and because, as revealed by confidential witness, FE 2, Boeing had decided in mid-November of 2019 that Spirit was to temporarily stop production of the shipsets at the end of the fourth quarter of 2019.

Defendants argue that the alleged statements are not actionable under Rule 9(b) and the PSLRA because the analyst report includes "no quotations from any Spirit personnel, does not indicate the date on which the purported meeting occurred, and does not provide a specific source of the information it purports to summarize and paraphrase." Doc. no. 77, ECF p. 23. Moreover, defendants contend that the statements are not actionable because purported paraphrases of statements made by unspecified Spirit personnel cannot be reconciled with the standard articulated in Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011), regarding the maker of a statement.

The court agrees with defendants that the alleged statements in the analyst report are not actionable. There are insufficient facts in the consolidated complaint to support plaintiffs' assertion that Gentile and Garcia made the alleged statements. The Supreme Court stated in Janus that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." Id. at 142. The report does not directly quote Gentile or Garcia in making

22

the challenged statements.  In addition, it does not directly attribute the statements to either Gentile, or Garcia or to both.  While the report indicates that Gentile and Garcia were present at the meeting, it does not reveal that they were the only Spirit managerial personnel in attendance.  In any event, even if they were the only personnel present, plaintiffs have not alleged any facts showing that Gentile or Garcia controlled the content of the report and whether and how to communicate it. The court concludes that the statements in the analyst report cannot be attributed to Gentile or Garcia and therefore fail to support the Section 10(b) and Rule 10b-5 claims.  *See*, In re Prudential Financial, Inc. Securities Litigation, Master File No. 2:19-cv-20839-SRC-CLW, 2020 WL 7706860, at *14 (D.N.J. Dec. 29, 2020) (statements appearing in analyst reports not attributable to defendants).[11]

(c). December 17, 2019

Plaintiffs allege that on December 17, 2019, *The Wichita Eagle* reported on Boeing's shutdown announcement and a subsequent meeting between Kansas Governor Laura Kelly and Gentile.  The newspaper article stated that "Kelly said she talked with Spirit CEO Tom Gentile on Tuesday [December 17, 2019] and he's optimistic that production of the troubled aircraft will resume soon."  Doc. no. 49, ¶ 237 (emphasis omitted); doc. no. 77-1, statement #8.  It also stated that "[t]he governor said Gentile told her he's not expecting to have to do layoffs, however, no workforce decisions have been made, Spirit officials said."  *Id*. at ¶ 238 (emphasis omitted); doc. no. 77-1, statement #9.

Plaintiffs allege that Gentile's statements were false and misleading because Gentile knew Boeing was unlikely to resume production any time soon given the

---

[11] Further, the court agrees with defendants that the allegations in the consolidated complaint with respect to the statements as reported by Jeffries LLC do not satisfy the requirements of Rule 9(b) and the PSLRA because plaintiffs do not allege the who (the speaker) and the when (when the statements were made).

continued 737 MAX grounding and that massive layoffs were imminent. Plaintiffs allege that Gentile's statement about layoffs was contrary to the internal reality that Spirit had already been running layoff exercises because of the slowdown in production that Boeing had ordered in late September or early October of 2019.

Defendants argue that the statements from the news article are not actionable because they paraphrase what the Kansas Governor Laura Kelly said about what Gentile said. Defendants contend that plaintiffs cannot satisfy their pleading burden by pointing to a third party's paraphrase of a defendant's statement. Even if the statements had been direct quotes from Gentile, defendants contend the optimistic statement is not actionable because it is mere "puffery," doc. no. 77, ECF p. 26, and the layoff statement is not actionable because it is not false.

The court agrees that the statements in the news article by Governor Kelly about what Gentile said are not actionable. The statements are not direct quotes of Gentile. While the article attributes the content of the statements to Gentile, plaintiffs have not alleged sufficient facts to show that Gentile had ultimate control over the content of those statements and whether and how to communicate them. There are no allegations that he was involved in reviewing or approving of the news article. The court concludes that those statements are not attributable to Gentile for purposes of the section 10(b) and Rule 10b-5 claims. *See*, Total Equity Capital, LLC. v. Flurry, Inc., No. 15-CV-4168 (JMF), 2016 WL 3093993, at *3 (S.D.N.Y. June 1, 2016); In re Fisker Automotive Holdings, Inc. Shareholder Litigation, Civ. No. 13-2100-SLR, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) (statements in articles not attributable to defendants).

The court additionally agrees with defendants that the "optimistic" statement (identified as statement #8) is not actionable because it was immaterial; it was only a vague statement of corporate optimism not capable of objective verification. Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) ("Vague, optimistic

statements are not actionable because reasonable investors do not rely on them in making investment decisions."). Further, the court concludes that plaintiffs have failed to sufficiently plead that the "layoff" statement (identified as statement #9) was false or misleading. Plaintiffs contend the statement "was directly contrary to the internal reality . . . that Spirit had already been running such layoff "exercises[.]" Doc. no. 49, ¶ 238. Although plaintiffs allege that Spirit had performed layoff analyses, plaintiffs do not allege the content of those analyses and they do not allege that any workforce decision as to layoffs had been made. The court concludes that plaintiffs' allegations do not demonstrate that statement #9 was false or misleading.

(ii). *Accounting Practices and Internal Controls*

Next, plaintiffs allege that on October 31, 2019, Gentile, Garcia, and Gilson made materially false and misleading statements concerning Spirit's compliance with established accounting principles relating to contingent liabilities (Boeing Claims) and the effectiveness of Spirit's internal controls over financial reporting. The alleged false and misleading statements are as follows.

The Form 10-Q for the quarter ending September 26, 2019, signed by Garcia and Gilson and filed with the SEC, stated in relevant part:

> [T]he Company's financial statements . . . have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and the instructions to Form 10-Q and Article 10 of Regulation S-X.
>
> * * * *
>
> In the opinion of management, the accompanying unaudited interim condensed consolidated financial statements contain all adjustments . . . considered necessary to fairly present the results of operations for the interim period.
>
> * * * *

25

> Our President and Chief Executive Officer and Senior Vice President and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of September 26, 2019 and have concluded that these disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms.
>
> * * * *
>
> There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Doc. no. 49, ¶¶ 240, 242, 244, 245; doc. no. 77-1, Appendix A, statements #10, #16, #17, and #18.

The Form 10-K for the year ending 2018, signed by Gentile, Garcia, and Gilson, and incorporated by reference in the Form 10-Q ending September 26, 2019, stated in part:

> Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this evaluation, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013 Framework). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2018.

Doc. no. 49, ¶ 246 (emphasis omitted); doc. no. 77-1, Appendix A, statement #11.

26

In connection with the Form 10-Q for the quarter ending September 26, 2019, Gentile and Garcia signed a certification pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (SOX certification) which stated in part:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report.

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

> \* \* \* \*

27

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting . . .

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \* \*

The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Doc. no. 49, ¶¶ 248, 249; doc. no. 77-1, Appendix A, statements #12, #13, #14, and #15.

Initially, defendants argue the alleged statements are not actionable because the accounting issue the statements purportedly concealed—deficiency in Spirit's internal controls over its accounting processes—was "undisputedly immaterial." Doc. no. 77, ECF p. 27 (emphasis omitted).  The deficiency, defendants assert, was "'that [Spirit] did not comply with its established accounting processes related to certain potential contingent liabilities that were received by Spirit after the end of [the] third quarter 2019'" and that '[a]s a result of such non-compliance, the Company concluded that it should have recorded an incremental contingent liability of less than $8.0 million for the [third quarter of 2019].'"  *Id.*, quoting doc. no. 49 at ¶¶ 206, 215.  Defendants contend that, as plaintiffs in their consolidated complaint "concede," the less than $8.0 million contingent liability was "immaterial" to Spirit's financial results.  *Id.*, citing ¶ 215.  Because the $8.0 million contingent liability was

immaterial to Spirit's financial results, defendants maintain that any failure to disclose facts relating to the alleged weakness of Spirit's internal controls was immaterial. Thus, defendants contend that plaintiffs cannot establish the alleged statements were materially misleading.

Plaintiffs respond that the consolidated complaint plainly alleges that the undisclosed weakness in Spirit's internal controls was material. Plaintiffs point out that the consolidated complaint alleges that defendants admitted the materiality of the weakness in their 10-K Form for 2019 and that the weakness affected processes associated with 76 percent of Spirit's contracts. In addition, plaintiffs assert that the consolidated complaint alleges it was defendants' assurances of effective internal controls and not the size of errors in the financial results that were materially misleading. Further, plaintiffs contend that courts have previously ruled that the effectiveness of a company's internal controls is information a reasonable investor would consider significant in making an investment.

An omitted fact is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quotation marks and citation omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231-32 (quotation marks and citation omitted). "In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact." In re Sprint Corp. Securities Litigation, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002) (citation omitted). "Only if defendants' statements are obviously immaterial may the court grant defendants' request for dismissal." Id. at 1215-16 (citation omitted).

Upon review, the court finds that dismissal is not appropriate on the ground of materiality. Viewing the factual allegations in the consolidated complaint and reasonable inferences from those allegations in plaintiffs' favor, the court cannot conclude that the alleged undisclosed weakness in Spirit's internal controls is obviously immaterial.

Next, defendants argue that the statement regarding the evaluation of the disclosure controls as of September 26, 2019 (statement #10, doc. no. 77-1), and the statement regarding the evaluation of the internal controls as of December 31, 2018 (statement #11, doc. no. 77-1), are not actionable. Defendants contend that plaintiffs have not averred that management did not evaluate the disclosure and internal controls and determine them to be effective. According to defendants, plaintiffs merely take issue with the effectiveness of the evaluations, which is an allegation of corporate mismanagement. Defendants maintain that corporate mismanagement is not actionable under the federal securities laws as the court ruled in <u>Andropolis v. Red Robin Gourmet Burgers, Inc.</u>, 505 F. Supp. 2d 662, 683 (D. Colo. 2007).

Plaintiffs counter that defendants have misread their allegations. They contend that they have alleged that defendants misrepresented the strength and quality of existing internal controls and concealed the existence of conduct actionable under the securities laws rather than alleging any matters of business judgment or mismanagement on the part of defendants. Plaintiffs assert that the consolidated complaint alleges that defendants falsely assured investors that Spirit's internal controls were effective, when they knew they were not. According to plaintiffs, defendants' statements were half-truths because they created the misimpression that Spirit's internal controls were effective. Plaintiffs contend that the allegations of the consolidated complaint are distinguishable from those in the <u>Andropolis </u>case cited by defendants.

The court, viewing the factual allegations and reasonable inferences in a light most favorable to plaintiffs, concludes that statements #10 and #11 are actionable. The court concludes plaintiffs' allegations with respect to the efficacy of the disclosure and internal controls are distinguishable from those in <u>Andropolis</u> and dismissal of plaintiffs' claims based upon that ruling is not warranted.[12]  Therefore, the court concludes that statements #10 and #11 are actionable.

In addition, defendants argue that the challenged statements made by Gentile and Garcia in the SOX certifications (statements #12, #13, #14, and #15 in doc. no. 77-1), are not actionable.  Defendants assert that courts have ruled that SOX certifications are not independently actionable.  Even if the SOX certifications were independently actionable, defendants contend that plaintiffs have not alleged anything to show that statements #12 through #15 were false at the time when they were made.  Defendants assert that for statements #12 and #13 to be false, plaintiffs must allege that Gentile or Garcia had "actual knowledge" that the Form 10-Q was materially misleading.  As to statement #14, defendants contend that plaintiffs have failed to allege that defendants did not design disclosure controls and internal controls.  Lastly, with respect to statement #15, defendants assert that plaintiffs have not alleged that their disclosure was based on something other than the recent evaluation of internal controls.

In response, plaintiffs cite case authority in which courts have determined SOX certifications to be actionable.  Plaintiffs also contend, with respect to statements #12 and #13, that they have alleged defendants' knowledge or recklessness relating to Campbell's misconduct with respect to the EAC process.  As

---

[12] In reply, defendants argue that statement #10 is not actionable because it "is not about internal controls at all, but rather disclosure controls, which the Complaint never addresses" and statement #11 is not actionable because plaintiffs' allegations do not relate to "as of December 31, 2018." Doc. no. 91, ECF pp. 14-15.  The court declines to address these arguments since they were raised for the first time in reply.

to statement #14, plaintiffs assert that they have alleged the statement is actionable as a misleading "half-truth" because it creates the misimpression that Spirit's controls were effective, when they were not.  Plaintiffs also assert that statement #15 is also actionable as a misleading "half-truth" because defendants omitted key facts about the existence of material weakness in the internal controls when they made the statement.

Upon review, the court declines to dismiss plaintiffs' claim based upon defendants' argument that SOX certifications are not independently actionable.  The Tenth Circuit has not ruled on the issue.  However, plaintiffs have cited cases, including City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 418 (D. Del. 2009), which have concluded SOX certifications can be actionable.  *See also*, In re Toronto-Dominion Bank Securities Litigation, Civil No. 17-1665 (NLH/JS), 2018 WL 6381882, at *10 (D.N.J. Dec. 6, 2018) (citing the Delaware decision).  Without a definitive ruling from the Tenth Circuit and district courts on both sides of the issue, *see*, Rok v. Identiv, Inc., No. 15-cv-5775-CRB, 2017 WL 35496, at *9, n. 14 (N.D. Calif. Jan. 4, 2017) (citing cases), the court finds that plaintiffs should be permitted to rely upon the SOX certifications as bases for their claims.  The court thus turns to defendants' other arguments as to why the statements are not actionable.

As pointed out by defendants, statements #12 and #13 begin with the phrase "[b]ased on my knowledge" and "[t]o the best of my knowledge."  The court agrees with defendants that with that qualifier, the falsity of the statements depends on what Gentile and Garcia knew at the time.  The court concludes that plaintiffs have not sufficiently alleged facts to show that Gentile and Garcia had actual knowledge those SOX certifications (statements #12 and #13) were false or misleading.  In their response, plaintiffs point out that the consolidated complaint alleges that "Defendants discussed the EAC with Campbell at EAC reviews and other meetings,

but willfully ignored whether Campbell's EAC calculations were supported, reliable, or accurate." Doc. no. 90, ECF p. 59.  This information was provided by a confidential witness, designated as FE 9 in the consolidated complaint.  While FE 9 indicated that Gentile and Garcia attended the EAC reviews and the Boeing Claims were raised in those reviews and were a "hot-button" issue, FE 9 does not provide any particularized facts to show that Gentile and Garcia knew about the alleged material weakness in internal controls.  There are no factual allegations that Gentile and Garcia knew Campbell was understating the amount of the Boeing Claims.  According to FE 9, the discrepancies between the actual value of the Boeing Claims and the value that Campbell accounted for in the EAC were not adequately discussed.  Doc. no. 49, ¶ 182.  However, there are no factual allegations that Gentile and Garcia knew there were any discrepancies and that such discrepancies needed to be addressed.  And while FE 9 indicated that "Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, *id*., and that "Campbell had a 'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue," *id*., at 183, there are no factual allegations that Gentile and Garcia knew that Campbell was manipulating the Boeing Claims.   As the consolidated complaint fails to allege any knowledge of Campbell's misconduct by Gentile and Garcia, the court concludes that plaintiffs have failed to allege that the SOX certifications, based upon knowledge, designated as statements #12 and #13, were false or misleading when made by Gentile and Garcia.

The court rejects defendants' challenges to statements #14 and #15.  Viewing the allegations in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged statements #14 and #15 were false or misleading statements.

Next, defendants challenge statement #16 in doc. no. 77-1 regarding accounting methodology and statement #17 in doc. no. 77-1 regarding adjustments. These statements were made by Garcia and Gilson in the Form 10-Q for the quarter ending September 26, 2019. Plaintiffs, in response, address defendants' arguments relating to statement #16 but do not specifically address defendants' substantive arguments relating to statement #17. The court, in its discretion, deems defendants' motion confessed as to statement #17, and upon independent review, concludes that dismissal of plaintiffs' claim based upon statement #17 is appropriate for the reason provided by defendant – "'Adjustments' is an accounting term of art, and [p]laintiffs fail to allege the issues later identified amounted to a failure to include such 'adjustments' in financial statements." Doc. no. 77, ECF. p. 34 (footnote and citation omitted). As to statement #16, viewing the allegations of the consolidated complaint in a light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently pleaded that statement #16 was false or misleading.

Finally, defendants challenge statement #18 in doc. no. 77-1, which was made by Garcia and Gilson in the Form 10-Q for the quarter ending September 26, 2019. Specifically, defendants stated: "There were no changes in our internal control over financial reporting during the quarter ended September 26, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." Defendants contend that this statement says nothing about the sufficiency of Spirit's internal controls, only that they had not changed during the third quarter of 2019. Defendants point out that plaintiffs have not alleged that the internal controls changed.

Plaintiffs contend that this statement, along with other statements in the Form 10-Q and those incorporated by reference as well as the SOX certifications attached to the 10-Q, collectively created the misimpression that defendants' internal controls had been, and still were, effective, when they were not.

Upon review, the court agrees with defendants that plaintiffs have failed to sufficiently plead that statement #18 was a false or misleading statement of material fact.  The court thus finds statement #18 is not actionable.

In sum, the court finds that statements #10, #11, #14, #15 and #16 in doc. no. 77-1 are actionable and statements #12, #13, #17 and #18 are not actionable.

B. Scienter

"[I]t is not enough for plaintiff[s] to point out misleading statements of material fact.  Under the heightened pleading standards of the PSLRA, plaintiff[s] must state with particularity facts 'giving rise to a strong inference' that the defendants acted with scienter[.]"  In re Level 3 Communications, Inc. Securities Litigation, 667 F.3d 1331, 1343 (10th Cir. 2012) (quoting Adams, 340 F.3d at 1105). Scienter is "'a mental state embracing [1] intent to deceive, manipulate, or defraud,' or [2] recklessness.'"  Smallen, 950 F.3d at 1304 (quoting Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229, 1236-1237 (10th Cir. 2016) (quoting Adams, 340 F.3d at 1105); In re Zagg, Inc. Securities Litigation, 797 F.3d 1194, 1201 (10th Cir. 2015).  "'Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."  Smallen, 950 F.3d at 1304 (quoting Fleming, 264 F.3d at 1260, quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)).  "Recklessness, on the other hand, is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  Smallen, 950 F.3d at 1304-1305 (quoting In re Zagg, 797 F.3d at 1201, quoting Fleming, 264 F.3d at 1258).  In the securities fraud context, recklessness is a high bar.  It is something akin to conscious disregard. Allegations of conduct that amount to negligence or even gross negligence will not suffice.  In re Zagg, 797 F.3d at 1201.

35

The PSLRA requires plaintiffs to, "'with respect to each act or omission alleged . . . , state with particularity facts giving rise to a *strong* inference that the defendant[s] acted with the required state of mind' in violating the securities laws." Smallen, 950 F.3d at 1305 (quoting In re Level 3 Communications, 667 F.3d at 1333) (emphasis in original).

"Although an inference of scienter 'need not be irrefutable, i.e., of the "smoking-gun" genre,' it 'must be more than merely plausible or reasonable.'" Smallen, 950 F.3d at 1305 (quoting Tellabs, 551 U.S. at 324). "Because the inference must be 'powerful or cogent' not only in its own right but 'strong in light of other explanations['], [the court] must 'consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff[s].'" *Id*. (quoting Tellabs, 551 U.S. at 323-324). "Under this standard, a complaint survives dismissal 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id*. (quoting Tellabs, 551 U.S. at 324).

(i). *Gentile*

Defendants contend that plaintiffs have failed to plead particularized facts establishing that Gentile made any alleged false and misleading statements with scienter.   As to the statements regarding the aircraft shipset production rate, defendants acknowledge plaintiffs' allegations as to Gentile having indicated at various times in 2019 the existence of a close working relationship between Spirit and Boeing, and that Gentile was "hands on" and "very engaged" with the 737 MAX program.  Doc. no. 77, ECF p. 36 (citing doc. no. 49, ¶¶ 296-99, 306-08).  However, those allegations, defendants assert, do not aver with particularity that Boeing told Spirit anything regarding the production rate that contradicted Gentile's statements. According to defendants, plaintiffs' allegations are "a less plausible variation on the oft-rejected contention that a defendant 'must have known' of fraud because of [his]

36

position in the company." *Id*., ECF p. 37 (quotations omitted). In addition, defendants contend that Gentile's position and the fact he attended meetings discussing the EAC process do not contribute to a strong inference of scienter as to Gentile's statements regarding accounting issues and internal controls. Defendants further argue that Gentile's SOX certifications add nothing substantial to the scienter calculus. Finally, defendants argue that Gentile's stock sales during the Class Period are not indicative of scienter. They point out that Gentile's net holdings of Spirit stock increased during the Class Period and the "F" transaction code for the stock sales indicated they were sold for the "[p]ayment of exercise price or tax liability." *Id*., ECF p. 39. Also, defendants assert that while Gentile sold a greater percentage of stock in 2020 than in the previous three years, the stock sales did not go "well beyond" the patterns of normal stock trading which courts have found to support an inference of scienter. *Id*. (quotation omitted). And they point out plaintiffs have not alleged that any other individual defendants engaged in any suspicious stock sales, which they claim undercuts an inference of scienter.

Plaintiffs argue that their allegations demonstrate that Gentile was informed of Boeing's instruction to cut the aircraft shipset production rate prior to his misstatements on October 31, 2019. In support, plaintiffs rely upon FE 7's account. Plaintiffs state that FE 7 detailed how, in light of Boeing's instruction to cut production, she was tasked with contributing data to reports to determine the number of layoffs necessary to implement that cut. She indicated that the subsequent layoff analyses were approved by Campbell and presented to Gentile by late October 2019. These allegations, plaintiffs assert, support a strong inference of scienter because they show Gentile knew of the production cut at least through the layoff analyses, which contradicted his public statements. Plaintiffs also argue that it strains credulity that Gentile was not informed by Campbell, or by Garcia and Gilson, who mostly likely attended the meeting with Boeing, of the drastic production cut

because of the importance of the 737 MAX program to Spirit's operations.  Plaintiffs contend that the allegations regarding Boeing's close working relationship with Spirit and the importance of the 737 MAX program to Spirit's operations (accounting for over 50 percent of annual revenue), viewed holistically with the other scienter allegations, such as FE 7's account, supports a strong inference of scienter with respect to Gentile's production rate cut statements.  Further, plaintiffs contend that Gentile's misleading statements about the production rate to analysts show his scienter.

As to misstatements regarding the effectiveness of Spirit's internal controls over financial reporting, plaintiffs argue that Gentile knew or recklessly ignored the material weakness in those controls.  Plaintiffs rely upon the details given by FE 9, wherein she stated that she repeatedly confronted Campbell about using unvalidated, unsupported and unreasonably low estimates of costs, including costs associated with the claims submitted by Boeing in connection with the 737 MAX program, but he either bullied or ignored her.  Plaintiffs also point out that FE 9 described how Gentile knew or recklessly ignored Campbell's conduct through regular meetings such as the EAC reviews.  FE 9 stated that the Boeing Claims had ballooned, and they were affecting Spirit's financial reporting and were being used by Boeing in negotiations over other issues.  According to plaintiffs, the ever-increasing Boeing Claims were a serious concern and were discussed at quarterly EAC Review meetings, monthly Executive Program Reviews for Spirit's 737 program and separate briefings, all of which FE 9 attended, along with Campbell and Gentile. Plaintiffs assert that FE 9's account also indicates that Gentile ignored the alleged discrepancies between the Boeing Claims and Campbell's valuations.  Additionally, plaintiffs argue that the false SOX certifications support a strong inference of scienter because Gentile knew his certifications were false.  Plaintiffs further argue

that the importance of the EAC process to Spirit's operations (affecting 76 percent of Spirit's contracts) supports a strong inference of scienter.

Plaintiffs also argue that Gentile's stock sales occurred on February 6, 2020, just weeks before Spirit's admission that it had a material weakness in internal controls over the EAC process and the revelation of the full, devasting impact of the 737 MAX production halt on Spirit's financial prospects. Plaintiffs contend that the timing, as well as the amount, of those sales support a strong inference of scienter for his misstatements. Specifically, as to amount, plaintiffs assert that they have alleged that over the course of two days, Gentile disposed of 22 percent of his Spirit stock for proceeds totaling $3.3 million, and these sales were much larger than his sales from 2016 to 2018. According to plaintiffs, the SEC filings do not explain whether the stock was sold for tax reasons, but regardless, plaintiffs contend the suspicious timing of those sales still supports an inference of scienter.

Upon review, the court finds that plaintiffs have failed to allege with particularity facts giving rise to a strong inference that Gentile made his alleged false and misleading statements with an intent to deceive or defraud or with recklessness. As stated, plaintiffs rely upon FE 7's account to establish that Gentile knew that his October 31, 2019 statements regarding the aircraft shipset production rate were false and misleading. According to FE 7, Gentile received the results of the layoff exercises implementing the production cut "just before the end of October 2019." Doc. no. 49, ¶ 105 (emphasis omitted). However, the consolidated complaint does not provide facts with sufficient particularity to establish that FE 7's statement is reliable and based on personal knowledge. The consolidated complaint does not provide factual averments sufficient to show that FE 7 was positioned to possess the information as to when Gentile received the results of the layoff exercises. *See*, Zucco Partners, 552 F.3d at 995 ("[C]onfidential witness statements may only be relied upon where the confidential witnesses are described with sufficient

particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

The consolidated complaint does not allege that FE 7 reported to Gentile. According to plaintiffs' allegations, FE 7 only had occasional contact with Gentile because of weekly performance meetings which Gentile attended once or twice per quarter. According to the consolidated complaint, FE 7 reported equally to Angel Little (Little) and Bill Brown (Brown). Although Brown reported to Gentile, FE 7 stated that she was tasked by Little, not Brown, to provide data to support other members of her team so they could analyze the appropriate workforce level needed to continue production at the new lower rate. The other members of the team were responsible for different components of the layoff exercises, and the results from their work "were then rolled up to" Brown and his direct reports, including Campbell, for review and approval. *Id*. at ¶ 104. FE 7 stated that assuming Mr. Brown agreed with the results of the exercises, Brown would report the results to Gentile for approval. *Id*. According to FE 7, it took "two to three weeks to complete the first round or iteration of such a layoff exercise" and the results were thereafter presented to Gentile. *Id*. at ¶ 105. However, there are no particularized allegations to show how FE 7 knew that the results of the exercises had been "rolled up" to Brown for review and approval and were presented to Gentile just before the end of October 2019.[13] FE 7's information appears to be based upon secondhand or hearsay information and there are no particularized allegations which would make that information sufficiently reliable, plausible, or coherent. *See*, Zucco Partners, 552

---

[13] The court notes that the consolidated complaint fails to describe with particularity the contents of the layoff analysis. *See*, Anderson, 827 F.3d at 1241 ("To create an inference of scienter based on [] reports, the plaintiffs must adequately describe the content of the reports[.]"). Also, it fails to allege whether Gentile had read the results or was aware of the results before the end of October 2019. *Id*. (confidential witness's allegations did not establish executives' knowledge because they did not establish the executives had seen the report or were aware of the reported losses).

F.3d at 997, n. 4.  The court concludes that the information provided by FE 7 is not sufficient to demonstrate that Gentile received or was aware of the layoff exercises just before the end of October 2019, and, therefore, knowingly or recklessly misled investors with his October 31, 2019 statements.[14]  *See*, *e.g.*, *id.* at 996-997 (statements not based on confidential witnesses' personal knowledge are not sufficient to raise a strong inference of scienter); Anderson, 827 F.3d at 1240 (corroborating witness's account does not establish executives' knowledge because the witness's allegations do not establish that Spirit's executives had seen a cost-study report or were aware of regularly reported losses on projects).[15,16]

The court rejects the proposition that Gentile's knowledge should be inferred because the 737 MAX program was critical to Spirit's core operations, the company had a close working relationship with Boeing, and Gentile was "hands on" and "very

---

[14] The court notes that the consolidated complaint alleges that Gentile sent out weekly emails regarding Spirit's operations, including Spirit's relationship with Boeing and the 737 MAX production.  According to FE 7, "in or around October 2019," Gentile told employees in one of the emails that "Spirit was keeping the same production schedule but said that there was a changing environment with Boeing."  Doc. no. 49, ¶ 297.  FE 7's account indicates that Gentile did not know of the alleged production rate cut in or around October 2019.

[15] In their consolidated complaint, plaintiffs also noted that according to another confidential witness, FE 5, Gentile had daily communications with Boeing.  Doc. no. 49, ECF p. 50, n. 11; ¶ 296.  The level of detail in the complaint, however, is insufficient to show that FE 5, who was four levels below Gentile, was positioned to know the communications between Gentile and Boeing or the substance of those communications.  FE 5's account is not sufficient to demonstrate a strong inference of scienter.  *See*, Zucco Partners, LLC, 552 F.3d at 996-997 (statements of confidential witnesses not based on personal knowledge are not sufficient to raise a strong inference of scienter); Anderson, 827 F.3d at 1243 (relatively low-level employees could not provide evidence bearing on the executives' mental states).

[16] The court rejects plaintiffs' argument that it strains credulity that Campbell and the other individual defendants did not advise Gentile of the production rate cut.  As stated, under the heightened pleading standard of the PSLRA, plaintiffs must state with particularity facts giving rise to a strong inference that defendants acted with the requisite state of mind.  Smallen, 950 F.3d at 1305.  The court notes that Campbell did not report directly to Gentile.  Further, as herein discussed, there are insufficient allegations to support a plausible inference that Garcia and Gilson were present at the meeting where Boeing instructed Spirit to cut the production rate in half.

engaged" with the 737 MAX program.  With respect to core operations, plaintiffs contend that the facts concerning the production cut were "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  Doc. no. 90 (quoting Hampton v. root9b Techs., Inc., Civil Action No. 15-cv-02152, 2016 WL 7971184, at *28 (D. Colo. Aug. 4, 2016), *objections to report and recommendation sustained on other grounds*, 2016 WL 9735744 (D. Colo. Sept. 21, 2016).  However, the court notes that the Tenth Circuit has not yet adopted the "absurd" presumption, and the court is not convinced that the alleged facts constitute the "rare circumstances" in which core operations allegations might "conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations."  South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 786 (9th Cir. 2008).  Additionally, allegations of a close relationship between companies do not establish the kind of circumstantial evidence necessary to support a claim of fraudulent intent.  Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001).  The court also notes that, while the Tenth Circuit has stated a defendant's position in the company is a relevant fact when analyzing scienter, it has also rejected "the notion that knowledge may be imputed solely from an individual's position within a company."  In re Zagg, Inc., 797 F.3d at 1205 (quoting Wolfe v. Aspenbio Pharma, Inc., 587 F. Appx. 493, 497 (10th Cir. 2014)); *see also*, Anderson, 827 F.3d at 1245 ("We cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."); Fleming, 264 F.3d at 1264 ("[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate. . . .") (quotation marks and citations omitted); *see also*, Anderson, 827 F.3d at 1246 ("'Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations

about the defendants' actual exposure to information, it will usually fall short of the [securities laws' pleading] standard.'") (quoting <u>South Ferry L.P. No. 2</u>, 542 F.3d at 784).  Here, the court concludes that knowledge of the production rate cut should not be imputed to Gentile based upon plaintiffs' contentions.[17]

Turning to the alleged false and misleading statements relating to compliance with established accounting procedures and the effectiveness of internal controls, the court concludes that FE 9's account is not sufficient to establish that Gentile's statements were made with an intent to deceive or defraud or with recklessness.  The consolidated complaint alleges that the material weakness was the result of Campbell intentionally underestimating the amount of Boeing Claims for the 737 program in the EAC process, which made the 737 program appear more profitable than it was.  FE 9 said that Boeing Claims had become a hot-button issue and were being used by Boeing in negotiations over other issues with Spirit and potential offsets for amounts paid to Spirit.  The increasing claims, FE 9 stated, were a concern to Spirit management and were discussed at EAC review meetings, attended by Gentile.  According to FE 9, Gentile ignored the discrepancies as to the actual value of the Boeing Claims versus Campbell's valuation of the claims.  However, there are no particularized allegations that Gentile was aware of any such discrepancies and there are no particularized allegations to support an inference that the valuation discrepancies were obvious.  FE 9 said that the discrepancies were not adequately discussed during the EAC reviews.  According to FE 9, "this was because Defendant Campbell had the final decision-making authority on the numbers for the claims estimates submitted in the EAC, and he was generally the only one to speak to upper management[.]"  Doc. no. 49, ¶ 182.  She also said that "Defendant Campbell had a

---

[17] Further, the court rejects plaintiffs' argument that Gentile's responses to analysts' questions relating to the 737 MAX production rates raise a strong inference of scienter, since there are no particularized facts that he knew of the production rate cut in advance of those responses.

'tight grip' over the Boeing Claims and usually was the only speaker at such meetings on the issue." *Id*. at 183. But there are no particularized factual averments which, if true, would show that Gentile knew, or that it was so obvious he must have known, that Campbell had the final decision-making authority on the Boeing Claims or was manipulating the Boeing Claims by underestimating them.[18] The fact that the Boeing Claims were generally discussed at the EAC reviews does not establish that the discrepancies in valuation of the Boeing Claims were discussed. And while FE 9 alleged that the PRO-3033 policy[19] was not genuinely followed, doc. no. 49, ¶¶ 161-162, there are no particularized facts alleged to the effect that Gentile had any knowledge that the PRO-3033 policy was not genuinely followed. Nor are there any particularized facts alleged to the effect that Andy Yacenda, one of Spirit's controllers for the 737 program, was acquiescing in Campbell's decisions, as alleged by FE 9. Further, there are no particularized facts averred to establish that Gentile was told or aware of any information that contradicted any of his statements. In the court's view, FE 9's account does not support a strong inference of scienter by Gentile with respect to the alleged false and misleading statements regarding compliance with established accounting procedures and the effectiveness of internal controls.[20]

---

[18] The court notes that plaintiffs allege that despite her concerns, FE 9 signed off in good faith on the claims in the EAC. Doc. no. 49, ¶ 176 & n. 27.

[19] According to the consolidated complaint, the PRO-3033 policy provided procedures for evaluating and validating the claims made by Spirit's customers, such as Boeing, and how the value of those claims should be factored in the EAC. Doc. no. 49, ¶ 161.

[20] Plaintiffs also point to Gentile's execution of the SOX certifications to support a strong inference of scienter. The court finds "the presence of the SOX certifications unpersuasive because they are not accompanied by any 'particularized facts to support an inference that [Gentile] knew [his] sworn SOX statements were false at the time they were made." Smallen, 950 F.3d at 1311 n. 10 (quotation marks omitted). "[Plaintiffs'] bare assertion regarding [Gentile's] execution of the SOX certifications adds nothing substantial to the scienter calculus and, at best, support[s] an inference

"'[M]otive can be a relevant consideration' in making the scienter determination, and 'personal financial gain may weigh heavily in favor of a scienter inference.'"  In re Level 3 Communications, 667 F.3d at 1345 (quoting Tellabs, 551 U.S. at 325).  Unusual or suspicious stock sales by corporate insiders may provide circumstantial evidence of scienter.  Zucco Partners, 552 F.3d at 1005.  Nonetheless, plaintiffs' allegations concerning Gentile's stock sales do not support a strong inference of scienter.  Even though Gentile sold roughly 22.5 percent of his common stock shortly before the disclosure, on February 28, 2020, of the material weakness in the internal controls, the sales are not unusual when viewed in context.  Gentile's stock holdings increased during the Class Period, and he retained a substantial percentage of his Spirit holdings.  This consideration, in the court's view, rebuts any inference of scienter the court might otherwise draw regarding the stock sales.  *See*, Smallen, 950 F.3d at 1310; In re Level 3 Communications, 667 F.3d at 1346-1347 (increased holdings weaken an inference of scienter).  In addition, the court notes that Gentile's stock, which was acquired on January 21, 2020, was sold after Spirit had publicly announced on January 30, 2020, that it did not comply with its established accounting processes and that an internal review of its accounting process compliance was ongoing.  *See*, Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (sales suspicious in timing when "calculated to maximize the personal benefit from undisclosed inside information").  Further, the court notes that plaintiffs do not allege that Garcia and Gilson sold any stock during the Class Period.  "'[T]he failure of other defendants to sell their stock undermine[s] [plaintiffs'] theor[y] that negative information was withheld to obtain a higher sell price.'"  Smallen, 950 F.3d at 1311 (quoting In re Scholastic, 252 F.3d 63, 75 (2d Cir. 2001)).  Consequently,

---

of negligence."  *Id.* (quotation marks omitted); *see also*, In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1116 (10th Cir. 2015).

the court is not persuaded that Gentile's stock sales demonstrate that he had a motive to defraud investors with respect to the effectiveness of Spirit's internal controls.[21]

Viewing all of plaintiffs' allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent.  Plaintiffs fail to provide particularized facts giving rise to a strong inference that Gentile intentionally misrepresented the production rate or the compliance with established accounting principles and the effectiveness of the internal controls.  Plaintiffs also argue that their allegations are sufficient to show recklessness.  This court disagrees.  "[R]ecklessness in this context is a particularly high standard, something closer to a state of mind approximating actual intent."  In re Zagg, 797 F.3d at 1206 (quotation marks and citations omitted).  The more compelling inference to be drawn from the allegations of plaintiffs' consolidated complaint is, at most, one of negligence on the part of Gentile, which is insufficient to avoid dismissal.  "[A]llegations of negligence or even gross negligence fall below the high threshold for liability under Section 10(b) of the Exchange Act."  Smallen, 950 F.3d at 1305 (quotation omitted).

In sum, the court concludes that the consolidated complaint fails to raise a strong inference that Gentile acted with scienter.  The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[]."  In re Gold Resource Corporation Securities Litigation, 776 F.3d 1103, 1118 (10th Cir. 2015).  The court therefore concludes that dismissal of plaintiffs' § 10(b) and Rule 10b-5 claims against Gentile is appropriate.

(ii). *Garcia*

---

[21] Further, the court is not persuaded that Gentile's stock sales demonstrate he had a motive to defraud investors about the 737 MAX production rate.

Defendants additionally contend that plaintiffs have failed to plead particularized facts establishing that Garcia made any alleged false and misleading statements with scienter.   According to defendants, plaintiffs' allegations that Garcia, like Gentile, was positioned to know about the alleged improprieties in the EAC accounting process, and signed the SOX certifications, are insufficient to demonstrate a strong inference of scienter regarding the alleged false and misleading statements about compliance with established accounting procedures and the effectiveness of internal controls.   Defendants assert that Garcia's resignation, following the announcement of Spirit's accounting issues, also does not support a strong inference of scienter because the resignation is equally consistent with nonfraudulent conduct.

As to the alleged false and misleading statements about the 737 MAX production rate, Garcia points out that there are no particularized facts averred which would support a conclusion that Garcia attended or was aware of any meeting where Boeing discussed the 737 MAX production cut.   Garcia points out that FE 7 did not attend the subject meeting discussing the production rate cut and there are no allegations that FE 7 was told who attended the meeting.   Although FE 7 believed that Garcia attended the meeting based upon her understanding that any revisions to the production schedule required his "sign off," Garcia points out that there are no allegations that the production schedule changed or that he signed off on any production changes.   Garcia maintains that there are no particularized allegations which tie him to the meeting with Boeing where the production rate cut was discussed.   Further, Garcia asserts that there are no particularized facts alleged to support an inference that he knew about the layoff exercises, for which FE 7 had been providing data.

Additionally, in his motion, Garcia asserts that there are no particularized factual allegations that he had any motive to commit fraud or that he profited in any

way from the alleged false and misleading statements.  The absence of a profit motive, Garcia argues, means that the circumstantial evidence of scienter must be more compelling.  Garcia contends that the consolidated complaint fails on this score as well.

Plaintiffs respond that FE 7's account of Boeing's instruction to Spirit to cut production shows that Garcia had knowledge of that fact.  Plaintiffs point out that FE 7 stated Garcia "most likely" attended the meeting and that FE 7 specified what was said at the meeting–specifically that Boeing instructed Spirit to cut production of 737 MAX shipsets in half.  Doc. no. 90, ECF pp. 65-67.  According to plaintiffs, FE 7's account, along with the core operations allegations, is sufficient to establish a strong inference of scienter with respect to Garcia's misstatements relating to the production rate.

In addition, plaintiffs contend that Garcia knew of or recklessly ignored Campbell's misconduct in estimating the costs associated with the Boeing Claims through regular meetings such as the quarterly EAC reviews.  Plaintiffs contend that Garcia ignored apparent discrepancies between the actual value of the Boeing Claims and the value Campbell assigned to them in the EAC.  Plaintiffs also argue that Garcia's resignation strongly supports a scienter inference because it was suspicious in its timing and circumstances.  According to plaintiffs, they adequately link Garcia's resignation to the alleged misconduct.  Further, plaintiffs point out that Spirit acknowledged that remedial measures to address the EAC process deficiencies included management changes.  Plaintiffs also contend that Garcia's SOX certifications support a strong inference of scienter because they have alleged Garcia knew his certifications were false.  Lastly, plaintiffs contend that the importance of Boeing Claims and the EAC process to Spirit's bottom line supports a strong inference of scienter.

Upon review, the court concludes that plaintiffs have failed to plead with particularity facts sufficient to give rise to a strong inference that Garcia acted with an intent to deceive or with recklessness when making the alleged false and misleading statements.  As to the alleged false and misleading statements concerning the 737 MAX production rate, the court concludes that FE 7's account is insufficient to establish that Garcia was aware of Boeing's instruction to cut production in half. FE 7 was not present at the meeting between Boeing and Spirit where the production rate cut was purportedly discussed and was not told by her direct supervisor, Mr. Little, or by Campbell who attended the meeting.  FE 7 also did not report to Garcia. According to FE 7, she believed Garcia attended the meeting because production rate changes or the production rate schedule required his "sign-off."  Doc. no. 49, ¶¶ 52, 102.  However, there are no particularized allegations of any change in the production rate schedule, referred to internally as the "Master Schedule," or that Garcia signed off on any change.  The lack of any particularized allegations as to a change in the Master Schedule undermines the only basis for plaintiffs' allegations that Garcia attended the meeting where Boeing told Spirit to cut production in half. Further, there are no particularized allegations that Garcia received the results of the layoff exercises for which FE 7 provided data.  The court concludes that FE 7's account is insufficient to establish that Garcia knew his statements about the aircraft shipset production rate were false and misleading or that he ignored obvious signs that his statements were false and misleading.  Lastly, the court concludes that plaintiffs' allegations as to the 737 MAX program's importance to Spirit's operations and Garcia's position with the company are not sufficient to establish a strong inference of scienter for the reasons previously discussed with respect to Gentile.

Turning to the alleged false or misleading statements with respect to the compliance with established accounting procedures and the effectiveness of internal

49

controls, the court concludes that FE 9's account is insufficient to establish that Garcia acted with an intent to deceive or with recklessness.  There are no particularized allegations that Garcia knew or was aware of the discrepancies concerning the valuation of the Boeing Claims or was aware that the PRO-3033 policy was not being followed.  In addition, there are no particularized allegations that Garcia ignored obvious signs of the alleged manipulation of the costs associated with the 737 program, including the Boeing Claims.  The fact that Boeing claims were discussed at the EAC meetings, which Garcia attended, does not suggest that Garcia knew or recklessly ignored an undervaluation of the Boeing Claims.  And as stated by Tenth Circuit, "mere attendance at meetings does not contribute to an inference of scienter."  Anderson, 827 F.3d at 1246; *see also*, In re Level 3 Communications, 667 F.3d at 1344 (10th Cir. 2012) (concluding that the fact the defendants "monitored the integration process through regular meetings and reports" was insufficient to "draw a strong inference" of the defendants' scienter).  Further, the court concludes that Garcia's knowledge should not be imputed based upon the alleged importance of the EAC process to Spirit's bottom line or Garcia's position with the company.

As to the resignation of Garcia, which the company identified as a remedial measure in the 2020 annual report, the court concludes, like the Tenth Circuit in In re Zagg, that the resignation is "at most an acknowledgement that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred."  *Id*. at 1205; *see also*, In re Hertz Global Holdings, Inc., 905 F.3d 106, 119 (3rd Cir. 2018) ("[P]leading scienter requires more than pleading a link between bad news and an executive's resignation.  Changes in leadership are only to be expected when leadership fails . . . [A]llegations [must] cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud.").

The allegations in the consolidated complaint are not sufficient to demonstrate that Garcia's resignation resulted from his knowing or reckless disregard of noncompliance with established accounting procedures or the material weakness in the internal controls.

Additionally, "[plaintiffs'] bare assertion regarding [Garcia's] execution of the SOX certifications adds nothing substantial to the scienter calculus and at best, support[s] an inference of negligence." Smallen, 950 F.3d at 1311 n. 10 (quotation omitted). Further, the court notes that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Fleming Cos., 264 F.3d at 1261 (quotation marks and citation omitted).

Further, as to Garcia, plaintiffs fail to offer anything in the way of a motivation to mislead investors. "Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain." Employees' Retirement System of Rhode Island v. Williams Companies, Inc., 889 F.3d 1153, 1173 (10th Cir. 2018). Moreover, it "mitigates an inference of scienter from the plaintiffs' other factual allegations." Anderson, 827 F.3d at 1239.

Viewing plaintiffs' allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of a nonfraudulent intent. The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[]." In re Gold Resource Corporation, 776 F.3d at 1118. The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Garcia is appropriate.

(iii). *Gilson*

Initially, defendants contend that plaintiffs' scienter allegations relating to Gilson fail for the same reasons that they fail as to Gentile and Garcia. Defendants

maintain that plaintiffs' "positional" allegations and allegations with respect to Gilson's resignation do not establish scienter on Gilson's part.  Doc. no. 77, ECF p. 41.

Defendants, however, recognize that the consolidated complaint includes additional scienter allegations with respect to the misstatements regarding compliance with established accounting procedures and the effectiveness of internal controls that are not alleged against Gentile and Garcia.  Defendants acknowledge that the consolidated complaint alleges that FE 9 recalled a specific instance in "early or mid-2019" when she "'discussed her concerns with Defendant Gilson.'"  Doc. no. 77, ECF p. 41.  The consolidated complaint specifically alleges that FE 9 "raised her concerns about these failures in the EAC process with respect to customer claims to Defendant Gilson directly."  Doc. no. 49, ¶ 178.  The pleading alleges that, because of her raising such concerns to Spirit's "Finance personnel" and causing an internal "conflict," FE  9 was called into a meeting in Gilson's office, arranged by the Finance personnel, to discuss these issues.  At the meeting, FE 9 discussed her concerns with Gilson and other Finance personnel, but to no avail.  FE 9 left the meeting completely disappointed with the response of Gilson and the other Finance personnel because they did not take any actions to remedy the problem and they accused her team of not supporting "Program personnel."  *Id*. According to FE 9, "given his responsibilities as Spirit's Controller, Defendant Gilson should have been 'pounding the table' upon hearing of such failures, but instead FE 9 was 'shut down' once again."  *Id*.

Defendants contend, however, that plaintiffs' allegations fall short with respect to scienter.  Defendants assert that the allegations do not reveal "*anything* that Gilson was actually told [at the] meeting."  Doc. no. 77, ECF p. 41.  Defendants maintain that without knowing what FE 9 specifically said to Gilson, it is impossible to determine whether that information given as early as "early 2019," undermined

Gilson's statements made on October 31, 2019.  Defendants also point out that "FE 9 ultimately 'signed off' on the accounting entries 'in good faith' 'despite her concerns.'"  Doc. no. 77, ECF p. 42 (quoting doc. no. 49, ¶¶ 176, n. 27, 178).  Further, defendants assert that plaintiffs' allegations are insufficient to establish scienter because FE 9 did not work at Spirit during the Class Period and her position with the company is not adequately alleged.

Plaintiffs respond that their scienter allegations are sufficient as they show Gilson knowingly or recklessly misrepresented the effectiveness of Spirit's internal controls.  Plaintiffs contend that Gilson knew of or recklessly disregarded the material weakness in Spirit's internal controls.  Plaintiffs specifically rely upon their allegations that FE 9 raised her concerns about Campbell directly to Gilson because of her concerns about the weaknesses in Spirit's EAC process, but Gilson ignored her.  Plaintiffs contend that her confrontation with Gilson, as well as her resignation shortly after her confrontation, support a strong inference of Gilson's scienter.  Plaintiffs also point to their allegations that Gilson attended regular meetings such as the EAC Reviews where the Boeing Claims were discussed.  Plaintiffs contend that even though FE 9 left Spirit's employment before the start of the Class Period, her allegations are nonetheless relevant because they provide insight into what Gilson knew at the start of the Class Period.  Further, plaintiffs assert that FE 9's position with Spirit is sufficiently alleged.

Upon review, the court concludes that plaintiffs have failed to sufficiently plead with particularity facts giving rise to a strong inference that Garcia acted with an intent to deceive or with recklessness.  The court concludes that FE 9's account is not sufficient to establish a strong inference that Gilson's alleged false and misleading statements with respect to compliance with established accounting procedures, and the effectiveness of internal controls, were made with intent to deceive or with recklessness.  Plaintiffs fail to allege with particularity what was

discussed at the meeting involving FE 9, Gilson, and Finance personnel. Without particularized allegations as to what was discussed, the consolidated complaint does not establish that Gilson was specifically informed by FE 9 of Campbell's manipulation of the Boeing Claims or any alleged material weakness in the internal controls. Indeed, plaintiffs' allegations with respect to the meeting do not mention anything specifically about the Boeing Claims. Doc. no. 49, ¶ 178. As pointed out by defendants, plaintiffs allege only that FE 9 "raised her concerns about these failures in the EAC process with respect to customer claims." Doc. no. 49, ¶ 178. Also, plaintiffs' allegations indicate that other Finance personnel did not share her concerns, *id.*, and as pointed out by defendants, plaintiffs' allegations indicate that FE 9 signed off on the claims in the EAC "in good faith." *Id.*, ¶ 176 & n. 27. If other Finance personnel did not share FE 9's concerns and FE 9 signed off on the claims in the EAC in good faith despite her concerns, those concerns do not, in the court's view, provide a strong inference that Gilson acted with an intent to deceive or to defraud or with recklessness. Although plaintiffs contend that FE 9's resignation supports the assertion that Gilson acted with scienter, there are no particularized allegations that Gilson knew of the resignation or the reasons for her resignation. Further, the fact that a material weakness in the internal controls was later identified, resulting in Gilson's resignation, does not provide a strong inference that Gilson acted with an intent to deceive or to defraud or with recklessness at the time he made the alleged false and misleading statements.

In addition, as pointed out by Gilson, the consolidated complaint fails to allege any motive on his part to commit securities fraud. Although plaintiffs need not show that Gilson acted with a particular motive, the failure to allege facts indicating a motive for securities fraud mitigates an inference of scienter. *See*, Anderson, 827 F.3d at 1239.

The court further agrees with defendants that plaintiffs' remaining scienter allegations concerning Gilson fail for the same reasons previously discussed with respect to Gentile and Garcia.

Lastly, viewing plaintiffs' scienter allegations holistically, *see*, In re Zagg, 797 F.3d at 1201, the court concludes that the inference of scienter is neither cogent nor as compelling as the competing inference of nonfraudulent intent.  The court is not persuaded that "a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff[s] allege[]."   In re Gold Resource Corporation, 776 F.3d at 1118.  The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Gilson is appropriate.

(iv). *Spirit*

Plaintiffs also allege liability under Section 10(b) and Rule 10b-5 on the part of Spirit.  Corporations, like Spirit, have no state of mind of their own.  Instead, scienter of the corporations' agents must be imputed to them. *See*, Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008).  In addition to the scienter allegations as to Gentile, Garcia, and Gentile, which the court has found to be insufficient to establish a strong inference of scienter, plaintiffs rely upon their allegations with respect to Campbell.[22]  Plaintiffs assert that those allegations support a strong inference that Campbell acted with scienter.  Defendants contend the scienter allegations as to Campbell are irrelevant on the issue of Spirit's scienter because Campbell did not make or issue any of the challenged statements.  Plaintiffs counter that Campbell's scienter is imputable to Spirit, despite the fact he did not make or issue any of the alleged false or misleading statements.  They point out that the Tenth Circuit authorizes corporate scienter to be evaluated by the state of mind

---

[22] No claim under Section 10(b) and Rule 10b-5(b) has been alleged against Campbell.

of the individual corporate official, who not only made or issued a false and misleading statement, but who also "furnish[ed] information or language for inclusion therein, or the like."  Doc. no. 90, ECF p. 77 (quoting <u>Smallen,</u> 950 F.3d at 1313).  Plaintiffs posit that given Campbell's critical role with the 737 MAX program and his ownership of the EAC process for Spirit's 737 program, his scienter should be imputed to Spirit.  According to plaintiffs, Campbell furnished false information for inclusion in the alleged misstatements regarding the 737 MAX production rate because he instructed the Business Operation Team, including FE 7, to create layoff analyses and similar planning reports to implement Boeing's production cut.  In addition, they assert that Campbell furnished false information for inclusion in the alleged misstatements regarding the effectiveness of internal controls, including through quarterly EAC reviews.  Plaintiffs maintain that they have sufficiently alleged facts giving rise to a strong inference of scienter with respect to Campbell.

The Tenth Circuit has determined that corporate liability for a Section 10(b) and Rule 10b-5 violation may be established by looking to "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or *who furnish information or language for inclusion therein*, or the like)."   <u>Smallen</u>, 950 F.3d at 1313 (emphasis added) (quotation marks and citation omitted).  Initially, the court concludes that the consolidated complaint fails to allege particularized facts to establish that Campbell furnished information or language for inclusion in any of the alleged false and misleading statements made with respect to the 737 MAX production rates.  The consolidated complaint does allege that the layoff exercises were "rolled up" to Brown and his direct reports, including Campbell, for review and approval, doc. no. 49, ¶ 104, but there are no allegations that those exercises were furnished to Gentile for inclusion in any alleged false and misleading statements involving the 737 MAX

production rate on October 31, 2019.  As previously discussed, the account of FE 7 is insufficient to demonstrate that Gentile even received that information prior to his alleged misstatements.  Further, there are no particularized allegations that Campbell furnished anything to Garcia or Gilson before their alleged misstatements.  The court therefore concludes that Campbell's state of mind cannot be relied upon to establish Spirit's scienter for the 737 MAX production rate statements.

Regarding the statements with respect to compliance with the established accounting procedures and the effectiveness of internal controls, the consolidated complaint does allege, based upon FE 9's account, that Campbell understated or underestimated the amount of the Boeing Claims in the EAC process.  Doc. no. 49, ¶ 170; ¶ 304.  The consolidated complaint, however, does not plead particularized facts to demonstrate that Campbell furnished information for inclusion in the false and misleading statements at issue in this case.  Nevertheless, even if the facts were sufficient for the court to conclude that Campbell furnished information for inclusion in those statements, the court finds that the consolidated complaint fails to allege particularized facts supporting a strong inference that Campbell acted with scienter (as opposed to negligence or gross negligence) in furnishing that information.  The factual allegations are insufficient to support that Campbell acted with an intent to deceive, manipulate, or defraud investors or with recklessness when he furnished the information.[23]  According to the consolidated complaint, Campbell engaged in the incorrect accounting "to make himself look better by showing better numbers to the

---

[23] In the consolidated complaint, plaintiffs allege that the timing and circumstances of Campbell's "resignation" support a strong inference of scienter.  Relying upon FE 11, plaintiffs allege that Campbell was terminated and escorted from the premises a week before Garcia and Gilson resigned.  Doc. no. 49, ¶ 314.  Plaintiffs also allege that FE 9's account corroborates the reason for Campbell's termination.  Id., ¶ 315.  However, the court finds FE 11 and FE 9's accounts are not sufficient to establish that Campbell was terminated and the reasons for that termination.  FE 11 and FE 9 left Spirit's employment in the fall of 2019.  Id., ¶ 56, ¶ 171.

Spirit Executive Team on the 737 program."  Doc. no. 49, ¶ 305.  As a result, the court concludes that Campbell's state of mind cannot establish Spirit's liability under Section 10(b).  *See*, Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp., 499 F. Appx. 345 (5th Cir. 2012) ("[T]he most compelling inference was that [the vice president of marketing] acted with the intent to maintain the good appearance of her department rather than to defraud investors by falsely inflating the value of [the company].").  The court therefore concludes that dismissal of the Section 10(b) and Rule 10b-5(b) claims against Spirit is appropriate.

VII.

*Count III – Claims Under Section 10(b) and Rule 10b-5, Subsections (a) and (c)*

In addition to claims under subsection (b) of Rule 10b-5, plaintiffs allege claims under subsections (a) and (c).  These claims are alleged against all defendants. Subsections (a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a) and (c).  While subsection (b) requires a plaintiff to establish that a false or misleading statement was made, subsections (a) and (c) "are not so restricted." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).  To state a claim for a violation of subsections (a) and (c), a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  In re Alstom SA Securities Litigation, 406 F. Supp. 2d 433, 476 (S.D.N.Y. 2005) (citing In re Global Crossing, Ltd. Securities Litigation, 322 F. Supp. 2d 319, 336 (S.D.N.Y 2004)).

Defendants contend that plaintiffs' subsections (a) and (c) claims should be dismissed because those claims are simply a repackaging of their subsection (b) claim because they rely upon defendants' alleged material misrepresentations as the basis for the claims.  Defendants point out that plaintiffs have not identified any

material misrepresentation or sufficiently alleged that they disseminated any material misrepresentation with scienter.  To the extent the claims are based on something besides a material misrepresentation, defendants argue that the claims fail because the only conduct alleged to be deceptive in the consolidated complaint was the purported misrepresentations.  Further, defendants maintain that plaintiffs have failed to plead reliance, an essential element of subsections (a) and (c) claims.  Defendants point out that aside from their alleged misrepresentations, none of their alleged conduct was publicly disclosed.  Therefore, defendants contend that plaintiffs could not have relied upon that non-public conduct.

Plaintiffs respond that they have pled sufficient facts to support liability under subsections (a) and (c).  Initially, they point out that the mere fact certain elements of their claims under subsections (a) and (c) also support a misrepresentation claim under subsection (b) is not grounds for dismissal.  They assert that scheme-liability claims may involve conduct similar to that underlying a subsection (b) claim.  In any event, plaintiffs contend that the consolidated complaint alleges defendants "engaged in a scheme to assure the market that Spirit could provide timely information regarding any changes in production levels for 737 MAX shipsets, and the revenue it could obtain from those sales, to minimize investor concerns relating to the uncertainties of Spirit's revenue stream created by the 737 MAX grounding."  Doc. no. 90, ECF p. 82.  According to plaintiffs, the alleged scheme included multiple actions distinct from the alleged misrepresentations, including "(i) touting its close relationship with Boeing in response to specific questions from analysts to set the expectation in investors that Spirit would immediately be aware of, respond to, and inform investors of any requests for  changes []; (ii) deflecting concerns about the number of 737 MAX shipsets Spirit was storing for Boeing []; and (iii) making no effort to inform investors when Boeing ordered Spirit to cut production in late September or early October 2019[]."  *Id*.  These actions, plaintiffs contend, which

are in furtherance of defendants' scheme are actionable under subsections (a) and (c).  Additionally, plaintiffs contend that they have sufficiently pled reliance upon defendants' scheme.  Plaintiffs maintain that it was the deceptive acts of defendants, rather than a third party, that "mitigated uncertainty in the minds of investors as to Spirit's shipset production and inflated the price for Spirit shares." *Id*.  They assert that the cases cited by defendants in support of their reliance argument are factually distinguishable.

Upon review, the court concludes that the claims under subsections (a) and (c) should be dismissed as to all defendants.  "As with claims under subsection (b) of Rule 10b-5, claims under subsections (a) and (c) are subject to the PSLRA, and, thus, a 'strong inference' of scienter must be pled 'with particularity.'" Takata, 2020 WL 2079375, at *14 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  The court concludes that plaintiffs have failed to allege particularized facts giving rise to a strong inference that any of the defendants acted with scienter when committing the alleged actions.  Even when plaintiffs' allegations are considered collectively, they do not, in the court's view, create a cogent, compelling inference of scienter on the part of the defendants.

## VIII.

### *Count II – Claims Under Section 20(a)*

As discussed, to state a claim under § 20(a) of the Securities Exchange Act, plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person.  Fleming, 264 F.3d at 1270.  Because the consolidated complaint fails to state a primary violation under Section 10(b) and Rule 10b-5, the court concludes that the claims under Section 20(a) against the individual defendants, Gentile, Garcia, Gilson, and Campbell also fail.

IX.

*Request to Amend Complaint*

At the end of their response brief, plaintiffs request the opportunity to amend the consolidated complaint if the court grants any part of defendants' motions.  The court, however, concludes that plaintiffs have failed to adequately request leave to amend their consolidated complaint.  Plaintiffs' "single sentence, lacking a statement for the grounds for amendment and dangling at the end of [their] memorandum, [does] not rise to the level of a motion for leave to amend."  Calderon v. Kan. Dept. of Social & Rehabilitation Services, 181 F.3d 1180, 1186-87 (10th Cir. 1999).  Plaintiffs have not made any effort to indicate how amending the consolidated complaint would cure the deficiencies in their claims, specifically as to the scienter element.  Plaintiffs rely heavily upon confidential witnesses to support their allegations, but do not indicate that the confidential witnesses can provide more information that was not alleged or that there are other confidential witnesses available to support their claims.  Because plaintiffs have failed to adequately request amendment and to support that request and in the absence of any indication that they can cure the deficiencies of their consolidated complaint, specifically as to scienter, the court concludes that the consolidated complaint should be dismissed without leave to amend.

X.

*Conclusion*

Based upon the foregoing, Defendants Spirit AeroSystems Holdings, Inc., Thomas C. Gentile, and Shawn Campbell's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 77), Defendant Jose Garcia's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (doc. no. 78) and Defendant John Gilson's Motion to Dismiss Plaintiffs' Consolidated Class Action

Complaint (doc. no. 79) are **GRANTED**.  Plaintiffs' Consolidated Class Action Complaint (doc. no. 49) is **DISMISSED WITH PREJUDICE**.

The Clerk of Court is **DIRECTED** to file this order and the accompanying judgment in Case Nos. 20-cv-00054-SPF-JFJ, 20-cv-00077-SPF-JFJ, and 20-cv-00117-SPF-JFJ.

IT IS SO ORDERED this 7th day of January, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0054p001.docx